NOURSE & BOWLES, LLP
Attorneys for Defendant
FIVE OCEAN CORPORATION LTD.
One Exchange Plaza
At 55 Broadway
New York, NY 10006-3030
(212) 952-6200


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

GLORY WEALTH SHIPPING SERVICES LTD.,    :
                                        :   08 Civ. 1102(VM)
                    Plaintiff,          :
                                        :   **AFFIDAVIT IN SUPPORT**
            - against -                 :   **OF DEFENDANT'S MOTION FOR**
                                        :   **COUNTERSECURITY, VACATION**
FIVE OCEAN CORPORATION LTD.,            :   **AND/OR REDUCTION IN**
                                        :   **SECURITY AND BARRING**
                    Defendant.          :   **FURTHER ATTACHMENTS OF**
                                        :   **DEFENDANT'S PROPERTY**
                                        :
-------------------------------------------------------------X


STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )


ARMAND M. PARÉ, JR., being duly sworn, states as follows:

1.      Attached as Exhibit "1" is a declaration of Eric Choi, Deputy Manager of

defendant, Five Ocean Corporation Ltd. ("Defendant") made under penalty of perjury in

accordance with 28 U.S. Code § 1746 together with its attached Exhibits A-G.  I understand

from Mr. Choi that it is estimated that the contemplated voyage to Iraq under the Subcharter

Party referred to in his declaration would have taken about 90 days.

2.      Attached as Exhibit "2" is a declaration of D.J. Kim of Seoul Maritime Corporation made under penalty of perjury in accordance with 28 U.S. Code § 1746, together with its attachment.

3.      Attached as Exhibit "3" is a copy of a letter from Plaintiff's attorneys advising of the attachments of $1,069, 366.44 and $61,559.73, for a total of $1,130,926.17 of Defendant's property, so far as is presently known.

4.      Attached as Exhibit "4" is a copy of Plaintiff's Complaint.

5.      Attached as Exhibit "5" is a copy of Defendant's General Appearance, Answer and Counterclaim.

6.      Attached as Exhibit "6" is a copy of a transcript of a Rule E(4)(f) hearing in Pioneer Trading (Asia Pacific) Ltd. v. Seyang Shipping Co. Ltd., 04 Civ. 5655 (DAB).

7.      Attached as Exhibit "7" are discovery requests served on Plaintiff respecting the amounts of its claim and attachment.

_____

ARMAND M. PARÉ, JR.

Sworn to before this
28 day of February, 2008

_____

Notary Public

MARY T. BANNON
Notary Public, State of New York
No. 01BA4785995
Qualified in New York County
Commission Expires February 28, 2010

2

# Exhibit 1

*Exhibit 1*



주 화이브오션
Five Ocean Corporation

7th Fl., Jeong-An B/D, #57-10, Seosomun-Dong,
Chung-Gu, Seoul, Korea (Zip code : 100-814)
TEL : 82-2-3604-2100 (Rep.)
FAX : 82-2-6204-0777
E-mail : operation@ocean.co.kr

Eric Choi states as follows:

1. I am the Deputy G.Manager of Five Ocean Corporation Ltd. ("FOC").

2. Attached as Exhibit A is the first hire statement for the charter of the vessel TE HO with Glory Wealth Shipping Pte. Ltd. ("Glory").

3. Attached as Exhibit B is a copy of the wire transfer showing the transfer of $1,840,900.94 to Glory respecting the first hire payment for the period January 11-27, 2008.

4. Attached as Exhibit C and D is the fixture confirmation and charter with Glory. Under this fixture, the hire was $82,000 per day. FOC, as the charterer, had the option to redeliver the vessel on May 7 and would have done so.

5. Attached as Exhibit E is the fixture confirmation with our subcharterer, Brave Bulk Transport Ltd. ("Brave Bulk"). This fixture also incorportated the terms of Exhibit D. The rate of hire was $85,000 per day and hence FOC would have made a $3,000 per day profit over the hire paid to Glory.

6. Attached as Exhibit F is a our message of January 11, 2008 advising the Master that the vessel was to proceed on a voyage to Iraq via the U.S. Gulf. Glory refused to follow these orders.

7. Attached as Exhibit G is a message from the Master concerning delivery of the vessel.

8. On information and belief, I understand that our subcharterer, Brave Bulk, had some 300 tons of intermediate fuel oil delivered to the vessel. This would have had a value of about $500 per ton or about $150,000.

I declare under penalty of perjury of the laws of the United States that the following is true and correct except for matters stated on information and belief and as to those, I believe them to be true.

Executed: Seoul, Korea
February, 28, 2008

Eric Choi / Deputy Manager

# *Declaration of Eric Choi*
# Exhibit A



# Five Ocean Corporation

7th Floor, JeongAn Bldg, 57-10, Seosomun-dong, Chung-gu Seoul, Korea
Tel: 82-2-364-2100, Fax: 82-2-6234-0777, E-Mail: fo@fiveocean.co.kr

## 1ST H I R E  S T A T E M E N T

| MV/VOYNBR.: | MV. TE HO | | V 0801 | | 14-Jan-08 |
|---|---|---|---|---|---|
| OWNERS: | GLORY WEALTH SHIPPING PTE. LTD. | | | BROKER: | SMC |
| CHARTERERS: | FIVE OCEAN CORPORATION | | | C/P date: | 08-Jan-08 |

|  |  |  |
|---|---|---|
| DAILY HIRE: $ | 82,000.00 | |
| ADD COMM: | 3.75% | DELIVERY: DLOSP LA SPEZIA ATDNSHINC |
| BROKERAGE: | 0.625% | REDELIVERY: DLOSP 1SP AS PER C/P |

**CHARTER PERIOD / COMMISSION:**

| ON HIRE: | | | | | CURRENT |
|---|---|---|---|---|---|
| From: | **Jan-11-08 10:33** Hrs | | To: **Jan-26-08 10:33** Hrs | | **TOTAL** |
| | = 15.000000 Days | | @ | $82,000.00 per day | $1,230,000.00 |

| BALLAST BONUS | | | | |
|---|---|---|---|---|
| Less | ADD COMM | 3.75% | | ($46,125.00) |
| less | BROKERAGE | 0.625% | | ($7,687.50) |

| **BUNKERS:** | | | | | | |
|---|---|---|---|---|---|---|
| BOD | | IFO: MT | 1,190.290 | $ | 500.00 p/MT | $595,145.00 |
| | | MDO: MT | 86.190 | $ | 800.00 p/MT | $68,952.00 |

| **Miscellaneous** | | | |
|---|---|---|---|
| CABLES/VICTUALLING/ENTERTAINMENT | L/S PER MONTH: | **$1,250.00** | $616.44 |

| **TOTAL DUE OWNERS:** | **$1,840,900.94** |
|---|---|

**Banking Details**

| | | |
|---|---|---|
| | Beneficiairy: | **GLORY WEALTH SHIPPING PTE LTD** |
| | Residence | **SINGAPORE** |
| | Country: | **SINGAPORE** |
| | USD A/C No.: | **260-579230-178** |
| | Swift Code: | **HSBCSGSG** |
| | Bankers: | **HSBC, SINGAPORE** |
| | | |
| | Correspondent Bank: | **HSBC BANK USA, NEW YORK** |
| | Swift Code: | **MRMDUS33** |
| | ABA No.: | **021001088** |

For and/on behalf of
FIVE OCEAN CORPORATION

Authorized signature

FIVE OCEAN CORPORATION

A

# *Declaration of Eric Choi*
# Exhibit B



# 외화송금 발신 전문 사본



지점명

일 자 :

| | |
|---|---|
| : 수신은행(TO ) | |
| :20 거 래 번 호 : (SENDER'S REFERENCE) | |
| :32A 일 자 및 송 금 액 (VAL/CUR/AMT) | |
| :50A 보 내 시 는 분 (ORDERING CUSTOMER) | FIVE OCEAN CORPORATION    /7H FL DUNDAN BLDG 57 10 SEOSOMUN-DONG JUNG-GU SEOUL KOREA   ID NUMBER   99910022915 |
| :57A 수취인 거래은행 (ACCOUNT WITH BANK) | HSBCSGSG   (SWIFT BIC) ** ** 전용수취은행 : HK AND SHANGHAI BANKING CORP,S'PORE,JG TTELLS HEX 02-00 OCEAN TOWERS       SINGAPORE 049620 |
| :59A 받 으 실 분 (BENEFICIARY CUSTOMER) | /260 579230 178 GLORY WEALTH SHIPPING PTE LTD |
| :70 송 금 내 역 (REMITTANCE INFORMATION) | MV TEHO 1ST HIRE |
| :71A 결제은행수수료부담자 (DETAILS OF CHARGES) | OUR |
| :72 기 타 지 시 사 항 (SENDER TO RECEIVER INFORMATION) | |

| | | | | | |
|---|---|---|---|---|---|
| 외화금액 | USD | 1,840,900.94 | 순대체금액 | USD | 1,840,900.94 |
| 가산정수) 송금수수료 | KRW | 7,500 | 전신료 | KRW | 8,000 |
| 국외은행수수료 USD | | 18.00 @ 943.30 | | KRW | 16,979 |
| | | | (수수료 합계 | KRW | 32,479) |

현금/외국통화      자기앞/순대체
| | | |
|---|---|---|
| | 32,479 KRW | 32,479 수납 |
| 1,840,900.94 | USD | 1,840,900.94 수납 |

송금료  17,500원 할인

< 임의선정깁 >

※ 동일한 내용으로 송금을 원하시는 경우 이 사본을 제시하시면 보다 신속히 처리됩니다.
  (It would be processed faster if you bring this copy in case the remittance be the same as this time.)

※ 인터넷뱅킹 등록 고객은 인터넷을 통하여 보다 편리하게 동일한 내용으로 송금할 수 있습니다.

www.keb.co.kr



EC-A-FM-035(1/2)[2007. 3. 개정 210×297]

# *Declaration of Eric Choi*
# Exhibit C

*Exhibit C*

**Loretta**

| | |
|---|---|
| **From:** | djkim/seoul maritime [seoul@seoulmaritime.com] |
| **Sent:** | Tuesday, January 08, 2008 2:43 AM |
| **To:** | FOC CHARTERING |
| **Subject:** | MV TE HO / FIVE OCEAN |

```
FROM SEOUL MARITIME CORPORATION / DJKIM
     TEL (822)7304595 FAX (822)7304570 E.MAIL seoul@seoulmaritime.com

TO: FIVE OCEAN COROPORATION
ATTN: MR. BRIAN CHO, PRESIDENT

RE:MV.TE HO/FIVE OCEAN---CLEAN RECAP

MANY THANKS SUPPORT AND PLSD TO CLEAN FIX ASF WITH CP DATED 8TH JAN,2008:

- ALL NEGO AND FINAL FIXTURE TB KEPT TOP P+C

- A/C FIVE OCEAN CORPORATION OF SEOUL, KOREA

- OWNRS - GLORY WEALTH SHIPPING PTE. LTD.

- M/V TE HO
  ---------
  PAN FLAG BLT 2004
  77,834 MT DWT ON 1 4. 122 M SSW
  GRT/NRT 41,372 / 26,094
  LOA/BM  225.0 /32.26 M
  HATCH COVER : 2 PANNEL, SIDE ROLLING TYPE
  7 HO/7HA, 92,151CBM GR CAPA
  H/SIZE : NO.1  17.10 X 13.36M
           NO.2-7 17.00 X 15.03M
  GRAIN CAPA :
  NO.1  12,827 M3
  NO.2  13,531 M3
  NO.3  13,306 M3
  NO.4  13,328 M3
  NO.5  13,364 M3
  NO.6  13,332 M3
  NO.7  12,460 M3
  TOTAL GRAIN CAPACITY : 92,151 M3
  Speed/Cons :
  about 14.0 Kts Laden/about 15.0 Kts Ballast (under good weather
  conditions not exceeding Beaufort wind force 4 / Douglas sea state 3
  and free of any adverse currents.)
  Consumption :
  At sea  - FO (IFO  380 CST) abt 36.5 mt +  DO abt 0.3 mt per day
  In port - idle IFO abt  2.5mt + DO abt 0.3mt per day
            working IFO 3.5mt + MDO 0.3mt per day
  at intermediate climate condition (plus additional DO 0.5MT/day at
  cold climate condition)
  Vessel has liberty of using MDO when manoeuvering in/out of ports,
  navigating in shallow or restricted or busy waters, canals, rivers,
  estuaries and/or in foggy weather and also during hold
  cleaning/ballasting
  operations.
  +AA+

- DELY: DLOSP 1SP ITALY INT LA SPEZIA PIOO ATDNSHINC
```

- LAYCAN: 0001HRS 10TH/2359HRS 18TH JAN 08 (ETA LA SPEZIA 6TH JAN;ETCD 11TH JAN)

- FOR TC PERIOD UPTO MIN/MAX 7TH MAY--6TH JUNE 2007 T/C IN CHTRS OPTN

- REDELY: DLOSP 1SP ADEN-PMO/SPORE-JPN RGE OR SKAW/PASSERO RGE PICO ATDNSHINC

- HIRE : USD82000 DIOT PAYABLE 15 DAYS IN ADVANCE

- 1ST HIRE PLUS VAULE OF BOD PAYABLE W/I 3 BKG DAYS AFT VSLS DELY

- ILOHC USD5,000 L/SUM

- C/E/V USD1,250 PER 30 DAYS OR PRORATA

- L.O.I :
THE CHARTERERS HEREBY STATE THAT THEY WILL INDEMNIFY THE OWNERS IN ACCORDANCE WITH
THE OWNERS P&I CLUB WORDING AGAINST ALL CONSEQUENCES ARISING FROM THE OWNERS
CONFORMING TO THE CHARTERERS REQUEST TO RELEASE CARGO WITHOUT ORIGINAL BILLS OF
LADING.THE CHARTERERS HEREBY SURRENDER A LETTER OF INDEMNITY TO THE OWNERS STRICTLY
CONFORMING WITH THE OWNERS P&I CLUB WORDING WITHOUT BANK GUARANTEE.

- BUNKER CL : BOD QTY ABT 1,200MT IFO + ABT 80-100MT MDO.
             BOR QTY ABT SAME AS ON DELY
             PRICES BENDS USD500/USD800 PMT FOR IFO/MDO RESP.
  OWRS TO BUNKER VSL UPTO ABOVE DEL QUANTITY AT GIB OR LAS PALMAS,
  TIME/COST TO BE FOR OWRS' ACCT. IN CASE CHTRS ALSO SUPPLY BUNKER AT GIB
  OR LAS PALMAS,THEN TIME/COST TO BE SHARED ON PRO-RATA BSS.

-  INCOPERATE BELOW QUESTIONNAIRE IN THE GOVENING C/P

1.    VESSELS COMMUNICATION DETAILS
           435383710
           Telefax No.: 600400395
           Telex No.: 600400396

2.    GRT/NRT
      41,372 / 26,094

3.    H+M VALUE
      USD 39,800,000

4.    NAME OF PANDI CLUB
      Britannia Club

5.    IMO NUMBER
      IS 9290701


6.    VESSELS CLASS
      BV

7.    BANKING DETAILS INCLUDING SWIFT CODE AND IBAN NUMBER

Correspondent Bank:  HSBC Bank USA, New York
                     (SWIFT Address: MRMDUS33)
Beneficiary Bank:    The Hongkong and Shanghai Banking Corp Ltd.
                     HAY WAH BUILDING
                     (SWIFT Address: HSBCHKHHHKH)
Beneficiary:         GLORY WEALTH SHIPPING SERVICE LTD
                     A/C NO.: 110-765245-838


8.    CONFIRM VSL FULLY ISM/ITF/AHL/WWF FITTED
         Yes vsl is fitted

- 5.0PCT TTL IE 3.75PCT ADDCOM+1.25 PCT BROKERAGE TO BROMAR/SMC

- OTHERWISE AS PER OWRS BTB CP (H.OWNERS EXISTING C/P M/V TE HO/KLEIMAR DTD 4/FEB/2005 AS ATTACHED)
  WITH LOGICAL AMENDMENTS EXCEPT FOR:-

- max one(1) shipment of cargo out of petcoke/rock salt/cement including clinker but max 1 cement per annum

- BIMCO STANDARD "BUNKER FUEL SULPHUR CONTENT CL" & "ISPS/MTSA CL" &
  "US CUSTOMS ADVANCE/AMS CL" TO BE INSERTED INTO THE C/P, CONTENT AS BELOW:-

Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel☐ failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

++

ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and ☐he Company?(as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the ☐wner?(as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or ☐he Company? ☐wner?to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners?account, except as otherwise provided in this Charter Party.

3

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

⬜The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners?

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers?account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers?account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners?account.

(d) If either party makes any payment which is for the other party⬜ account according to this Clause, the other party shall indemnify the paying party.

Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn.

++

U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a)  If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)  Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii)  Provide the Owners with a timely confirmation of i) and ii) above; and
iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers?failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)  The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

4

END

감사합니다.

B.RGDS/DJ KIM
MOB (8211)3077119

# *Declaration of Eric Choi*
# Exhibit D




# Time Charter

### GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party,** made and concluded in *LONDON:* ........................ *4th.* day of *February* ........................ 19 20(

2 Between *TA HO MARITIME CORP.* ........................

3 Owners of the good ........................ Steamship/Motorship *"TE HO"* ........................ of ........................

4 of........................ tons gross register, and........................ tons net register, having engines of ........................ indicated horse pov

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed ........................

6 at........................of about........................cubic feet bale capacity, and about........................tons of 3240 lbs.

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capaci

8 allowing a minimum of fifty tons) on a draft of........................feet........................inches on........................ Summer freeboard, inclusive of permanent bunke

9 which are of the capacity of about........................tons of fuel, and capable of steaming, fully laden, under good weat

10 conditions about........................knots on a consumption of about........................tons of best Welsh coal—best grade fuel oil—best grade Diesel—

11 now........................

12 ........................ and *KLEIMAR N.V.* ........................ Charterers of the City of *ANTWERP* ........................

13     **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, f

14 about *Minimum 22 to maximum 15 months Time Charter, exact period in Charterers' option, trading always afloat, always* ........................

15 *within Institute Warranty Limits via safe anchorage(s), safe berth(s), safe port(s), routing in Charterers' option. NAABS. Clause to be applied in ARGENTINA/RIVER PLATE/BRAZIL/URUGUAY within below mentioned trading limits.*

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible f

17 the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligation hereunder.*

18 Vessel to be placed at the disposal of the Charterers, at *on dropping last outward Sea Pilot one safe port TAIWAN, port in Owner*

19 *option (intention HOPING) at any time day or night, Sundays and Holidays included* ........................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6),

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel's *holds* on her delivery *or late: on arrival at first loading port after delivery* to be

22 *ready to receive cargo* with clean-swept, *dried, free of rust, loose rust flakes/scales, fit and safe for the reception, carriage an preservation of any permissible cargo* holds and tight, staunch, strong and in every way fitted for the service, *and so maintained by the Owner throughout the currency of this Charter Party,* having water ballast, *and with sufficient power to operate all hatches and* winche *simultaneously,* and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the sam

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchar

25 dise, including petroleum or its products, in proper containers, excluding – *See Clause 30.*

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British Nort

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/c

29 Mexico, and/or South America *and places within British Institute Warranty Limits and war risk trading warranties (see also Claus. 31)* and/or Europe

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence betwee

31 October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic

32 ........................

33 ........................

34 ........................

35 as the Charterers or their Agents shall direct, on the following conditions:

36     1. That the Owners shall provide and pay for all provisions, wages and *charges for port services pertaining to crew and the Owners business including immigration, fines, garbage charge,* consular shipping and discharging fees of the Crew; shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, *lub oil and fresh water (excluding additional fresh water for holds cleaning when vessel's own stock insufficient)* including boiler water and maintain her class and keq

38 the vessel in a thoroughly efficient state in hull, *cargo spaces,* machinery and equipment for and during the service. *However, after delivery, vessel i: under Charterers' full disposal, in case marine growth on hull due to long staying at a anchorage/port ordered by Charterer: under this Charter, Charterers should be responsible for hull cleaning at Charterers' time/account and Owners are no. responsible for vessel's under performance arising therefrom before hull cleaning.*

39     2. That the Charterers, *whilst the vessel is on hire,* shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsor)* Pilotages, *Boatage on Charterers' business,* Agencies, Commissions,

40 Consular Charges (except those pertaining to *individual crew members or flag of the vessel* the Crew), and all other usual expenses except those befor stated, but when the vessel puts into

41 a port for causes for which vessel *and/or Owners/Master/Crew* is responsible, then all such expenses incurred shall be paid by the Owners. Fumigation





ordered because of

42 illness of the crew to be for Owners account *and time*. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under t

43 charter to be for Charterers account *and time*. All other fumigations to be for Charterers account after vessel has been on charter for a continuous peri

44 of six months or more.

45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, 1

46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boa

47 for dunnage, they making good any damage thereto.

48 3. That the Charterers, at the port *point* of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel *and diesel* ו

remaining on

. 49 board the vessel *according to prices and quantities as per Clause 33.* at the current prices in the respective ports, the vessel to be delivered with ו

less than..........................................................................................................................................................................

50 ...........................................tons and to be delivered with not less than.................................................tons and not more than........................ten

51 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *(as per Clause 32)*.....................................................

52 .................................................................... United States Currency per *day* ton on vessel's total deadweight carrying capacity, including bunkers,

53 stores, on ...............................................summer freeboard, per Calendar Month, commencing on and from the *time of the* day of her delivery, as aforesaid, and

54 and after the same rate for any part of a *day* month; hire to continue until the *time* hour of the day of her re-delivery in like good order and condition, ordina

55 wear and tear excepted, to the Owners (unless lost) at *on dropping last outward Sea Pilot, one safe port, SINGAPORE/JAPAN includi*

56 PEOPLE'S REPUBLIC OF CHINA/SOUTH KOREA/PHILIPPINE ISLANDS/MALAYSIA,

*In Charterers' option:*
*On dropping last outward Sea Pilot, one safe port, SKAW/PASSERO RANGE*
*Or in Charterers' option:*
*Passing SKAW/PASSERO WESTBOUND*
*Or in Charterers' option:*
*On dropping last outward Sea Pilot, one safe port, BOSTON/BUENOS AIRES RANGE*
*Or in Charterers' option:*
*On dropping last outward Sea Pilot, one safe port, ADEN/SINGAPORE excluding ARABIAN GULF which case PASSING*
*MUSCAT OUTBOUND*
*At any time, day or night, Sundays and Holidays included.*
*Port in Charterers' option,* unless otherwise mutually agreed. Charterers are to give Owners *declaration of redelivery range 30 days pric*
*estimated redelivery,* not less than................days. *Then Charterers to issue 30/20/15/10 days approximate and 5/3/1 day(s) definit*
*redelivery*

57 notice *to Owners.* of vessel's expected date of re-delivery, and probable port.

58 5. Payment of said hire to be made in New York in cash in United States Currency, *15 days* semi-monthly in advance, and for the last half month ע

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it become

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of th

61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Cha

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *But subject to the notification procedure as pe*

*Clause 32.* Time to count from 7 a.m. on the working day

63 following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, the

64 to have the privilege of using vessel at once, such time used to count as hire.

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subje

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the applicatio

67 of such advances. *In the event that the Master requests delivery of cash money at the vessel, all risks and expenses involved ו*

*arranging and making such delivery of cash money to the vessel shall be borne by the Owners.*

68 6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf *or anchorage* or place that Charterers or their Agents ma

69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safel

70 lie aground *(as per Clause 77).*

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably *and safely* stow and carry), als

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew

73 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers

74 paying Owners................................................per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses ו

75 incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense *No cargo on deck.*

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision *and responsibility* of the Captain, who i

to sign Bills of Lading for

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts *(see also Clause 65).*

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall or

81 receiving particulars of the complaint, investigate the same, and, if *requested by Charterers* necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of $15.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per mea, *as per Clause 60,* for all such victualling.

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct *deck and engine* Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the

Char-



88  terers, their Agents or Supercargo, when required, with a true *and free copy in English* of such daily *Deck and Engine* Logs, showing the course of
    vessel and distance run and the con-
89  sumption of fuel *etc. as per Charterers' form.*
90      12.  That the Captain shall use diligence in caring for the ventilation of the cargo.
91  ~~13.  That the Charterers shall have the option of continuing this charter for a further period of~~..........................................................................
92  ..................................................................................................................................................................................................
93  ~~on giving written notice thereof to the Owners or their Agents~~ ...........................~~days previous to the expiration of the first named term, or any declared op~~
94      14.  That if required by Charterers, time not to commence before *(see Clause 74).*............................................................................. and should ve
95  not have given written notice of readiness on or before *(see Clause 74).*..........................................................................~~not later than 4 p.m.~~ Charterer
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.  *Voyage order(s) given do not wa.*
    *Charterers' option of cancelling.*
97      15.  That in the event of the loss of time from deficiency *and/or default by men including strikes, sabotage of Officer and cr*
    *whether due to labour disputes or otherwise,* or deficiency of ~~men or~~ stores, fire, breakdown or damages to hull, machinery or equipm
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other ca
99  *whatsoever* preventing the full working of the vessel, the payment of hire *and overtime, if any,* shall cease for the time thereby lost *until the ves.*
    *has returned to equivalent position and all extra expenses sustained by the aforementioned causes to be for Owners' accou*
    *and shall be deductible from the hire;* and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequent
101 thereof, and all extra expenses shall be deducted from the hire.  *Any stevedore and/or labour charges for breakdown of vessel's equipment n*
    *caused by Charterers to be for Owners' account.*
102     16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall
103 returned to the Charterers at once.  The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Se
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for i
106 purpose of saving life and property.
107     17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred *arbitraton in London.  English La*
    *to apply.* ~~to three persons at New York,~~
108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and t~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~ *(See Clause 6*
110     18.  That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-Time Charter hire* for any amounts due under this Chart
    including General Aver-
111 age contributions, and the Charterers to have a lien on the *Ship* for all monies paid in advance and not earned, and any overpaid hire or exce
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, whi
113 might have priority over the title and interest of the owners in the vessel.
114     19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses a
115 Crew's proportion. General Average shall be adjusted, ~~stated and settled,~~ according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F~~
116 York-Antwerp Rules 1974 as amended 1990 ~~1924,~~ at London, English Law to apply, but *Owners respecting Charterers' sub-contra*
    *stipulation as long as confined to recognised place of adjustment.* ~~Such port or place in the United States as may be selected by the carrier, a~~
    ~~as to matters not provided for by these~~
117 ~~Rules, according to the laws and usages at the port of New York.~~ In such adjustment disbursements in foreign currencies shall be exchanged in
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement -
120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carri
121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall,
122 required, be made by the goods, shippers, consignees or owners of the goods before delivery. Such deposit shall, at the option of tt
123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at th
124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid i
125 United States money.  *The word "Carrier" in this Clause refers to the Owners of the vessel.  Time Charter hire shall not contribut*
    *to General Average.*
126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage, resulting from any cause whatsoev~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, tt~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifice~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of th~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship c~~
131 ~~ships belonged to strangers.~~
132     Provisions as to General Average in accordance with the above *as well as the New Jason Clause attached* are to be included in all bills of ladin
    issued hereunder.
133     20.  Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as quantity, and th
134 cost of *bunkers consumed to be calculated at same price as last bunkering against supporting vouchers* replacing same, to be *fo.*
    *Owners' account.* ~~allowed by Owners.~~
135     21.  ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~  *(See Clause 38.*
138 ..................................................................................................................................................................................................
139 ..................................................................................................................................................................................................
140     22.  ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear fo~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *sufficient lights and powe*
    *simultaneously work in all holds and deck free of charge to Charterers if required* ~~lanterns and oil~~ for

143 night work, and vessel to give use of electric light when so fitted, any additional lights over those on board to be at Charterers' expense. 1
144 Charterers to have the use of any gear on board the vessel.

145    23.  Vessel to work night and day *and on Sundays and holidays*, if required by Charterers, ~~and all winches to be at Charterers' disposal during~~
146 ~~loading and discharging;~~
147 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
148 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
149 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches,~~
150 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
~~thereby.~~

151    24.  It is also mutually agreed that this Charter is subject to ~~all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to~~ the following clauses, be
154 of which are to be included in all bills of lading issued hereunder:

155    U. S. A. Clause Paramount *(see also Clause 72)*
156    This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved Ap
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of ladin
159 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160    New Both-to-Blame Collision Clause *as attached*
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or h~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~

167    25.  The vessel shall not be required to enter any ice-bound port, or any port *or place* where lights or light-ships have been or are about to be with
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter th
169 port or to get out after having completed loading or discharging.

170    26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for th
171 navigation of the vessel, *acts of pilots and tugs, cargo claims that are Owners responsibility*, insurance, crew, and all other *similar* matters
same as when trading for their own account.

172    27.  A commission of ~~2 1/2~~ *1.25* per cent is payable by the Vessel and Owners *each to H. CLARKSON & CO. LIMITED, LONDON an*
173 *M.I.T. CHARTERING* ...................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175    28.  An address commission of 2 1/2 per cent payable to *Charterers*.................................. on the hire earned and paid under this Charter.

*Clauses 29 through 99 are fully incorporated in this Charter Party.*


TA-HO MARITIME CORPORATION

Joseph Wu
President

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.





RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON:   4TH FEBRUARY 2005

Clause 29 – Outline Specification

**M.V. "TE HO"**

| | | |
|---|---|---|
| Flag | : | Panamanian |
| Built | : | 2004 |
| DWT | : | 77,834 metric tons on 14.122 metres Summer Salt Water |
| GRT / NRT | : | 41,372 / 26,094 |
| LOA / Beam | : | 225.0 / 32.26 metres |
| Hatch Covers | : | 2 Pannel, Side Rolling Type |
| Holds / Hatches | : | 7 / 7 |

| | | |
|---|---|---|
| Grain Capacity | : | 92,151 cubic metres |

| | | | |
|---|---|---|---|
| Hatch Sizes | : | No: 1 | 17.10 x 13.36 metres |
| | | No: 2 – 7 | 17.00 x 15.03 metres |

| | | | |
|---|---|---|---|
| Grain Breakdown | : | No: 1 | 12,827 M3 |
| | | No: 2 | 13,531 M3 |
| | | No: 3 | 13,306 M3 |
| | | No: 4 | 13,328 M3 |
| | | No: 5 | 13,364 M3 |
| | | No: 6 | 13,332 M3 |
| | | No: 7 | 12,460 M3 |
| Total Grain Capacity | | | 92,151 M3 |

Speed / Consumption :

About 14.0 knots Laden / about 15.0 knots Ballast (under good weather conditions not exceeding Beaufort wind force 4 / Douglas Sea State 3 and free of any adverse currents).

Consumption :

| | | |
|---|---|---|
| At sea | : | FO (IFO 380 CST) about 36.5 metric tons + DO about 0.3 metric tons per day |
| In port | : | Idle - IFO about 2.5 metric tons + DO about 0.3 metric tons per day |
| | | Working – IFO 3.5 metric tons + MDO 0.3 metric tons per day at intermediate climate condition (plus additional DO 0.5 metric tons/day at cold climate condition) |





ORIGINAL

RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON: 4ᵀᴴ FEBRUARY 2005

Vessel has liberty of using MDO when maneuvering in/out of ports, navigating in shallow or restricted or busy waters, canals, rivers, estuaries and/or in foggy weather and also during hold cleaning/ballasting operations.

**All details "about"**

- Questionnaire as attached.

- Vessel to be a gearless/singledeck/self-trimming bulk carrier: Yes

- Vessel has clear and unobstructed holds for the loading and discharging of all bulk cargoes allowed under this Charter Party: Yes

- Vessel to be suitable for grab/bulldozer discharging which always to be within permissible tank-top strength: Yes

- Vessel is fitted ITF/WWF/AHL in order: Yes

- Owners warrant that the vessel is suitable for alternative hold loading for heavy cargoes: Yes

- Owners warrant that the vessel has a valid certificate of financial responsibility (water pollution) issued by USCG during this charter period which should apply OPA 90: Yes

- Owners guarantee that the vessel is in no ways directly or indirectly controlled by Yugoslav (Serbian/Montenegro) interests irrespective of flag/registry of the vessel and that there are no Yugoslav Master/Officers/Crew prohibited during this charter period: Yes

- Owners to guarantee that the vessel never call at Russian-Pacific ports since vessel's built: Yes

- Vessel's Hull and Machinery value: U.S.$ 39,800,000

-AA-

**Clause 30 – Cargo Exclusions**

All cargo is to be carried as per the IMO regulation in respect of carriage of cargo.

The vessel is employed in carrying lawful merchandises excluding:
acids, ammonium nitrate, ammonium sulphate nitrate, aluminum ferrosilicon, aluminum nitrate, arms, ammunition, asbestos, asphalt, bitumen or any of its products, borax in bulk, barium nitrate, calcium carbide, calcium oxide bone chipped, calcium chloride, caustic soda cements, cotton, calcium hydrochlorate, charcoal, car and motor vehicles, Chilean nitrate, chemical products, creosote goods, dangerous chemicals,




**RIDER CLAUSES TO M.V. "TE HO"**
**CHARTER PARTY DATED LONDON: 4ᵀᴴ FEBRUARY 2005**

concentrates, direct reduced iron ore, direct reduced iron ore pellets, fishmeal, heavy lifts with weight exceeding vessel's strength, hypochloride, hot briquetted iron (H.B.I.), meat bone meal, motor blocks and metal turnings/shavings/borings, motor spirits, naphtha, fines, mobile homes, resin in bulk, turpentine, granite, seedcakes, oilcakes, quicklime, pond coal, pyrites, sulphur, iron swarf, steel swarf, iron oxide, iron sponge, ferrosilicon, potassium nitrate, sodium nitrate, ammonium nitrate fertilizer listed in IMO BC code appendix C to be allowed, magnesium, magnesium sulphate, lead nitrate, fishmeal and fish scrap castor beans, ferrous metal, steel products, livestock of any description, explosives, pitch in bulk/drums, black power, dynamite, TNT, nuclear isotopes, nuclear cargo, naphta, tar, radioactive cargo/waste/materials or its products, sodium, TNT, waste/materials or its products, salt of any kind, salt petre, shavings, any goods of dangerous, injurious or flammable or corrosive nature, sunflower seed expellers, turnings, motor spirits and waste scrap, logs of any kind, petroleum and it's products, hides of any kind, war/warlike materials, zinc ashes, copra and it's products, always excluding IMO class nos. 1 through 7. Any additional premium required for carrying IMO classed cargoes to be for Charterers account.

MAX THREE(3) SHIPMENTS OF CARGO OUT OF PETCOKE/ROCK SALT/CEMENT INCLUDE CLINKER BUT MAX 1 CEMENT PER ANNUM

PETCOKE MENTIONED HEREIN IS ONLY LIMITED TO THE TYPE OF NON-HAZARDOUS/NON DANGEROUS GREEN DELAYED TYPE AND/OR CALCINED TYPE.

ABOVE CARGOES NOT TO BE LOADED AS CONSECUTIVE SHIPMENTS AND NOT TO BE LAST TWO CARGO BEFORE REDELY. INTERMEDIATE HOLD CLEANING FOR THESE 3 CARGOES TO BE USD6,000.00 PER VOYAGE.

CONCENTRATES EXCLUDED HOWEVER IRON ORE CONCENTRATES TO BE ALLOWED.

C̲E̲M̲E̲N̲T̲ ̲H̲O̲L̲E̲S̲ ̲C̲U̲T̲T̲I̲N̲G̲ ̲C̲L̲A̲U̲S̲E̲:

Charterers have option to burn holes on hatches so as facilitate loading operation at the loading port. Such burning should be done at Charterers' time and expenses.




RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON:    4TH FEBRUARY 2005

Then such holes to be rewelded before sailing from loading port at Charterers' time and expenses with Master's and class surveyors' satisfaction and all class survey fee to be for Charterers account.

All cargoes to be loaded and carried as per IMO/U.S. Coast guard or similar authorities regulations include SOLAS, dept of trade recommendations also to apply.

Before loading rock salt, vessel's holds are to be lime washed or hold block and lime to be introduced into the bilge openings to Master's/shippers' representatives satisfaction in Charterers' time and for Charterers' account. Charterers may arrange with master for crew to carry out lime washing or holdblock in which case crew to render utmost assistance as per instructions from Charterers, but without owners' responsibility for the result. Charterers to pay lump sum U.S.$500.00 per hold for lime washing or hold block bonus apart from hold cleaning bonus as agreed as well as cost of lime and extra material required to be for Charterers' account.

Alternatively Charterers may arrange the job to be done by shore labour under Master's supervision.

Decoating/cleaning after cement/salt cargo always to be done by shore labour at Charterers' time/account.

If petcoke/cement clinker is loaded, crew will assist to clean holds if time and regulations permit before loading, but owners are not responsible for failure of vessel to pass hold survey, unless due to loose rust or rust scaling.

After discharge petcoke any time used and equipments, chemical and facilities (e.g. barge) used for hold cleaning and/or for collecting washing/bilges oily water to be for Charterers' account.

PIG IRON PROTECTING CLAUSE:

A)   Charterers undertake to use holds as few as possible, provided vessel stability and strength permitting and not to be the last two cargoes.

B)   Charterers undertake that loading of first layer of pig iron to be released as lower as possible to close to tanktop and not to be dumped/dropped during loading, so as to provide a cushion flooring for the balance of cargo under the master's supervision and his reasonable satisfaction.

C)   Charterers undertake to supply on board, at their expense, dunnage and/or other materials which master reasonably considers necessary to provide safe protection from damage by loading pig iron.

D)   If any dispute arised between Charterers/Master, an independent surveyor should be appointed jointly by Owners/Charterers and his decision should be final.

PAGE: 4





**RIDER CLAUSES TO M.V. "TE HO"**
**CHARTER PARTY DATED LONDON: 4ᵀᴴ FEBRUARY 2005**

E) In case during en route from loading to discharging port, cargo was found to shift which may affect the seaworthiness or safety of the vessel, Owners have the right to call at nearest port for necessary cargo trim, all time/expenses incurred to be for Charterers' account and vessel to remain on hire for period. Unless such shifting can be proved direct derived from Master's/Officers' incorrect stowage/loading.

### Clause 31 — Trading Limit

Trading always afloat, always via safe berth(s), safe port(s), safe anchorage(s) always within Institute Warranties Limits excluding: any form of ice, Cuba, Haiti, Lebanon, Israel, Iraq (excluded U. N proved cargo), Jordan, Yemen, Sudan, Namibia, Libya (including Gulf of Sidre/Sirte), Kampuchea, Laos, Syria, Albania, Liberia, Former Yugoslavia Except Koper, Plomin, Bakar and Rijeka which allowed (federal republic of (Serbia + Montenegrin)), Angola (including Cabinda), Madagascar, Zaire, Ethiopia, Somalia, North Korea, Cambodia, CIS/Pacific Coast of Russia, Orinoco River, excluding Boca Grande, Cyprus, Nigeria, Sri-Lanka, Sierra Leone, war or war-like zones as well as those places from time to time prohibited by the United Nations and/or excluded by the vessel's flag state authorities.

Vessel not to be ordered to/from Taiwan directly after or prior calling the People's Republic of China unless this restriction is lifted by the proper authorities in Taiwan and P.R.C.

In any event vessels not to force ice or follow ice breakers.

Vessel is not allowed to trade to the ports/areas, which are prohibited from trading by the United Nations.

If the war/warlike zone have been declared by vessel's underwriters and/or P and I Club after cargo has already been loaded on board, subsequently, the war risk exclusion clause of Owners' P and I Club to apply and Charterers are fully responsible to pay for all additional war risk premium as required by vessel's underwriters and/or P and I Club with all risk/consequences to be for Charterers account.

The vessel is not be ordered to Arabian Gulf if general hostile actions exist or are seriously threatened as defined by Lloyds of London.

Charterers have the option to break Institute Warranty Limits subject Owners prior consent which not be unreasonably withheld with their paying of extra insurance premium against proper invoices (not above Lloyd tariff) but always excluding St. Lawrence during 20/Dec ~ 30/April.

NAABSA Clause to be applied in Argentina/River Plate/Brazil/Uruguay.




ORIGINAL

RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON:   4TH FEBRUARY 2005

### Clause 32 – Hire & Hire Payments

U.S.$ 31,750.00 per day or pro rata including overtime.   Hire shall be calculated basis G.M.T.   First hire plus actual bunkers quantity on delivery shall be settled within three (3) banking days after vessel's delivery.   Hire shall be settled every 15 days in advance.

Hire to be paid to Owners' bank account as follows:

| | | |
|---|---|---|
| Beneficiary Name | : | Ta-Ho Maritime Corporation, Taipei, Taiwan |
| Beneficiary Account | : | 00753047518 |
| A/C with Bank (Beneficiary's Bank): | | The International Commercial Bank of China, HOFD, Taipei, Taiwan |
| Swift Code | : | ICBCTWTP |
| Corresponding Bank | : | The International Commercial Bank of China, New York Agency, N.Y. |
| USD | : | ICBCUS33 |

Referring to lines 60 and 62:   In default of prompt payment of the hire, or bank guarantee or deposit, or on any breach of this charter, the Owners shall notify the Charterers, whereupon Charterers shall rectify matters within three banking days of receipt of notification from Owners, failing which Owners shall have the right to withdraw the vessel from the service of Charterers, without prejudice to any claim Owners may otherwise have on Charterers under this charter.

<u>DEDUCTIONS FROM HIRE:</u>

Charterers have the option to deduct an address commission from the hire.   Charterers have the right to withhold from charter hire during the period of this charter such amounts due to them for off-hire and Owners' disbursements.   Deductions to be properly supported by relevant documents.   Charterers further have the right to withhold from last sufficient hire payment(s) estimated Owners' advances and disbursements, including any fines and other amounts which are for Owners' account, and also the value of redelivery bunkers. If amount justified to be deducted exceeds value of 15 days hire, then from last two semimonthly payments to apply.   Final settlement to be made soonest possible after redelivery.

### Clause 33 – Bunkers on Delivery/Redelivery

Bunkers quantities on delivery about 1200 metric tons for IFO and
about 70 metric tons for MDO

Bunkers on redelivery to be about same quantity as bunkers on delivery.





RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON: 4TH FEBRUARY 2005

Bunker prices both ends:      U.S.$ 210.00 per metric ton IFO
                            U.S.$ 390.00 per metric ton MDO

Charterers to add the cost of bunkers to first hire payment and Charterers have the right to deduct cost of bunkers from last sufficient hire statement.

Charterers/Owners to have the privilege to bunker the vessel prior to delivery/redelivery respectively provided same does not interfere with discharging operations.

## Clause 34

Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates and approvals enabling the vessel and her crew to carry the cargoes and trade within the trading limits allowed throughout this Charter Party.

Owners warrant that at the date of delivery and throughout the currency of this charter vessel shall be of the description set out in lines 3 through 10 and Clause 29 and undertake that whenever her hull, machinery, and/or equipment is not thoroughly efficient, they will immediately take all necessary steps to put her condition right again. All the cost/expenses/time to be for Owners' account.

## Clause 35 – On/Off-Hire Survey

Joint bunkers and condition on-hire survey to be held on delivery or at first loading port in Owners' time by an independent sworn surveyor for both parties to be mutually agreed. Joint bunkers and condition off-hire survey to be held on redelivery in Charterers' time by an independent sworn surveyor for both parties to be mutually agreed. The expenses for both parties to be equally shared.

## Clause 36 – Off-Hire: Duration of Charter Party

Charterers to have the option of adding any or all time the vessel is 'off-hire' to the maximum charter period. Such declaration to be made *two (2) months* prior to first notice of redelivery.

Should vessel be off-hire for a continuous period of more than 45 days, Charterers have the option of cancelling the charter.

## Clause 37 – Lay-Up Clause

Charters to have the privilege of ordering the vessel to be laid up at any time during the period of this Charter Party at a safe berth or place and in such a manner as mutually agreed upon and acceptable to the vessel's Hull Underwriters. At the request




ORIGINAL

### RIDER CLAUSES TO M.V. "TE HO"
### CHARTER PARTY DATED LONDON:   4TH FEBRUARY 2005

of Charterers and on their indicating likely lay up position and duration, Owners shall at any time provide an estimate of the economies which may be possible in the event of the laying up of the vessel. Such estimate shall not however be binding upon Owners. In the event of such laying up, Owners shall take steps to effect all reasonable economies in operating costs including signing off of crew, reduction in the scope of insurance cover (but not on insured values) etc. and to give prompt credit to Charters in respect of all such economies in the form of a reduction in the hire payable, but only to the extent of the financial savings to Owners (which shall be substantiated to Charters by a written statement by Owners) as may be actually achieved. Hire shall continue to be paid throughout the period of lay up. All costs and extra costs for putting the vessel in a lay up position and condition, during lay up and on reactivation to be in Charterers' time and at their expense, such extra costs to include, but not limited to cost of crew repatriation, indemnities payable to the crew, cost of crew re-joining, drydocking and repainting the vessel's underwater parts etc. Charterers to give sufficient notice (i.e. not less than 30 days) of their intention to lay up the vessel and sufficient notice (i.e. not less than 30 days) of their intention to reactivate her. Owners shall try, but without any responsibility on their part, to make necessary arrangements for decommissioning and recommissioning within the 30 days period. In the event that the vessel is in laid up condition 45 days before the expiration of this charter, Owners have the option in Charterers' time and at Charterers' expense to reactivate/recommission the vessel or debit Charterers with the estimated cost and time involved.

### Clause 38 – Drydocking

The Owners shall have the option to place the vessel in drydock during the currency of this charter at a mutual convenient time and place for regular maintenance, for bottom painting and/or repairs as required. The Owners, unless in case of an emergency, are to give the Charterers not less than 5 months prior notice of approximate date and place of dry docking and further 3 months prior intended date.

Charterers to be followed Owner's desired drydock place and schedule.

### Clause 39 – Interclub Clause

Owners agree that liability for cargo claims, as between Owners and Charterers, shall be settled in accordance with NYPE Interclub agreement 1996 and any subsequent amendments thereto.

The party having paid the claim shall submit same to the other party with supporting documents as soon as possible. Neither party shall between themselves refer to the one year time limit as a defence.





RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON:   4ᵀᴴ FEBRUARY 2005

### Clause 40

Deleted.

### Clause 41 – Double Banking Clause

Charterers have the privilege to double bank the vessel, i.e. may order the vessel alongside other vessels (or vice versa) for loading and/or discharging and/or bunkering, double banking always to be solely at Master's discretion as regards safety of the crew, vessel and cargo and Master/crew to give every facility/co-operation in line with normal shipping practice.   Master also has the right at any time to order vessel to sail if he considers it unsafe for vessel to remain double-banked.

In case additional fenders are required for double-banking, same to be provided and paid for by Charterers.   If the Master reasonably decides to suspend or cease operation due to safety as above vessel is not to be placed off-hire.

### Clause 42 – Stevedore Damage

Stevedores to be appointed and paid by the Charterers/Shippers/Receiver but to work under the supervision of the Master, should any damage be caused to the vessel or her fittings by the stevedore, the Master has to try to let stevedores repair such damage and try to settle the matter directly with them at the first stage. If the damage cannot be repaired by stevedores or stevedores refuse to repair the same, Master has to endeavour to obtain written acknowledgment of the damage liability from stevedores.   In case of any stevedore damage can not be direct settled between Owners and parties should responsible for then Charterers should be final responsible for alleged stevedore damage.

Master is required to inform Charterers within 36 hours when stevedore damage incurred otherwise Charterers is not responsible for such stevedore damages.

All damages, which are to be repaired by Charterers and which do not refer to fair wear and tear or which are recoverable from third parties and do not affect the ship's seaworthiness or working capacity, to remain for occasional repairs or when the ship is to dock for Owners' account during or after this charter so that the Charterers pay the actual cost of repairs but not for the time used, provided time occupied in repairing stevedores' damages does not exceed time necessary for Owners to carry out their own works/repairs.

### Clause 43 – War Risk Insurance and Crew War Bonus

Basic insurance premium for annual war risk insurance on hull and machinery to be for Owners account.

*PAGE: 9*





RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON:   4TH FEBRUARY 2005

Any additional premium net of all rebates in respect of war risk arising from the vessel proceeding and trading at the Charterers request to areas designated as excluded areas by vessel's war risk underwriter to be for Charterers account but not exceeding the Lloyds scale.   Crew war bonus for trading to restricted areas payable by Owners under the relevant crew contract, always to be for Charterers account.

Any blocking/trapping/detention insurance to be for Charterers account.

## Clause 44 – Holds Condition

Vessels hold latest on arrival first loading port after delivery to be clean swept/dried, free of rust, loose rust flakes/scales and in every way ready and suitable to load Charterers intended cargo(es).   If the vessel is rejected at loading port by Charterers/Shippers surveyors, vessel to be off-hired until all holds to be accepted by them and all extra expenses directly caused thereby to be borne by Owners.

The vessel is to be redelivered with her holds in like condition as on delivery. Charterers have the option to redeliver the vessel unclean as left by stevedores against paying U.S.$ 5,000.00 lump sum in lieu of hold cleaning.

## Clause 45 – Cleaning Enroute

Intermediate hold cleaning U.S.$ 400.00 per hold for sweeping only and U.S.$600.00 per hold for sweeping and washing down.   In case of petcoke/rock salt/cement including clinker: U.S.$6,000.00 lump sum.

Owners not to responsible for not passing the hold condition survey at the loading port if the hold cleaning is performed by the vessel.

## Clause 46 – War Cancellation Clause

If war or actual hostilities break out between any of the following countries:   U.S.A., C.I.S., U.K., France, Germany, Denmark, Japan, China and Belgium, both Charterers and owners have the option to cancel this charter.   It is understood that war or actual hostilities means direct war or hostilities between these nations and does not include local hostilities or civil war where any of the above countries support opposing sides. Charterers and Owners shall not unreasonably take advantage of this Clause in case of a limited local conflict.

## Clause 47 – Stability and Trimming

It is understood that no cargo need to be carried in deeptanks in order to ensure vessel's stability, trim or seaworthiness.   Owners guarantee vessel has sufficient




RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON:  4TH FEBRUARY 2005

stability and safe trim when trading homogeneously loaded to full capacity and deadweight capacity.

Vessel is a self-trimming bulk carrier.  No additional trimming is required to fill all holds up with coal, ore, grain, phosphate or similar bulk cargoes.

### Clause 48

Freshwater consumed under this Charter Party by stevedores and/or for the purpose of hold cleaning and/or for Charterers business in excess of vessel's fresh water generating capacity shall be for Charterers account.

### Clause 49 – Notice of Delivery

Owners to give delivery notice on fully fixing and 15/10/7/5/3/2/1 day(s) prior delivery.

### Clause 50 – Deviation

A)  Should the vessel be put into any port other than those instructed by the Charterers by reason of accident or breakdown or for the purpose of landing any injured or sick officer, the Master or members of the crew, the port charges, pilotages, bunker consumption and other expenses, including loss of time, shall be borne by Owners, also should the vessel be put back whilst on voyage by any of the above mentioned reasons, the hire shall be suspended from the time of her putting back until she is again in the same or equidistant position and the voyage resumed therefrom.

B)  Vessel has liberty to deviate for the purpose of saving life and/or property and to tow and assist vessels in distress.  Such operation not to be deemed to be a diversion under this Charter Party, but all salvage contribution thus payable to vessel to be equally divided with Charterers after proper deduction of expenses, if any (including Captain and crew's share), incurred in this respect.

### Clause 51 – Boycott and Arrest of Vessel

Should the vessel be arrested during the currency of this Charter Party at the suit of any person having or purporting to have claim against or any interest in the vessel, hire under this Charter party shall not be payable in respect of any period whilst the vessel is under arrest, provided under the terms of this Charter Party such claims are not Charterers' liability.  In the event of the vessel being subjected to boycott, being delayed or rendered inoperative by strikes, blacklisting, labour stoppages or any other difficulties arising from vessel's flag, ownership, crew or terms of employment of crew of chartered

*PAGE: 11*





RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON:    4TH FEBRUARY 2005

vessel or any other vessel under the same ownership, operation or control, such time lost is to be considered as off-hire and all expenses incurred thereby, including fuel/diesel consumed during such periods, to be for Owners' account.

### Clause 52 – I.T.F.

Officers and crew to be employed under an agreement recognised by the I.T.F. and all time lost/expenses incurred as a result of an action taken by the I.T.F. or any of it's affiliated unions against the vessel or Owners to be for Owners' account and vessel to be considered off-hire.

### Clause 53 - Quarantine

The vessel to be in possession of necessary certificates to comply with safety and health regulations and all current requirements at all ports of call under this Charter Party. Normal quarantine time and expenses to enter ports to be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness etc. of the vessel's Master, officers and crew to be for Owners' account, as long as the vessel remains within her trading limits under the present Charter Party.

### Clause 54 - Smuggling

Charterers to be responsible for any fines whatsoever imposed in the event of smuggling by Charterers' employees, but Owners to be responsible for any such acts of their own officers and/or crew. Charterers to remain responsible for detention of the vessel due to smuggling committed by Charterers' employees only.

### Clause 55 – Crew Onboard

At loading and discharging port(s) any time lost by the vessel for the reason of not all the crew being onboard when the vessel is ready to sail to be for Owners' account, as well as expenses deriving therefrom.

### Clause 56 - Overtime

Officers' and crew's overtime, as included in vessel's hire, to include but not limit to amongst operations usually performed by the crew the following services unless prohibited by shore regulations whether occurring during straight time or overtime:

A)    Opening and/or closing of hatches in preparation of loading and/or discharging operations.

B)    Assistance during docking and undocking, shifting and bunkering operations.




ORIGINAL

**RIDER CLAUSES TO M.V. "TE HO"**
**CHARTER PARTY DATED LONDON: 4TH FEBRUARY 2005**

C) Shaping up hatches as much as possible, weather permitting, prior to arrival at loading and/or discharging port and/or docks and/or places so that loading and/or discharging operations can commence immediately.

D) Supervising during loading and discharging.

Vessel to work day and night without Charterers' special request.

**Clause 57 - Watchmen**

Watchmen for gangway ordered by vessel to be for Owners' account, but if same compulsory by port regulations same to be for Charterers' account. Watchmen for cargo always to be for Charterers' account.

**Clause 58**

Charterers confirm that they have Charterers liability insurance with an internationally recognized P & I Club.

**Clause 59**

Owners guarantee that during the ownership, the vessel has not been blacklisted by countries/ports/areas allowed in the Charter Party. Owners guarantee during the whole Charter Party that the vessel is WWF/AHL fitted.

The vessel shall be at all times be covered by an ITF agreement or other similar wage agreement acceptable to ITF and Owners undertake that upon arrival at any port the officers and crew will be covered by such ITF or similar agreement acceptable to ITF. All consequences including loss of time/expense as a result on non compliance to the above shall be for Owners account and can be deducted from the hire.

Owners guarantee that the vessel to be ITF fitted throughout the Charter.

**Clause 60 – Representation and Communication Expenses**

Charterers shall pay lump sum U.S.$ 1,200.00 per 30 days or pro-rata in lieu of communication/victualling/entertainment.

**Clause 61 – U.S. Regulations**

If the vessel calls at any U.S. port for purposes of loading or discharging cargo, vessel's equipment shall comply with regulations established by U.S. Public Law 85-742 part 9 (Safety and Health Regulations for Longshoring) or any amendments/new laws pertaining to this. If longshoremen are not permitted to work due to failure of the Master and/or Owners' agents to comply with the aforementioned

RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON: 4TH FEBRUARY 2005

regulations, any delay resulting therefrom, and any stevedore standby time and other expenses involved, shall be for Owners' account.

## Clause 62 – Arbitration

All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in shipping, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above unless objection to his action be taken before the award is made. Any dispute arising hereunder shall be governed by English law.

For disputes where the total amount claimed by either party does not exceed U.S.$.50,000.00 the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

If either of the appointed Arbitrators refuse to act, or is incapable of acting, or dies, the party who appointed him may appoint a new Arbitrator in his place. If one party fails to appoint an Arbitrator, either originally or by way of substitution as aforesaid, for thirty clear days after the other party having appointed his Arbitrator has served the party making default with notice to make the appointment, the party who has appointed an Arbitrator may appoint that Arbitrator to act as sole Arbitrator in the reference, and his award shall be binding upon both parties as if he has been appointed by consent.

## Clause 63 – Insurance

A) Owners guarantee that vessel is entered and shall remain for the duration of this Charter Party in a Protection and Indemnity Association, which is a member of the International Group of P.&I. Clubs.

   Owners' P & I Club is: The Britannia Steamship Insurance Association Limited.

B) Any additional insurance on vessel and/or cargo levied by reason of the vessel's flag, ownership, class or condition to be borne by Owners.

## Clause 64 – Classification

Owners engage themselves to maintain vessel classed *Bureau Veritas* Register as per Line 5 or equivalent during the currency of this charter. Owners guarantee that the vessel will be insured on a basis, which in respect of collision liability gives protection





RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON:  4TH FEBRUARY 2005

that is considered to embrace at least as much as the Running Down Clause with 3/4 with Hull and Machinery Underwriter and 1/4 with P. & I. Club.

## Clause 65 – Bill(s) of Lading

Charterers and/or their Agents are hereby authorized by Owners to sign Bill(s) of Lading on Masters/Owners behalf. Bill(s) of Lading as presented but always in strict accordance with Mate's receipt and/or tally sheet.   Charterers to be responsible for any and all consequences resulting from Charterers and/or their Agents signing Bill(s) of Lading not adhering to the remarks in the Mate's receipt and tally sheet.   In case of no original Bill(s) of Lading being presented to the captain, Charterers have the right to order the captain of the vessel to discharge and release the entire/relevant cargo in which case the Owners/captain have no responsibility caused by such non presentation of Bills of Lading.

The Charterers hereby state that they will indemnify the Owners in accordance with the Owners P & I Club wording against all consequences arising from the Owners conforming to the Charterers request to release cargo without original Bills of Lading. The Charterers hereby surrender a Letter of Indemnity to the Owners strictly conforming with the Owners P & I Club wording without bank guarantee.

## Clause 66 – Grain Regulations

A)  The Owners guarantee that the vessel is a self trimming bulk carrier allowed to load grain or grain products without shifting boards or other fittings for grain. Any expenses resulting from breach of this warranty to be for Owners' account.

B)  For the carriage of grain in bulk vessel to have onboard at any time of this charter period valid documents and certificates issued by a recognised Classification Society and certified by National Cargo Bureau.

## Clause 67 – Panama and Suez

Vessel is fitted for and has necessary equipment and certificates onboard to transit Panama Canal (and not restricted due to her loadline or bilge radius), and Suez Canal.

## Clause 68 - Pollution

1)  Owners warrant that during the currency of this Charter Party they will comply fully with any rules and/or regulations presently in force and any legislation enacted with respect to pollution by oil or any other substances (including any rules and/or regulations issued thereunder) issued by any government department or other authorities, and also any similar legislation enforced by any nation of the world, relevant to vessel's actual/required trading under this Charter Party.





**RIDER CLAUSES TO M.V. "TE HO"**
**CHARTER PARTY DATED LONDON:    4TH FEBRUARY 2005**

2)  Owners warrant that throughout the currency of this Charter Party they will provide the vessel with valid certificates of financial responsibility for oil pollution issued pursuant to: (1) sec. 311 (p) of the U.S. Federal Water Pollution Control Act, as amended and (2) any certificates which may be required by U.S. Federal Legislation at any time during the currency of this charter.    Should any delay or detention of the vessel occur from failure by Owners to comply with the said acts, laws, rules, regulations or legislations, or failure to hold relevant certificates, the hire shall cease for the period of such delay or detention, and all extra expenses incurred because of such failure shall be for Owners' account.

### Clause 69 – Drug and Alcohol Policy

Owners warrant that they have a policy on drug and alcohol abuse ("Policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines for the Control of Drugs and Alcohol Onboard Ship.

The appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations.    An objective of the Policy should be that the frequency of the unannounced testing be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through a combined program o f unannounced testing and routine medical examinations.    Owners further warrant that the Policy will remain in effect during the currency of this charter and that Owners shall be exercise due diligence to ensure that the Policy is complied with.    It is understood that an actual impairment of any test finding of impairment shall not in and of itself mean that the Owners have failed to exercise due diligence.

### Clause 70 - Stowaways

(A) 1.    The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

2.    If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the vessel shall remain on hire.

*PAGE: 16*





### RIDER CLAUSES TO M.V. "TE HO"
### CHARTER PARTY DATED LONDON:   4TH FEBRUARY 2005

3.  Should the vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a) 1. above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release the vessel.

4.  **(B)   1.**   If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the vessel shall be off-hire.

   **2.**   Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

### Clause 71 – Weather Routing

Charterers have the right to appoint Ocean routes or a similar weather routing service to monitor vessel's performance during sea passages.   Owners will request Master to co-operate with the appointed weather routing service and follow their recommendations as far as practical.   Weather reports to be taken from vessel's deck log and/or Ocean Routes or similar weather routing service if so elected by Charterers. In the event of consistent discrepancies between the two sources the above weather service to be taken as final.

### Clause 72

BIMCO Conwartime 1993, New Both-to-Blame Collision Clause, New Jason Clause and Chamber of Shipping War Risk Clauses 1 & 2 as attached, to be included in this Charter Party, and all Bill(s) of Lading shall be subject to said clauses.

Paramount Clause, US Trade-Drug-Clause to be applied, or the Hague Rules as enacted in countries other than the U.S.A. and Canada, as applicable, to be incorporate in all Bill(s) of Lading.

### Clause 73

This Charter Party to be governed by and construed in accordance with English law.





RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON: 4TH FEBRUARY 2005

### Clause 74 – Layday/Cancelling Date

Laycan:  20th February / 3rd March 2005

### Clause 75

Owners guarantee vessel is suitable for discharge by grabs customarily used by Charterers and receivers but grabs not to exceed vessel's tanktop strength.

### Clause 76

The vessel to be free of obstruction in holds and hatches, suitable in every respect for carrying all cargoes allowed under this Charter party.   The vessel will comply with all current trading regulations. The vessel is self-trimming and can carry full cargo grain without bagging/strapping/securing.

### Clause 77 – NAABSA Clause

Owners agree to allow the vessel to call at Argentina/River Plate/Brazil/Uruguay subject to sufficient draft and lie there at any time of tide at a good and safe berth not always afloat but Charterers guarantee safely aground.

### Clause 78 – Mobile Crane

Mobile cranes to be allowed only in Taiwan and/or Thailand for discharge. Charterers/Shippers/Receivers have the right to place mobile cranes on deck loading and/or discharging port(s) but always observing vessel's deck strength. Dunnage/wooden battens/welding of temporary tracks, if required for spreading weight of mobile cranes in order to comply with vessel's deck strength to be placed and removed by Charterers/receivers/shippers at their expense and in their time.   Any damage caused to the vessel by mobile cranes and any modification/cutting of hatchcover stoppers required in this respect which is always subject to Owner's consent will be effected and repaired/restored by Charterers/Shippers/Receivers in their time and at their expense to the satisfaction of vessel's class surveyor.

### Clause 79

BIMCO ISM Clause to be applied.

### Clause 80

Charterers undertake to keep Owners informed during the period as regards the itinerary of the vessel and the names of their Agents at port of call.




**RIDER CLAUSES TO M.V. "TE HO"**

**CHARTER PARTY DATED LONDON:   4ᵀᴴ FEBRUARY 2005**

**Clause 81**

The Charterers agree that their agents will undertake, without charges, normal ship's husbandry as Owner's agents. This shall not include any extra ordinary business, VIZ, drydocking, general average, crew members, in which case Owners shall appoint their own agents or pay Charterers' agent an agency fee in accordance with locally recognized tariff.

**Clause 82**

Charterers are allowed to enlist Vessel in the purple finder system at their expense.

**Clause 83**

Vessel is suitable for and allowed to be discharged by the system known as CAVALLETTO discharge, however, mobile crane placed on hatch coaming with special fittings should subject to hatch coaming strength/relevant port authority regulation and Charterers to provide details first for Owners evaluate strength etc.

**Clause 84**

Charterers to have the option to use bulldozers and similar equipment in the vessel's hold provided weight not exceeding the tank top strength as per vessel's description clause.

**Clause 85**

Charterers have option to perform hose test at their own expense. In case vessel fail to such survey, Owners to rectify the same at their own time and cost and time of subsequent test to be for Owners' account. If required by Charterers, crew to assist in sealing vessel's hatches with remneck tape. Remneck tape to be provided and paid for by Charterers. During sealing of hatches, vessel remain on-hire.

**Clause 86 ~ Ballasting**

Vessel to ballast/de-ballasting clean water ballast tanks only including deeptable holds, if required by Charterers or their Agents at any time during loading and/or discharging, free of expense to Charterers, but in Charterers' time. All ballasting/de-ballasting shall be at the discretion of Master having due regard to stability stresses and seaworthiness of the Vessel. Whenever practicable or required by law (at the next port of call) the Vessel is to replace ballast taken in port or coastal waters with clean seawater ballast. Owners guarantee that the Vessel will always be maintained in a safe condition during ballast operations. If at any time solid ballast is required, all expenses for same

Mobile: 82-11-9490-0005
Fax:82-2-735-8018

bld bbose tjd:-

<a/c daebo>

<oodaeb> o/a

PAGE: 19

Received 2005/10/14 HH#6 09:00:52 - Robin\(seaglobe shpg\) <seaglobe@seaglobe.co
Subject: a/c daebo
051014-01849174     User: BERNARD     Page 1 of 1



ORIGINAL

**RIDER CLAUSES TO M.V. "TE HO"**
**CHARTER PARTY DATED LONDON:   4TH FEBRUARY 2005**

including time used for loading and discharging such ballast, bankers consumed during such period, and time used for cleaning holds after the discharge of such solid ballast, shall be for Charterers' account.

The vessel is capable of ballasting No.4 hold, and indeed the Vessel normally proceeds to loadports with No.4 hold in ballast. In such instance Owners, Master and crew will do their utmost to de-ballast and dry such hold as quickly as possible provided time between discharging port and next loading port is sufficient for the crew to de-ballast and dry up flooded hold. However, it is understood that time used for such de-ballasting and drying up of hold No.1 is not to be considered as off-hire time. Subject to Master decision considering vessel safety Owners and Master will do their utmost throughout the duration of this charter to minimize the use of hold No.4 for ballast purposes.

Owners guarantee vessel always to be safe in ballast.

In case of any change to vessel's deadweight capacity or cubic capacity or other important particulars , hire to be revised proportionately.

## Clause 87 – Benefit of P & I Club/Underwriters

The Charterers to have the full benefit of any lay-up and/or return insurance premium received by Owners from Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of 30 days, provided vessel is on-hire.

## Clause 88 – Australia Quarantine and Inspection Service

The Owners hereby confirm that the Owners duly acknowledge the voluntary guidelines for controls on the discharge of ballast water and sediments from her entering Australia from overseas stipulated by Australia Quarantine and Inspection Service.

## Clause 89 - Liberties

Charterers' option to discharge by vacuvators but same not to exceed permissible strength of upper deck, which is *(to be advised by Owners)* metric ton per square meter, on the port and starboard side of the hatchcoamings.

Charterers to have the right of placing stevedores on deck together with their cooking utensils if required and vessel to supply them for Charterers' account daily with their requirements of fresh water for washing, cooking and drinking purposes. Cost of fresh water supply to be direct negotiated with Master and subject to Master's discretion and prior consent.





**RIDER CLAUSES TO M.V. "TE HO"**
**CHARTER PARTY DATED LONDON:    4TH FEBRUARY 2005**

Owners and Master to undertake best efforts to co-operate with Charterers for the best stowage of cargo.

Owners and Master also undertake to co-operation with Charterers in taking necessary steps for cargo fumigation, if necessary, at Charterers' time and expenses.

### Clause 90 – Vessel Appearance

Throughout the duration of this Charter, Owners to maintain the Vessel's exterior hull, accommodation block, main deck, hatches and hatch covers in a clean and well painted condition. furthermore, all plimsoll and draft marks are to be clearly marked and readable at all times.

### Clause 91 – Azov Sea Clause

In case of vessel calling at the port of the Sea of AZOV are to be equipped with either a sewage treatment plant or a feacal tank. The latter must be fitted with facilities for delivering its contents to port barge (connections and pump).

### Clause 92 – BIMCO Standard Year 2000 Clause for Voyage and Time Charter Parties

"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the Year 2000.

Without prejudice to their other rights, obligations and defences under this Charter Party including, where applicable, those of the Hague or Hague-visby Rules, the Owners and the Charterers, and in particular the Owners in respect of the Vessel, shall exercise due diligence in ensuring Year 2000 conformity in so far as this has a bearing on the performance of this Charter Party. "

### Clause 93 – Australian Regulations

Vessel will comply with and be maintained in accordance with the requirements of the Commonwealth of Australia loading and unloading safety measure regulations. Owners confirm that the vessel is fitted and will be fitted throughout the duration of this charter, with hold ladders that conform to the Regulations of the Waterside Workers Federation of Australia.

During the currency of this Charter Party the vessel will comply with all Australian Navigation (London and Unloading Safety Measures) Regulations 1961 and related requirements and recommendations.   Loss of time as a result of non-compliance shall be considered as off-hire.





RIDER CLAUSES TO M.V. "TE HO"
CHARTER PARTY DATED LONDON:    4TH FEBRUARY 2005

### Clause 94 – Bunkering Privileges

Owners certify that the Vessel is and will remain so throughout the duration of this Charter, eligible for full bunkering privileges in the United States of America and its territories and possession, under all present and future United States Laws and/or regulations and is not, nor will be restricted, as to bunkering at any other countries or ports of call during this Charter.

### Clause 95 – Additional Equipment and Fittings

The Charterers, subject to the Owners and/or Master's prior consent shall be at liberty to fit/weld any additional equipment and fittings for loading, discharging and/or securing cargo. Such work shall be done at the Charterers' risks/expenses and time and the Charterers shall remove such equipment and fitting at their risks/expenses and time prior to redelivery if so required by the Owners.

### Clause 96 – Performing Speed

The Charterers to have the privilege of slow steaming and/or speeds the vessel.

Owners to supply to Charterers details of expected fuel consumption at the reduced speed or speeds required. Such estimates being provided in good faith.

### Clause 97 – Sea Waybill Clause

Charterers and/or their Agents may issue and sign non-negotiable sea waybills in lieu of Bills of Lading for those Shippers with whom Charterers have contracts allowing or requiring sea waybills to be used.

Sea Waybills to be issued subject to CMI Uniform Rules for sea waybills and incorporate Clause Paramount covering Hague Rules and Hague-Visby Rules.

Charterers hereby indemnify Owners and hold them harmless in respect of any liability, loss, damage or expenses by reason of the cargo being so delivered by sea waybills and receiver non-conformity with one specified in sea waybills.

Cargo to be released to the identified Receiver who is strictly same as one in sea waybills at discharging port(s) smoothly without presentation of any documents including sea waybills/Letter of Indemnity to Master.

### Clause 98 – U.S. Customs-Trade Partnership Against Terrorism (C-TPAT) Clause

The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service.




### RIDER CLAUSES TO M.V. "TE HO"
### CHARTER PARTY DATED LONDON:   4TH FEBRUARY 2005

The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement.

However, under no circumstances shall the Owners, Master and Crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.

The Charterers agree to indemnify and hold the Owners, Master and Crew harmless for any claims made against the Owners, Master and Crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

### Clause 99 – U.S. Security Clause

If the vessel calls in the United States, including any U.S. territory the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including but not limited to security guards, launch services, tug escorts, port security fees or taxes and inspections shall be for Charterers' account unless such costs or expenses result solely from Owners' negligence.





### RIDER CLAUSES TO M.V. "TE HO"
### CHARTER PARTY DATED LONDON: 4ᵀᴴ FEBRUARY 2005

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

The Charterers shall procure that all Bill of Lading issued under this Charter Party shall contain the same clause.

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply.

## BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying vessel or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

The Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.





**RIDER CLAUSES TO M.V. "TE HO"**
**CHARTER PARTY DATED LONDON:   4TH FEBRUARY 2005**

## CHAMBER OF SHIPPING WAR RISK CLAUSES 1 & 2

1.     No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ship sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charter Party as ordered by Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.

2.     The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the government of the nation under whose flag the vessel sails or any department thereof, or any person acting or purporting to act with the authority of such Government or any department thereof, or by any committee or person having under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and compliance with any such orders or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly.

The Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

KLEIMAR VESSEL QUESTIONAIRE

| | | | |
|---|---|---|---|
| 1. | NAME AND EX-NAME/S | | MV 'TE HO' |
| 2. | FLAG | | PANAMA |
| 3. | MONTH/YEAR BUILT | | JUNE, 2004 |
| 4. | BUILT WHERE | | CSBC, TAIWAN ROC. |
| 5. | CLASSIFICATION SOCIETY | | BV |
| 6. | CALL SIGN | | H3MG |
| 7. | SATELLITE COMMUNICATION NO | | 435383710 |
| | TELEFAX NO | | 600400395 |
| | TELEX NO | | 600400396 |
| | INTERNET ADDRESS AVAILABLE TO CHRS | | TEHO/THMC.AMOSCONNECT.COM |
| 8. | HOMEPORT | | PANAMA |
| 9. | OFFICIAL REGISTRATION NUMBER | | 29956-04 |
| 10. | INTERNATIONAL GRT/NRT | | 41372/26094 |
| 11. | LOA ( M ) | | 225.00M |
| | LBP ( M ) | | 218.31M |
| 12. | BEAM MOULDED ( M ) | | 32.26M |
| 13. | DRAFT SUMMER SALT WATER ( M ) | | 14.122M |
| 14. | DWAT SSW ( M ) | | 77834MT |
| 15. | TPC ( AT FULL DRAFT ) | | ABT 67.8 |
| 16. | GRAIN CUBIC ( CBM –EXCL WINGTANKS ) | | |

| HOLD | GRAIN | BALE |
|---|---|---|
| HOLD NO.1 | 12827 M3 | 12523 M3 |
| HOLD NO.2 | 13531 M3 | 13088 M3 |
| HOLD NO.3 | 13306 M3 | 12947 M3 |
| HOLD NO.4 | 13328 M3 | 12969 M3 |
| HOLD NO.5 | 13364 M3 | 13005 M3 |
| HOLD NO.6 | 13332 M3 | 12972 M3 |
| HOLD NO.7 | 12460 M3 | 12101 M3 |

| | | |
|---|---|---|
| 17. OWNERS CONFIRM VESSEL CAN LOAD SLABS USING 'CALIFORNIA BLOCK STOW' METHOD (YES/NO) | | YES |
| 18. OWNERS CONFIRM THAT VESSEL CAN LOAD FULLDWAT CARGO IN ALTERNATE HOLDS (YES/NO) | | YES |
| 19. NUMBER OF HOLDS/HATCHES | | 7/7 |
| NUMBER OF MOORING DRUMS | | 4 F/2C/4A |
| 20. NATIONALITY OF CREW DURING THE CURRENCY OF THIS CP | | TAIWANESE + CHINESE |
| 21. NAME/NATIONALITY OF MASTER CAPT. | | CHENG NIEN TIAR / TAIWANESE |
| 22. FULL CLASS NOTATION | | YES |

23. VARIOUS DEADWEIGHTS AND RELATED DRAFT/TPC:

SUMMER  77834  MT / 14.122 M /  69.1

WINTER  75812  MT / 13.828 M /  69

PANAMA  (39'6'  TFW)  ABT  62,000MT

| DRAFT | SALT(1.025) | BRACKISH(1.013) | FRESH(1.000) |
|---|---|---|---|
| 32  FT | 48,000MT | 47,500 | 46,800 |
| 33  FT | 50,200 | 49,500 | 48,800 |
| 34  FT | 52,100 | 51,300 | 50,800 |
| 35  FT | 54,200 | 53,400 | 52,800 |
| 36  FT | 56,200 | 55,300 | 54,800 |
| 37  FT | 58,300 | 57,300 | 56,700 |
| 38  FT | 60,300 | 59,300 | 58,700 |
| 39  FT | 62,300 | 61,300 | 60,700 |
| 40  FT | 64,300 | 63,300 | 62,700 |

| 24. | CONSTANTS EXCL FRESH WATER  (MTS) | ABT  250 - 300 |
|---|---|---|
| 25. | MIN FRESH WATER RESERVE  (MTS) | ABT  100 |
| 26. | DAILY FW CONSUMPTION  (MTS) | ABT  14 |
| 27. | MAXIMUM FW CAPACITY  (MTS) | ABT  287 |
| 28. | FW GENERATIOR CAPACITY (MTS / DAY) | ABT  25 |

29.  MIN DISTANCE FM W.L TO TOP OF HATCH COVER IN OPEN CONDITION N CORRESPONDING

DRAFT BSS 50 PCT BNKRS

---FULL BALLAST INCL NO.4 BALLAST HOLD:

   H1/17.03M    H2/15.90M   H3/15.09M   H4/14.83M   H5/14.58M   H6/14.33M   H7/14.08M

---DIFFERENCE IN HEIGHT BTWN HATCH COAMING AND HATCHCOVER

   IN OPEN POSITION: 1H F/0-75M A/1-40M, 2H F/0-90M A/1-30M, 3-7H F/A 0-90M

30.  DISTANCE FM W.L TO HIGHEST POINT DRAFT BASS 50 PCT BNKRS

---FULL BALLAST INCL NO.4 BALLAST HOLD:          40.07M

---FULL BALLAST EXCL NO.4 BALLAST HOLD:          41.12M

| 31. | MOULDED DEPT | 19.5M |
|---|---|---|
| 32. | BALLAST TANK CAPACITY (CBM) | 35,378 M3 INCL H4(13342 M3) |
|  | BALLAST PUMPING CAPACITY CBM/HR: | 900 CBM/HR |
|  | NUMBER OF BALLAST PUMPS: | 2  SET |
| 33. | HOLD BALLAST CAPACITY  (CBM) | 13342  M3 |
|  | IN HOLD/S, NO/S | HOLD 4 |
| 34. | MAINENGINE --- TYPE    MITSUI—B/W 6S60 MC (MARK 6) X 1 SET | |
|  | RPM    (MCR/CSR)  (DMCR)  13600PS X 93.5 RPM (NOR) | |
|  | 11560PS X  ABOUT  88.6RPM | |
| 35. | TANK CAPACITY/USABLE | --FUEL (CBM)    2458M3    100% |
|  |  | --DIESEL (CBM)    116M3    100% |
| 36. | SHFT GENERATOR    (YES/NO) | NO |
| 37. | HATCH DIMENSIONS (M) | |

| HATCH | LENTH | WIDTH |
|---|---|---|
| NO.1 | 17.10 M | 13.36M |
| NO.2-7 | 17.10M | 15.03M |

| 38. | TYPE OF HATCHCOVERS | SIDE ROLLING 2 PANEL |
|---|---|---|
| 39. | STRENGTH OF HATCHCOVERS (MT/SQM) | ABT 3.25 MT/M2 |
| 40. | HOPPERED TANKTOP (YES/ NO) | YES |
| 41. | TOPSIDE TANKS   (YES/NO) | YES |
| 42. | CORRUGATIONS   (YES/NO) | NO |
| 43. | TANKTOP STRENGTH (MT/SQM):   1, 3, 5, 7 | 29.57 MT/M2 |
| | 2, 4, 6 | 19.78 MT/M2 |
| 44. | DECK STRENGTH (MT/SQM) | 7.25MT/M2 |
| 45. | CO2 FITTED (YES/NO) | YES |
| 46. | AUSTRALIAN HOLD LADDERS (YES/NO) | YES |
| 47. | STRENGTHENED FOR HEAVY CARGOES (YES/NO) | YES |
| | NO/S HOLD/S EMPTY | 2, 4, 6 |
| 48. | LAST DRYDOCK (WHEN/WHERE) | NEW BUILD |
| 49. | LAST SPECIAL SURVEY (WHEN/WHERE) | NEW BUILD |
| 50. | LAST BOTTOM PAINT TYPE | NEW BUILD |
| 51. | LAST HOLD PAINT/TYPE | NEW BUILD |
| 52. | INSURED VALUE (USD) | 39.8 M |
| 53. | UNDERWRITERS | TAIWAN FIRE + MARINE INSURANCE CO |
| 54. | OWNER'S P AND I CLUB | BRITANNIA CLUB |
| | VALIDITY DATE OF COVER | 2005/2 (RENEWED NOW) |
| | CONTACT PERSON (P AND I) | |
| | TELEPHONE NUMBER (P AND I) | |
| 55. | HOLD SIZES INSIDE CORRUGATIONS (M): | |

| HOLD | LENGTH | WIDTH | HEIGHT |
|---|---|---|---|
| NO.1 | 25.65 | 26.65 | 19.80 |
| NO.2 | 25.65 | 31.58 | 19.48 |
| NO.3 | 25.65 | 31.58 | 19.48 |
| NO.4 | 25.65 | 31.58 | 19.48 |
| NO.5 | 25.65 | 31.58 | 19.48 |
| NO.6 | 25.65 | 31.58 | 19.48 |
| NO.7 | 25.65 | 31.58 | 19.48 |

LENGTH/WIDTH OF TANKTOP (M)

| HOLD | LENGTH | WIDTH |
|---|---|---|
| NO.1 | 25.65 | 8.70-7.42 |
| NO.2 | 51.30 | 8.70 |
| NO.3 | 51.30 | 8.70 |
| NO.4 | 51.30 | 8.70 |

56. ECONOMICAL SPEED/CONSUMPTION
(VARIOUS SPEEDS)
FULL SPEED LESS 0,5 KNOT    35.5 MT
FULL SPEED LESS 1,0 KNOT    35.0 MT
FULL SPEED LESS 1,5 KNOT    34.5 MT

| FULL SPEED LESS 2,0 KNOT | |
|---|---|
| 57. CONSUMPTION IN PORT<br>(MTS -24 HOURS –IDLE   IFO 1.3+MDO 0.3 MT<br>-WORKING     IFO 2.6 +MDO 0.3 | |
| 58. ITF (YES/NO) | YES |
| 59. CEMENT HOLES/DIMENSIONS | NO |
| 60. LAST 3 CARGOES(LAST FIRST) | COAL / IRON ORE / COAL |
| 61. ISM : DOC NUMBER | DOC-02-039 |
| DOC EXPIRY DATE | OCT/22,2007 |
| SMC NUMBER | SMC-04-073 |
| SMC EXPIRY DATE | OCT 31.2009 |
| CLASSIF.SOCIETY | UTILIZED |
| 62. LAST PORT STATE CONTROL INSPECTION | |
| (WHEN/WHERE) | 13/08/2004 / GLADSTONE |
| —PROBLEMS,IF ANY | |
| ---PASSED WITHOUT RECOMMENDATION<br>AND DETENTION(YES/NO) —IF NO,PLESE SPECIFY) | |
| 63. FULL STYLE OF REGISTERED ONERS | TA HO MARITIME CORP |
| FULL STYLE OF DISPONENT OWNERS   10F 113, CHUNG SHAN N.ROAD SEC 2<br>(IF NOT REGISTERED OWNERS)     TEL:25310909, FAX 25373659<br>FULL STYLE OF MANAGERS<br>(IF NOT REG/DISP. OWNERS) | |
| 64. OWNERS CONFIRM | |
| —VESSEL HAS DUAL DWT CERTIFICATE ON BOARD AND<br>THAT CHARTERERS CAN HAVE THE BENEFIT OF THE<br>CERTIFICATE WITHOUT FURTHER COSTS TO THEM(YES/NO) | YES |
| PLS ADV DUAL DWT FIGURES | 13.144M ABT 70891 MT |

-VESSEL IS EQUIPED WITH 1COMBI GUN/1 MAXI GUN/1 SPRAYER FOR CHEMICALS/1 SLURRY
PUMP AND OTHER NECESSARY EQUIPMENT FOR HOLDCLEANING (YES/NO):          NO
( VESSEL HAS HIGH PRESSURE CLEANERS ONLY ONBOARD )
—VESSEL HAS MIN 16 MOORING LINES ON BOARD WHEREOF:
14 MOORING LINES HAVE A MIN LENGTH OF 200 M                                   YES
6 MOORING LINES ARE STEEL MOORING LINES                                       NO
OWNERS WARRANT THAT THE VSL IS SELF—TRIMMING TYPE BULKCARRIER, SUITABLE FOR
CARRYING FULL CARGOES OF GRAIN IN ALL HOLDS WITHOUT REQUIRING ANY GRAIN.
FITTINGS AND/OR BAGGINGS/SECURING. VESSEL HAS ON BOARD VALID GRAIN LOADING
BOOKLET IN ACCORDANCE WITH SOLAS 1974 CONVENTION AND ANY SUBSEQUENT
AMENDMENTS.FURTHERMORE, VESSEL TO HAVE ON BOARD APPROVED TABLE OF
HEELING .MOMENTS FOR 'FILLED HOLDS –UNTRIMMED ENDS' IN ACCORDANCE WITH IMO
INTERNATIONAL GRAIN CODE ANNEX,SECTION B PARA 3.

# *Declaration of Eric Choi*
# Exhibit E

**amp**

| | |
|---|---|
| **From:** | djkim/seoul maritime [seoul@seoulmaritime.com] |
| **Sent:** | Thursday, January 10, 2008 5:13 AM |
| **To:** | FOC CHARTERING |
| **Subject:** | MV TE HO / FIVE OCEAN |

```
FROM SEOUL MARITIME CORPORATION / DJKIM
     TEL (822)7304595 FAX (822)7304570 E.MAIL seoul@seoulmaritime.com

TO: FIVE OCEAN CORPORATION
ATTN: MR. BRIAN CHO, PRESIDENT

RE: MV TE HO / BBT
--
PLS FIND HEREBELOW CLEAN RECAP OF FIXTURE AS FOLL WITH C/PARTY DATED 10/JAN/2008:-

- ALL NEGO AND FINAL FIXTURE TB KEPT TOP P+C

- OWNERS - FIVE OCEAN CORPORATION OF SEOUL, KOREA

- ACCOUNT - BBT

- M/V TE HO
  ---------
  PAN FLAG BLT 2004
  77,834 MT DWT ON 1 4. 122 M SSW
  GRT/NRT 41,372 / 26,094
  LOA/BM  225.0 /32.26 M
  HATCH COVER : 2 PANNEL, SIDE ROLLING TYPE
  7 HO/7HA, 92,151CBM GR CAPA
  H/SIZE : NO.1   17.10 X 13.36M
           NO.2-7 17.00 X 15.03M
  GRAIN CAPA :
  NO.1  12,827 M3
  NO.2  13,531 M3
  NO.3  13,306 M3
  NO.4  13,328 M3
  NO.5  13,364 M3
  NO.6  13,332 M3
  NO.7  12,460 M3
  TOTAL GRAIN CAPACITY : 92,151 M3
  Speed/Cons :
  about 14.0 Kts Laden/about 15.0 Kts Ballast (under good weather
  conditions not exceeding Beaufort wind force 4 / Douglas sea state 3
  and free of any adverse currents.)
  Consumption :
  At sea  - FO (IFO  380 CST) abt 36.5 mt +  DO abt 0.3 mt per day
  In port - idle IFO abt  2.5mt + DO abt 0.3mt per day
           working IFO 3.5mt + MDO 0.3mt per day
  at intermediate climate condition (plus additional DO 0.5MT/day at
  cold climate condition)
  Vessel has liberty of using MDO when manoeuvering in/out of ports,
  navigating in shallow or restricted or busy waters, canals, rivers,
  estuaries and/or in foggy weather and also during hold
  cleaning/ballasting
  operations.
  +AA WOG+


- DELY: DLOSP 1SP WCI ITALY NOT EAST OF PASSERO PIOO ATDNSHINC

- LAYCAN: 0001HRS 10TH/2359HRS 15TH JAN 08 BFC CANCELATION CL TO APPLY
```

1

E

(ETA LA SPEZIA 6TH JAN;ETCD 11TH JAN)

- FOR ONE TIME CHARTER TRIP VIA SPS/SBS/SAS VIA USG TO IRAG WITH WHEAT IN BULK
  (U.N. APPROVED CARGO ONLY FOR IRAQI PORT(S))

- REDELY: ON PMO ATDNSHINC

- HIRE : USD 85,000 DIOT PAYABLE 15 DAYS IN ADVANCE

- 1ST HIRE PLUS VAULE OF BOD PAYABLE W/I 2 BKG DAYS AFT VSLS DELY

- ILOHC USD 5,000 L/SUM

- C/E/V USD 1,250 PER 30 DAYS OR PRORATA

- L.O.I :
THE CHARTERERS HEREBY STATE THAT THEY WILL INDEMNIFY THE OWNERS IN ACCORDANCE WITH
THE OWNERS P&I CLUB WORDING AGAINST ALL CONSEQUENCES ARISING FROM THE OWNERS
CONFORMING TO THE CHARTERERS REQUEST TO RELEASE CARGO WITHOUT ORIGINAL BILLS OF
LADING.THE CHARTERERS HEREBY SURRENDER A LETTER OF INDEMNITY TO THE OWNERS STRICTLY
CONFORMING WITH THE OWNERS P&I CLUB WORDING WITHOUT BANK GUARANTEE.

- BUNKER CL : BOD QTY ABT 1,200MT IFO + ABT 80-100MT MDO.
             BOR QTY ABT SAME AS ON DELY
             PRICES BENDS USD500/USD800 PMT FOR IFO/MDO RESP.
  OWRS TO BUNKER VSL UPTO ABOVE DEL QUANTITY AT GIB OR LAS PALMAS,
  TIME/COST TO BE FOR OWRS' ACCT. IN CASE CHTRS ALSO SUPPLY BUNKER AT GIB
  OR LAS PALMAS,THEN TIME/COST TO BE SHARED ON PRO-RATA BSS.

- 5.0 PCT TTL IE 3.75PCT ADDCOM + 1.25 PCT BROKERAGE TO BE SPLIT BTWN MNF/SMC

- OWS TO ADV how much CGO THE vsl can load at 42'/42',50'' at 10,5 m swad at
  iraq without requiring any bagging/strapping/securing"

- O/W AS PER ows btb cp dd 4 feb 2005 EXCEPT LOGICAL ALTERATIONS AND
  INCLUDING BELOW AMENDMENTS

- BIMCO STANDARD "BUNKER FUEL SULPHUR CONTENT CL" & "ISPS/MTSA CL" &
  "US CUSTOMS ADVANCE/AMS CL" TO BE INSERTED INTO THE C/P, CONTENT AS BELOW:-

Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005

(a) Without prejudice to anything else contained in this Charter Party, the
Charterers shall supply fuels of such specifications and grades to permit the
Vessel, at all times, to comply with the maximum sulphur content requirements of any
emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and
bunker surveyors used by the Charterers to supply such fuels shall comply with
Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of
sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of
any loss, liability, delay, fines, costs or expenses arising or resulting from the
Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect
of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with
the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a),

the Charterers shall not otherwise be liable for any loss, delay, fines, costs or
expenses arising or resulting from the VesselⒺ failure to comply with Regulations 14
and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as

stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national
authorities such as, but not limited to, the EU and the US Environmental Protection
Agency.

++

ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for
the Security of Ships and of Port Facilities and the relevant amendments to

Chapter XI of SOLAS (ISPS Code) relating to the Vessel and Vhe Company?(as defined
by the ISPS Code). If trading to or from the United States or passing through United
States waters, the Owners shall also comply with the requirements of the US Maritime
Transportation Security Act 2002 (MTSA) relating to the Vessel and the 1wner?(as
defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the
relevant International Ship Security Certificate (or the Interim International Ship
Security Certificate) and the full style contact details of the Company Security
Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages,
expense or delay) caused by failure on the part of the Owners or Vhe Company?Ξwner?
to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for
the Owners?account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style
contact details and, upon request, any other information the Owners require to
comply with the ISPS Code/MTSA. Where sub-letting is permitted under

the terms of this Charter Party, the Charterers shall ensure that the contact
details of all sub-charterers are likewise provided to the Owners and the Master.
Furthermore, the Charterers shall ensure that all sub-charter parties they enter
into during the period of this Charter Party contain the following
provision:

6The Charterers shall provide the Owners with their full style contact details and,
where sub-letting is permitted under the terms of the charter party, shall

ensure that the contact details of all sub-charterers are likewise provided to the
Owners?

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense
or delay) caused by failure on the part of the Charterers to comply with this Clause
shall be for the Charterers?account, except as otherwise provided in this Charter
Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs
or expenses whatsoever arising out of or related to security regulations or measures
required by the port facility or any relevant authority in accordance with the ISPS
Code/MTSA including, but not limited to, security guards, launch services, vessel
escorts, security fees or taxes and inspections , shall be for the Charterers?
account, unless such costs or expenses result solely from the negligence of the
Owners, Master or crew. All measures required by the

Owners to comply with the Ship Security Plan shall be for the Owners?account.

(d) If either party makes any payment which is for the other partyΞ account
according to this Clause, the other party shall indemnify the paying party.

Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn.

++

U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a)   If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)   Have in place a SCAC (Standard Carrier Alpha Code);
ii)   Have in place an ICB (International Carrier Bond);
iii)   Provide the Owners with a timely confirmation of i) and ii) above; and
iv)   Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all

other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers?failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on

hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)   The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

END RECAP

PLS CONFIRM ALL IN ORDER WITH YR NOTES


B.RGDS/DJ KIM
MOB (8211)3077119

*Declaration of Eric Choi*
Exhibit F

**Loretta**

| | |
|---|---|
| **From:** | Five Ocean Corp - Jessie [ops@fiveocean.co.kr] |
| **Sent:** | Friday, January 11, 2008 12:38 AM |
| **To:** | M/V Te Ho - master |
| **Cc:** | five ocean - ops |
| **Subject:** | Re: TE HO |

```
TO: MASTER OF M/V TE HO
FM: FIVE OCEAN CORP.

RE: M/V TE HO

DEAR CAPT SIR,

AS SOON AS DELIVERY SBJ VSL TO FIVE OCEAN CORP., SHE WILL BE DELIVERED TO "BBT".
PLS KINDLY NOTE ASF-:

- SUB CHTRS: BBT
- DELY: DLOSP LA SPEZIA ATDNSHINC
- LAYCAN: 0001HRS 10TH/2359HRS 15TH JAN 08 BFC CANCELATION CL TO APPLY
- FOR ONE TIME CHARTER TRIP VIA SPS/SBS/SAS VIA USG TO IRAG WITH WHEAT IN BULK
  (U.N. APPROVED CARGO ONLY FOR IRAQI PORT(S))
- REDELY: ON PMO ATDNSHINC


A. PLS KINDLY COOPERATE "BBT" AND SEND US S.INSTRUCTION AFTER GETTING IT FM THEM.
B. ON DLOSP LA SPEZIA, PLS SEND "DELIVERY NOTICE" TO US AND TO BBT.
C. DAILY REPORT FOR US SHOULD BE PROVIDED US AS PER OUR S.INSTURTION EVERYDAY.
D. WE'D VERY APPRECIATE YOU TO CONFIRM SAFE RECEIPT BY RETURN. THANKS.


B.RGDS/ JESSIE (Hayden HJ Son)

FIVE OCEAN CORP.
TEL: 82-2-3455-1402
MOBILE: 82-10-8965-5534
E-MAIL: ops@fiveocean.co.kr <mailto:ops@fiveocean.co.kr>
```

F

# *Declaration of Eric Choi*
# Exhibit G

**Loretta**

| | |
|---|---|
| **From:** | M/V Te Ho - master [teho@thmc.amosconnect.com] |
| **Sent:** | Friday, January 11, 2008 6:51 AM |
| **To:** | Five Ocean Corp |
| **Cc:** | Glory Wealth - Operation; Glory Wealth Shpg Service; TA HO; TaHo-Chen Mei Chun |
| **Subject:** | TE HO - DELY REPORT |

```
TO: FIVE OCEAN CORPORATION
CC: GLORY WEALTH SHIPPING SERVICE
CC: TA-HO TPE
FM: MASTER OF MV/TE HO
REF:V39/11JAN08-B

RE: DELY REPORT

1.    1133LT/11-JAN.(1033GMT/11-JAN) DLOSP AT LA SPEZIA
2. MEANTIME DELY TO " FIVE OCEAN CORPORATION " FROM
   " GLORY WEALTH SHIPPING SERVICE "
3.  POSITION: 44-04.7N, 009-51.0E
4.  BROB: IFO/440.29MT, MDO/66.19MT .

=   PLS KDLY BE ADVD THAT VSL WL REFUEL IFO/750MT MDO/20MT AT GIBRALTAR
    TO MAKE BNKRS ON DELIVERY: IFO/1190.29MT MDO/86.19MT

B/RGDS.
```

G

# Exhibit 2

*Exhibit 2*



**SEOUL MARITIME CORPORATION**
(주)서울마리타임 코포레이션
■ TEL : 82-2-730-4590    ■ FAX : 82-2-730-4570
■ 131-851, 서울특별시 중랑구 묵2동 235-87. 다솜빌딩 101호
■ #101, Dasom Bldg, 235-87, Muk2-dong, Jungnang-gu, Seoul, 131-851, Korea

E-Mail : seoul@seoulmaritime.com
ops@seoulmaritime.com

Mr. DJ Kim states as follows:

1) I am a charter party broker with Seoulmaritime Corporation and have
   worked as a charter party broker for 14 years.  I am familiar with the value
   of vessels in the grain trade.

2) Attached is a list of vessel fixtures taken from the Baltic Exchange Daily
   Fixture Index.  This is a well known list of vessel fixtures.

3) I have been asked to find an equivalent fixture for the TE HO in the U.S. Gulf
   as of February 1.  The TE HO is a vessel of some 77,834 deadweight tons
   built in 2004.  It will be noted on the attachment that the vessel DIMITRIOS
   S was chartered for $58,000 per day for 4/6 months with $800,000 ballast
   bonus for U.S. Gulf.  Assuming a charter of 4 months only, this ballast
   bonus of $800,000 over 120 days would add a further $6,666 to the market
   value of the vessel.  The total market value, with ballast bonus would
   therefore be $64,666 per day ($58,000+$6,666).  The DIMITRIOS S is
   smaller than the TE HO at only 66,088 deadweight tons.  It is also much
   older than TE HO because the DIMITRIOS S was built in 1990.  Based on
   these factors and the DEMITRIOS S  fixture, it seems reasonable to
   conclude that the equivalent value of the TE HO, a larger and newer vessel,
   should be a minimum of $65,000-$70,000 per day.
   I declare under penalty of perjury of the laws of the United States that the
   foregoing is true and correct.
   Executed: Seoul, Korea
   February 27, 2008

                                        Your Faithfully
                                Seoul Maritime Corporation

                                D.J.Kim - President

"2"

**Loretta**

| | |
|---|---|
| **From:** | djkim/seoul maritime [seoul@seoulmaritime.com] |
| **Sent:** | Friday, February 01, 2008 8:35 AM |
| **To:** | SMC |
| **Subject:** | BALTIC EXCHANGE DAILY FIXTURE/INDEX LIST 01/02/2008 |

```
FROM SEOUL MARITIME CORPORATION / DJKIM
      TEL (822)7304595 FAX (822)7304570 E.MAIL seoul@seoulmaritime.com

BALTIC EXCHANGE DAILY FIXTURE/INDEX LIST 01/02/2008

BDI 6134 (UP 82)
BCI 9031 (UP 265)
BPI 5749 (UP 63)
BSI 3839 (DOWN 21)
BHSI 1954 (DOWN 34)

TIMECHARTER

'CAPE OCEANIA' 1994 152025 DWT  DELY GIJON 16/18 FEB  TRIP VIA TUBARAO REDEL DUNKIRK
APPROX $92500 DAILY - STX PAN OCEAN

'IMABARI TBN' NEWBUILDING 77000 DWT  DELY EX YARD IMABARI OCT/DEC 2008 2 YEARS
TRADING REDEL WORLDWIDE $52500 DAILY - DEIULEMAR - <RECENT>

'MULBERRY WILTON' 2004 76453 DWT  DELY DALIAN 19/21 FEB 12/14 MONTHS TRADING REDEL
WORLDWIDE $63000 DAILY - BBL

'NAVIOS AURORA' 2005 75397 DWT  DELY WORLDWIDE 1 MAR/30 APR 5 YEARS OR 10 YEARS
REDEL WORLDWIDE $37500 DAILY  IF 5 YEARS 27000 DAILY IF 10 YEARS - RIO TINTO

'BARILOCHE' RELET 2007 75395 DWT  DELY HUANGPU 13/15 FEB  TRIP REDEL SKAW-CAPE
PASSERO $35000 DAILY - CNR

'AUDAX' 2001 75220 DWT  DELY TAICHUNG 4/6 FEB  TRIP VIA AUSTRALIA REDEL CONTINENT
$32000 DAILY - MUR

'SALDANHA' 2004 74707 DWT  DELY ZHANJIAGANG 2/3 FEB  TRIP VIA PG REDEL PMO $40000
DAILY - STX PAN OCEAN

'PACIFIC PARADISE' 1993 73645 DWT  DELY FUJAIRAH 3/8 FEB  TRIP BANDAR ABBAS REDEL
CHINA $53000 DAILY - IRANIAN CHRTR

'ANANGEL OMONIA' TPC RELET 1996 73519 DWT  DELY AUGHINISH 11/13 FEB  TRIP VIA
NORFOLK & EGYPT REDEL CAPE PASSERO $58000 DAILY - ARMADA

'NEW HERALD' 1997 72875 DWT  DELY LONGKOU 12/14 FEB 3/5 MONTHS TRADING REDEL
WORLDWIDE $57700 DAILY - EDF

'B.ASIA' 1990 70424 DWT  DELY EX DRY DOCK SHEKOU 1/7 FEB  TRIP VIA WC INDIA REDEL
CHINA $32000 DAILY - WORLDLINK

'ENERGY' 1993 69255 DWT  DELY SANTOS 17/23 FEB  TRIP VIA EC SOUTH AMERICA REDEL
SKAW-CAPE PASSERO $52000 DAILY + $850000 - ARMADA

'DIMITRIOS S' 1990 66088 DWT  DELY US GULF 20/28 FEB 4/6 MONTHS TRADING REDEL
WORLDWIDE $58000 DAILY + $800000 BB - BRAVE MARITIME

'VINASHIN MOONSTONE' 1984 64332 DWT  DELY CAPE PASSERO 15/17 FEB  TRIP VIA US GULF
REDEL CAPE PASSERO $47500 DAILY - WINDROSE
```

1

GUOYAN NO.5' 1985 63000 DWT   DELY APS BANDAR ABBAS PPT   TRIP REDEL CHINA $48000 DAILY - PHINIQIA

'TIARA OCEAN' 2004 52532 DWT   DELY MUMBAI 3/5 FEBRUARY   TRIP REDEL CHINA $40000 DAILY - OLDENDORFF

'KEN SIRIUS' 2003 50337 DWT   DELY KARACHI 7/9 FEBRUARY   TRIP VIA INDIA REDEL SINGAPORE-JAPAN $43000 DAILY - CHINESE CHARTERER

'BRITANNIA' 2001 48337 DWT   DELY LIANYUNGANG 4/8 FEBRUARY   TRIP VIA SOUTH-EAST ASIA REDEL SINGAPORE-JAPAN $32000 DAILY - CHINESE CHARTERER

'MAKRA' 1994 45862 DWT   DELY SHANGHAI 9/11 FEBRUARY 3/5 MONTHS TRADING REDEL WORLDWIDE $35800 DAILY - CARGILL

'SMARTY' 2000 45499 DWT   DELY PMO 15/20 FEBRUARY   TRIP VIA INDIA REDEL SINGAPORE-JAPAN $34000 DAILY - NORTH CHINA SHIPPING

ORE

'CAPE SHANGHAI' CARGILL RELET 2007 160000/10 GUIABA/SHANGHAI 18/25 FEB $59.00 FIO SCALE/30000SC - RGL

'INTREPID CLIPPER' 1993 150000/10 DAMPIER/QINGDAO 16/25 FEB $22.00 FIO SCALE/30000SC - RIO TINTO

COAL

'SWISS MARINE TBN' 160000/10 RICHARDS BAY/ROTTERDAM 18/29 FEB $29.00 FIO SCALE/25000SC - MORGAN STANLEY


B.RGDS/DJ KIM
MOB (8211)3077119

# Exhibit 3

*Exhibit 3*

# LYONS & FLOOD, LLP

### ATTORNEYS AT LAW

65 WEST 36TH STREET, 7TH FLOOR
NEW YORK, NEW YORK 10018

TELEPHONE: (212) 594-2400
FAX: (212) 594-4589

KIRK M. LYONS
E-Mail: klyons@lyons-flood.com

ADMITTED IN NEW YORK,
CONNECTICUT, NEW JERSEY,
& MASSACHUSETTS

February 19, 2008

**BY E-MAIL and REGISTERED**          ops@fiveocean.co.kr
**MAIL; RETURN RECEIPT REQUESTED**

Five Ocean Corporation Ltd.
7th Floor, Jeong-an Bldg., 57-10
Seosomun-Dong, Chung-Ku
Seoul, Korea 100-814

Re:   Glory Wealth Shipping Service Ltd. v. Five Ocean Corporation Ltd.
      08 Civ. 1102 (VM)
      Our File: 2618009

Dear Sirs:

We are New York attorneys for Glory Wealth Shipping Service Ltd. On behalf of
Glory Wealth Shipping Service Ltd., we have commenced a lawsuit in New York
pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime
Claims of the Federal Rules of Civil Procedure, seeking attachment and garnishment of
property of Five Ocean Corporation Ltd., as security for plaintiff's claims for unpaid hire.
The lawsuit is captioned Glory Wealth Shipping Service Ltd. v. Five Ocean Corporation
Ltd., 08 Civ. 1102 (VM), and is pending in the United States District Court for the
Southern District of New York.

Pursuant to the court's Ex Parte Order for Process of Maritime Attachment and
Garnishment and the Process issued thereunder, we have been advised by Citibank that
on February 19, 2008, it restrained two electronic fund transfers being sent for the benefit
of Five Ocean Corporation of Seoul, Korea in the amounts of $1,069,366.44 and
$61,559.73.

This is the notification required under Local Admiralty Rule B.2 of the Local
Rules of Civil Procedure of the United States District Court for the Southern District of
New York.

NEW JERSEY OFFICE:                          CONNECTICUT OFFICE:
  1495 MORRIS AVENUE                           19 COVENTRY LANE
  UNION, NJ 07083                               RIVERSIDE, CT 06878
  TEL: (201) 569-4435   FAX: (201) 569-4438     TEL: (203) 661-2355  FAX: (203) 661-2577

3

Additionally, enclosed are copies of the Summons, Verified Complaint, Ex Parte Order for Process of Maritime Attachment and Garnishment and Process of Maritime Attachment and Garnishment.

Very truly yours,

**Lyons & Flood, LLP**

By: _Kirk M. Lyons_
      Kirk M. Lyons

Encl.

<u>**BY E-MAIL**</u>                    ops@bromar.com.cn
                                          lorri@bromar.com.cn

Bromar Maritime Co., Ltd.
Room 611, No. 97 Ju Ye Road
Shanghai, China 200135

U:\kmhldocs\2618009\Correspondence\Five Ocean 01 ltr.doc

# Exhibit 4

*Exhibit 4*

LYONS & FLOOD, LLP
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400

RECEIVED

08 FEB -1 PM 5:26

U.S. DISTRICT COURT
S.D.N.Y.

Attorneys for Plaintiff
GLORY WEALTH SHIPPING SERVICE LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

GLORY WEALTH SHIPPING SERVICE LTD.,

Plaintiff,

- against -

FIVE OCEAN CORPORATION LTD.,

Defendant.

-----------------------------------------------------------------X

**ECF CASE**

08 Civ.

## VERIFIED COMPLAINT

Plaintiff GLORY WEALTH SHIPPING SERVICE LTD. ("GLORY"), by its

attorneys, Lyons & Flood, LLP, as and for its Verified Complaint against defendant,

FIVE OCEAN CORPORATION LTD. ("FIVE OCEAN"), alleges upon information and

belief as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure and the action falls within the Court's subject

matter jurisdiction pursuant to 28 USC §§ 1331 and 1333.  Subject matter jurisdiction

also exists because the action arises under the New York Convention on the Recognition

and Enforcement of Foreign Arbitral Awards at 9 USC § 201 *et seq.* and/or the Federal

Arbitration Act, 9 USC § 1 *et seq.*

2.      At all material times, plaintiff GLORY was and still is a corporation

organized and existing under the laws of a foreign country, with an office and place of

4

business at #.25-03 Suntec City Tower, Four-Singapore 038986 and is the disponent

owner of the M/V TE HO ("the Vessel").

3.    Upon information and belief, at all material times, defendant FIVE

OCEAN was and still is a corporation organized and existing under the laws of a foreign

country, with an office and place of business at 7th Floor, Jeong-an Bldg., 57-10,

Seosomun-Dong, Chung-Ku, Seoul, Korea 100-814, and was the charterer of the Vessel.

4.    By a time charter dated January·8, 2008 (the "Charter Party"), defendant

FIVE OCEAN chartered the Vessel from plaintiff GLORY for a period of time to run

from January 11, 2008, until a minimum date of May 7, 2008, and a maximum date of

June 6, 2008.

5. .    On or about January 11, 2008, plaintiff GLORY delivered the Vessel to

the defendant FIVE OCEAN pursuant to the terms of the Charter Party. .

6.    Clause 31 of the Charter Party prohibits the Vessel from trading with Iraq

or from sailing into the Arabian Gulf if general hostile action exists or is seriously

threatened as defined by Lloyds of London.

7.    Under the Charter Party, defendant FIVE OCEAN is required to pay

plaintiff GLORY, hire payments of $82,000 per a day every 15 days. .

8.    On or about January 11, 2008, after the Vessel was under charter to them,

defendant FIVE OCEAN sub-chartered the Vessel to Brave Bulk Transport Ltd

("BRAVE BULK").

9.    On or about January 15, 2008, BRAVE BULK subsequently issued

voyage instructions to the Vessel to load in the US Gulf Coast and proceed to a discharge

port in Iraq.

10.     Pursuant to the terms of the Charter between GLORY and FIVE OCEAN, plaintiff GLORY refused to allow the Vessel to proceed to an Iraqi discharge port.

11.     On or about February 1, 2008, defendant FIVE OCEANS in response to GLORY'S refusal to allow the Vessel to discharge in Iraq, wrongfully, and in breach of the Charter Party, repudiated and terminated the Charter Party. GLORY, in turn have accepted FIVE OCEAN's notice as a repudiation of the Charter Party, resulting in a termination of said Charter.

12.     On information and belief, defendant FIVE OCEAN has failed to pay the hire payments due and owing to plaintiff GLORY for the hire period covering January 26, 2008, until February 1, 2008, an amount of approximately $468,316.15, as nearly as now can be calculated.

13.     Due to defendant FIVE OCEAN's wrongful repudiation of the Charter Party, plaintiff GLORY will have to re-charter the Vessel to a subsequent charterer at the current market rate of hire payments amounting to $45,000 per day, compared to the Charter Party hire payment rate of $82,000 per day, resulting in a loss of $37,000 in hire payment(s) per day.

14.     On information and belief, based upon the calculated loss of $37,000 of hire payment (s) per day for the remainder of the charter period, a period of approximately 114 days, minus the associated expenses and commission costs, plaintiff GLORY will suffer a loss of hire payments amounting to approximately $4,060,000, as can now be calculated.

15.     Pursuant to Clause 17 of the Charter Party, disputes between plaintiff GLORY and defendant FIVE OCEAN are subject to English law and London arbitration.

16.    Therefore, this action is in aid of arbitration in accordance with 9 USC § 8.

17.    Under English law, plaintiff would expect a London arbitration tribunal to award interest on the principal amounts awarded at a rate of approximately 7.5%. Plaintiff has therefore calculated interest on the sums set forth in paragraphs ¶ ¶ 14 and 15 of the Verified Complaint herein based on that interest rate.

18.    Under English law, plaintiff would also expect a London arbitration tribunal to award the legal costs of arbitration against defendants. These legal costs would include plaintiff's London solicitors' legal fees, experts' fees, barristers' fees in relation to the arbitration hearing, costs associated with the arbitration hearing itself, and travel costs and expenses for witnesses attending the hearing.

19.    The defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but upon information and belief, FIVE OCEANS has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court held in the hands of garnishees, which are believed to be due and owing to defendant FIVE OCEAN.

20.    Plaintiff GLORY hereby demands:

(a)    Payment of $468,316.15 as security for past due hire payment(s) due and owing to plaintiff under the Charter Party;

(b)    Payment of $4,060,000.00 as security for the loss of the $37,000 per day in hire payments that Plaintiff would have received had Defendant fulfilled its obligations under the Charter Party;

(c)    Payment of $1,018,832.00 as security to cover interest on the

- 4 -

amounts in paragraph (a) and (b) above as recoverable under English law. Plaintiff reserves the right to amend the demand herein in the event the amounts in paragraphs (a) and (b) above shall increase over time; and

(d) Payment of $550,000.00 as security to cover the legal costs in connection with the London arbitration as recoverable under English law. Plaintiff reserves the right to amend the demand in the event the legal costs increase over time.

**Total $6,097,148.10**

WHEREFORE, plaintiff GLORY WEALTH SHIPPING SERVICE LTD., prays that:

a.    process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against defendant citing it to appear and answer under oath all and singular the matters alleged;

b.    since Defendant cannot be found within this District, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and the United States Arbitration Act, 9 USC §§ 1, 8 and 9, attaching all of the defendant's tangible or intangible property in this District or claimed by or being held for, belonging to, due or being transferred to, from, or for the benefit of defendant by any garnishees within this District, in the amount of $6,097,148.10 to secure plaintiff GLORY's claims, and that all persons claiming any interest in the same

be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters

alleged;

      c.     this Court retain jurisdiction over this matter for purposes of any

subsequent enforcement action as may be necessary;

      d.     judgment be entered by this Court in favor of plaintiff and against

defendant enforcing and recognizing any London arbitration award(s) or judgment(s) that

may be rendered on the claims set forth herein; and

      e.     plaintiff has such other, further, and different relief as this Court may

deem just and proper.

Dated: February 1, 2008

                         LYONS & FLOOD, LLP
                         Attorneys for plaintiff
                         GLORY WEALTH SHIPPING SERVICE LTD.

        By:        _Edward P. Flood_ _____

                         Edward P. Flood (EF-5797)
                         Kirk M. Lyons (KL-1568)
                         65 West 36th Street, 7th Floor
                         New York, New York 10018
                         (212) 594-2400

U:\kmhldocs\2618009\Pleadings\Verified Complaint.doc

## VERIFICATION

Edward P. Flood, the undersigned, an attorney admitted to practice in this Court,

state that I am the attorney of record for plaintiff GLORY WEALTH SHIPPING LTD.,

in the within action; I have read the foregoing Verified Complaint and know the contents

thereof; the same is true to my knowledge based on documents in my file, except as to the

matters therein stated to be alleged on information and belief, and as to those matters I

believe them to be true.

The reason this Verification is made by me and not an officer of plaintiff GLORY

WEALTH SHIPPING SERVICE LTD., is because there are no officers now present in

this District.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on:   February 1, 2008

_____
Edward P. Flood

U:\kmhldocs\2618009\Pleadings\Verified Complaint.doc

# Exhibit 5

*Exhibit 5*

NOURSE & BOWLES, LLP
Attorneys for Defendant
FIVE OCEAN CORPORATION LTD.
One Exchange Plaza
At 55 Broadway
New York, NY 10006-3030
(212) 952-6200


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GLORY WEALTH SHIPPING SERVICES LTD.,   :
                                                                         :
                        Plaintiff,                          :
                                                                         :    08 Civ. 1102(VM)
                        - against -                         :
                                                                         :       **VERIFIED GENERAL**
FIVE OCEAN CORPORATION LTD.,               :       **APPEARANCE, ANSWER**
                                                                         :          **TO COMPLAINT**
                        Defendant.                       :       **AND COUNTERCLAIM**
                                                                         
                                                                         
-------------------------------------------------------------X


        Defendant, FIVE OCEAN CORPORATION LTD. (hereinafter referred to as

"Defendant"), by its attorneys, NOURSE & BOWLES, LLP, appearing generally herein

and as and for its Answer and Counterclaim to the Complaint of GLORY WEALTH

SHIPPING SERVICES LTD. (hereinafter referred to as "Plaintiff") herein alleges on

information and belief as follows:

## AS AND FOR DEFENDANT'S ANSWER

        1.      Defendant admits that Plaintiff alleges a claim arising under the subject

matter jurisdiction of this Court's admiralty and maritime jurisdiction under Rule 9(h) of

the Federal Rules of Civil Procedure and 28 U.S.C. §§ 1331, 1332 and from 9 U.S.C. §§ 1 et seq. and §§ 201 et seq.

Except as so admitted, it denies Plaintiff has a valid claim that invokes said jurisdiction.

2.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint.

3.    Defendant admits it is a corporation organized and existing under the laws of Korea with an office and place of business at 7th Floor, Jeong-an Bldg., 57-10, Seoul, Korea 100-8114 and chartered the vessel M/V TE HO (the "Vessel") from Plaintiff.

4.    Defendant admits that on or about January 8, 2008 it entered into a charter party, as charterer with Plaintiff, as owner, for the vessel TE HO (the "Charter Party").

Except as so admitted, it denies the allegations contained in paragraph 4 of the Complaint

5.    It admits Plaintiff provided notice the Vessel was delivered on January 11, 2008 at about 10:33 hours but denies that Defendant received any services from the Vessel as Plaintiff wrongfully refused to follow Defendant's legitimate voyage orders.

Except as so admitted, Defendant denies the allegations contained in paragraph 5 of the Complaint.

6.    Plaintiff admits that the Charter Party contained a provision that the Vessel was not to be ordered to Arabian Gulf if general hostile actions exist or are seriously threatened as defined by Lloyds of London but it denies that any such conditions existed

or applied in the circumstances. It further denies that the charter prohibited the contemplated voyage of the Vessel to Iraq.

Except as so admitted, it denies the allegations contained in paragraph 6 of the Complaint.

7.     Defendant admits that the rate of hire was $82,000 per day, less any applicable deductions, under the Charter Party payable every 15 days.

Except as so admitted, Defendant denies the allegations contained in paragraph 7 of the Complaint.

8.     Defendant admits it, as disponent owner, subchartered the vessel to Brave Bulk Transport Ltd. (hereinafter "Subcharter Party" and "Brave Bulk") at a rate of $85,000 per day.

Except as so admitted, Defendant denies the allegations contained in paragraph 8 of the Complaint.

9.     It admits that instructions were given for the Vessel to load a grain cargo in the U.S. Gulf for discharge in Iraq.

Except as so admitted, Defendant denies the allegations contained in paragraph 9 of the Complaint.

10.     Defendant admits that, in breach of the Charter Party, Plaintiff refused to allow the Vessel to proceed to Iraq.

Except as so admitted, Defendant denies the allegations contained in paragraph 10 of the Complaint.

3

11.     Defendant admits that Plaintiff, and not Defendant, repudiated the Charter Party by Plaintiff refusing to allow the Vessel to proceed to Iraq, as Defendant was permitted to do under the terms of the Charter Party.

Except as so admitted, Defendant denies the allegations contained in paragraph 11 of the Complaint.

12.     It denies that any hire was due for the said period as Plaintiff refused to follow Defendant's legitimate orders respecting the Vessel.

Except as so answered, it denies the allegations contained in paragraph 12 of the Complaint.

13.     Defendant denies that it repudiated the Charter Party and denies that the current market rate for the Vessel is only $45,000 per day, as alleged by Plaintiff, which greatly exaggerates, on the low side, the current state of the vessel charter market and greatly exaggerates the amount of Plaintiff's claimed damages and pre-judgment order of attachment of Plaintiff's property.  Plaintiff has also failed to take into account payments and credits in its damage calculations.

Except as so answered, Defendant denies the allegations contained in paragraph 13 of the Complaint.

14.     Plaintiff has greatly exaggerated, on the low side, the state of the vessel charter party market and thereby greatly exaggerated Plaintiff's claimed damages. Plaintiff has also failed to take into account payments and credits in its damage calculations.

Except as so answered, Defendant denies the allegations contained in paragraph 14 of the Complaint.

15.     Defendant admits that the Charter Party calls for arbitration of disputes in London and for application of English law.

16.     Defendant denies Plaintiff has damages or a valid claim and hence that Plaintiff is entitled to attach Defendant's property pursuant to 9 U.S.C. § 8.

Except as so answered, Defendant denies the allegations contained in paragraph 16 of the Complaint.

17.     Defendant admits that a London arbitration tribunal might award interest to a prevailing party with a money judgment claim.

Except as so admitted, Defendant denies the allegations contained in paragraph 17 of the Complaint.

18.     Defendant admits that a London arbitration tribunal might award legal costs to a prevailing party.

Except as so answered, Defendant denies the allegations contained in paragraph 18 of the Complaint.

19.     By this General Appearance and Answer Defendant may be found within the District and any further attachments of Defendant's property should therefore be barred.

Except as so answered, Defendant denies the allegations contained in paragraph 19 of the Complaint.

20.     Defendant denies that Plaintiff is entitled to any of the amounts set forth in paragraph 20 of the Complaint.

## FIRST DEFENSE

21.     Defendant generally denies the claim of Plaintiff, and denies it has any liability to Plaintiff, as alleged.

## SECOND DEFENSE

22.     Plaintiff's Complaint fails to state a valid claim against Defendant upon which relief can be granted.

## THIRD DEFENSE

23.     Defendant's actions in ordering the Vessel to Iraq were entirely legitimate under the terms of the Charter Party and Plaintiff repudiated the Charter Party by refusing to following these legitimate orders.

## FOURTH DEFENSE

24.     Plaintiff's alleged damages fail to take into account payments made by Defendant and other credits.

## FIFTH DEFENSE

25.     Plaintiff's alleged damages and request for attachment fails to take into account bunkers delivered to the vessel for which Plaintiff has had the use and benefit.

## SIXTH DEFENSE

26.     Defendant asserts, by way of defense, the terms and conditions of the Charter Party.

## STAY OF ACTION

27.     Plaintiff's claim against Defendant should be stayed pending arbitration.


## AS AND FOR DEFENDANT'S COUNTERCLAIM

28.     Defendant repeats and realleges paragraphs 1-20 above as if set forth herein at length.

29.     Defendant's counterclaim arises under the aforesaid Charter Party between it and Plaintiff and is an admiralty and maritime claim within this Court's admiralty and maritime jurisdiction and within Rule 9(h) of the Federal Rules of Civil Procedure.

30.     Plaintiff without justification failed and refused to perform its obligations under the Charter Party and, in particular, failed to perform a voyage that was legitimate and fully permitted under the Charter Party and, in fact, Plaintiff repudiated the said Charter Party by its actions.

31.     By reason of Plaintiff's repudiation and failure to perform the Charter Party, Defendant has suffered damages.  This includes (1) damages in the amount of $1,840,900.94 consisting of prepaid charter hire paid by Defendant to Plaintiff for which no vessel services were rendered; (2) a loss of $270,000 in profits that Defendant would have earned under the Subcharter Party to Brave Bulk based on the difference in rates between the Charter Party and the Subcharter Party; (3) damages in the amount of $3,439,283.75 arising by virtue of claims by Brave Bulk against Defendant arising under the Subcharter Party, all for a total principal claim, as best as can presently be calculated, in the amount of $5,550,184.69.

32.    Defendant's claim is subject to arbitration in London where legal and arbitral costs are routinely awarded to the prevailing party.  Defendant claims costs in the amount of $550,000, the same amount sought by Plaintiff in paragraph 20(d) of its Complaint.

33.    Interest is also routinely awarded in arbitration in London and Defendant claims compound interest at three month rests on the principal amount of its counterclaim of $5,550,184.69 at 7.5% per annum for three years, the same apparent basis as claimed by Plaintiff in paragraph 13 of its Complaint for interest in the amount of $1,385,972.01 on this basis.

34.    Defendant's counterclaim against Plaintiff, with costs and interest, amounts to $7,486,156.70, as best as can presently be calculated.

35.    Defendant's property has been attached by Plaintiff in this case and Defendant's counterclaims arise out of the same transaction as Plaintiff's claim. Defendant is therefore entitled under Rule E(7) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure to countersecurity for its counterclaim, including interest and costs.

WHEREFORE, Defendant prays:

(a)    That Plaintiff's Complaint be dismissed with costs and its attachment of Defendant's assets vacated;

(b)    That Plaintiff's claims and attachments of Defendant's property be vacated or reduced as they are greatly exaggerated;

(c)    That Defendant have countersecurity for its counterclaims;

8

(d)    That, by virtue of this General Appearance, Answer and Counterclaim all further attachments against Defendant's property be barred.

(e)    That Defendant have discovery with respect to the amounts claimed by Plaintiff on which Plaintiff premises its attachments;

(f)    That the matter be stayed pending arbitration; and

(g)    That Defendant has such other and further relief as may be just and equitable.


Dated: New York, New York
       February 28, 2008

                           NOURSE & BOWLES, LLP
                           Attorneys for Defendant
                           FIVE OCEAN CORPORATION LTD.

                           By:_____
                               Armand M. Pare, Jr.(AP-8575)
                               One Exchange Plaza
                               At 55 Broadway
                               New York, NY  10006-3030
                               (212) 952-6200

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF NEW YORK         )

ARMAND M. PARÉ, JR., being duly sworn, deposes and says:

I am a member of the firm of Nourse & Bowles, LLP, attorneys for defendant herein and I have read the foregoing Verified General Appearance, Answer to Complaint and Counterclaim and know the contents thereof and that the same are true to my own knowledge, except as to the matters herein stated to be alleged on information and belief, and as to those matters I believe them to be true.

The source of my information is documents, records and other information submitted to me on behalf of the defendant.

This verification is made by me because defendant is a foreign corporation.

_____
ARMAND M. PARÉ, JR.

Sworn to before me this
28 day of February, 2008

_____
Notary Public

MARY T. BANNON
Notary Public, State of New York
No. 01BA4785995
Qualified in New York County
Commission Expires February 28, 2013

10

# Exhibit 6

*Exhibit 6*

478fponc                    Conference

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    PIONEER TRADING (ASIA PACIFIC)
      LTD.,
 4
                    Plaintiff,
 5
              v.                           04 CIV 5655 (DAB)
 6
      SEYANG SHIPPING COMPANY,
 7    LTD.,,

 8                    Defendant.

 9    ------------------------------x

10                                         August 19, 2004
                                           11:15 a.m.
11
      Before:
12
                        HON. DEBORAH A. BATTS,
13
                                           District Judge
14
                              APPEARANCES
15
      HEALY & BAILLIE, LLP
16         Attorneys for Plaintiff
      BY:  LEROY LAMBERT
17
      NOURSE & BOWLES, LLP
18         Attorneys for Defendant
      BY: ARMAND M. PARE
19

20

21

22

23

24

25
```

478fponc                          Conference

1              THE COURT:  Good morning.  Please be seated.

2              Pioneer Trading Ltd. versus Seyang Shipping Company

3    Ltd.

4              On behalf of the plaintiff we have Mr. Lambert?

5              MR. LAMBERT:  Yes, your Honor.  Good morning.

6              THE COURT:  And on behalf of the defendant we have

7    Mr. Pare?

8              MR. PARE:  Yes, your Honor.

9              THE COURT:  Good morning.

10             Now, the issue initially seems to be whether or not at

11   the time that the plaintiff filed its papers seeking the

12   garnishment, that indeed the defendant was, quote, not to be

13   found in the district.

14             I have reviewed the plaintiff's papers and the

15   defendant's papers, and I have seen what the plaintiff did in

16   ascertaining whether or not the defendant was here, and I have

17   seen the response of the defendant.

18             Now, Mr. Lambert, was there any reason that the

19   Secretary of State was not served?

20             MR. LAMBERT:  Your Honor, we have 120 days to serve

21   the complaint, and what we were after is quasi in the realm of

22   jurisdiction, trying to get the property in this District,

23   and --

24             THE COURT:  All right.  So, I guess my question is:

25   What was the basis for that if, indeed, he was, the defendant

478fponc                    Conference

1    was found in the district?

2              MR. LAMBERT:  The person registered as the corporation

3    under New York law with the Secretary of State was a New York

4    corporation of the same name.  Our defendant is a Korean

5    corporation.

6              There is no dispute that the defendant is the Korean

7    corporation and it's an interesting point, but there is simply

8    no allegation that, say, I will call them Seyang New York is

9    doing the business of Seyang Korea in this District or New York

10   at all.

11             So, I, frankly -- I mean, since I'm the one who did

12   the affidavit of search, I was tempted just to stop there, as

13   we say, in the brief.  They could have incorporated Smith

14   Brother's Shipping.  It's a separate entity and I am not

15   alleging veil piercing.

16             THE COURT:  You are not alleging veil piercing?

17             MR. LAMBERT:  No, I am not, as Seyang New York and

18   Seyang Korea.

19             THE COURT:  Let me hear from Mr. Pare.

20             MR. PARE:  We do not think that that is the critical

21   issue in this case, and the reason for that is that it is not

22   clear that any funds have been attached by the first round of

23   attachments.  We think that the critical issue in this case is

24   whether future attachments should be permitted or whether,

25   instead, the case should be stayed pending arbitration, as

1    plaintiff pleaded in paragraph three of its where for clause of

2    the complaint.

3              I would be happy to answer any questions.

4              THE COURT:  I understand where you are going.  You

5    have to deal with what I want first.

6              MR. PARE:  Yes, your Honor.

7              THE COURT:  And my question is:  As I understood you

8    were initially challenging that the requirements for getting

9    the in rem signed initially had not been met because you were

10   in the district?

11             MR. PARE:  Well, that's correct, your Honor.

12             And the basic point, of course, on the Seawind is you

13   have to be prevent in the district in two ways:  One, you have

14   to be present for jurisdictional purposes.  By filing an

15   incorporation, that makes you present in every district in this

16   state, and that's the Chilean Line case decided by the Second

17   Circuit.

18             The second question is:  Are we present for service of

19   process?  And there are at least two points there.  The first

20   point, of course, is that by going on line or calling up the

21   Secretary of State, you find out low and behold, eighth floor,

22   302 Park Avenue, big sign.

23             THE COURT:  No, no, no.  I appreciate that.  But my

24   question is:  I understand Mr. Lambert's position is that

25   whoever was registered with the Secretary of State in New York

478fponc                          Conference

1   was not the company that he was trying to sue.

2            MR. PARE:  Well, your Honor, the only response I can

3   make to that, it was not I who did that work, but the affidavit

4   of Mr. Bach, who did do that work makes it clear that the

5   purpose of incorporating the identical name was to create a

6   presence in the district for Seyang Shipping Company Ltd. of

7   Korea to do business.  That is what we contend.

8            THE COURT:  So I guess my question is, if you bear

9   with me a minute, I want to refer back to the actual

10  Certificate of Incorporation.  All right.

11           So, your position, Mr. Pare, is that the Certificate

12  of Incorporation refers to Seyang Shipping Company, Ltd. which

13  is the same name that is used for the defendant in the papers

14  before the Court?

15           MR. PARE:  Yes, your Honor.

16           THE COURT:  And that by registering Seyang Shipping

17  Company, Ltd. with the Secretary of State, you were subjecting

18  Seyang Shipping Company, Ltd. to the jurisdiction of the Courts

19  in New York, both for purposes of service and for jurisdiction?

20           MR. PARE:  Well, certainly for purposes of --

21           THE COURT:  Service.

22           MR. PARE:  -- jurisdiction.

23           THE COURT:  All right.

24           MR. PARE:  And for service, then, the question is,

25  because for service the plaintiff correctly points out that

                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1    service has to be able to be made within the district, not just

2    within the state.  And for that, that's when I get to my first

3    point, is that you just go to the eighth floor.  Then the

4    second point, of course, is that there was a person, by

5    prearrangement, who would have accepted service of process

6    there as Mr. Bach's affidavit says.

7           THE COURT:  That is not known to a person trying to

8    serve process.

9           MR. PARE:  I agree with that, your Honor.  As the

10   cases say, including Seawind, itself, and the other cases we

11   cited, including Dragonfly, which is a case I lost in which the

12   judge said to me I should have called up my opponent and asked

13   him specifically, will you accept service of process?

14          All the plaintiff had to do in this case was, I take

15   it, I have read their papers -- again, they did go up to the

16   eighth floor, they looked on the wall to see if Mr. Bach's name

17   was on the wall.  Not seeing Mr. Bach's name on the wall, they

18   didn't ring the bell.  Our point is under Seawind, under

19   Dragonfly and under the Gogetter case, there was an obligation

20   to inquire further given the facts of this case.  If this was

21   an Easter egg hunt, they would have flunked the test.  All

22   markers indicated exactly where they could go to find Seyang.

23          MR. LAMBERT:  May I respond, your Honor?

24          THE COURT:  Well, I guess my question is:  You are

25   saying that the Secretary of State was not someone designated

7

478fponc                      Conference

1    by whom process could be served?

2              MR. PARE:  No, the Secretary of State was designated,

3    that's clear, but the Secretary of State is located in Albany.

4              THE COURT:  Right.

5              MR. PARE:  Not in this District.

6              THE COURT:  So that you are saying that means

7    that that was not sufficient?

8              MR. PARE:  That's what plaintiff would say.  To which

9    my response is all you have to do is look at the Certificate of

10   Incorporation, and it points you to the eighth floor of 302

11   Fifth Avenue, where, indeed, there is a person there who will

12   accept service of process.  All you have to do was ring the

13   bell.

14             THE COURT:  There is only one door, I take it?

15             MR. PARE:  There is only one door, and that's what Mr.

16   Bach's affidavit states.

17             THE COURT:  Mr. Bach's name is not on the door?

18             MR. PARE:  It's not on the door.  My name is not on

19   the door of my office, nor is it in the lobby, but I am there

20   and have been there for 15 years.

21             THE COURT:  And Seyang Shipping Company, Ltd. was not

22   on the door?

23             MR. PARE:  It was not, your Honor.

24             THE COURT:  All right.  So, it's a question of whether

25   or not that was sufficient for expecting the plaintiff to take

8

1   the next step, and go in and ask at which point he would have

2   been told -- we are speculating about what he would have been

3   told.  He could have been told anything.  We don't know who are

4   you talking about or what you are talking about to, yes, we

5   will accept service.

6          MR. PARE:  We are not speculating.  Mr. Bach's

7   affidavit says by prearrangement Ms. Su Yung Yi had authority

8   to accept service of process.  He arranged it with her.

9          THE COURT:  All right.

10         MR. PARE:  I don't believe it's a matter of

11  speculation.  That was the arrangement.  There is no more

12  speculation than if it had been in writing, signed and with the

13  Secretary of State.

14         THE COURT:  All right.  So your position, Mr. Pare, is

15  that the plaintiff didn't go far enough in terms of trying to

16  establish whether or not the defendant could be found within

17  the district?

18         MR. PARE:  Yes, your Honor.

19         THE COURT:  Mr. Lambert, your position is that based

20  on what was visible, you feel that you did all that was

21  required of you?

22         MR. LAMBERT:  That is correct, your Honor.

23         But there is more.  In that event, if I had taken the

24  extra step, the person I sent up there to look reported there

25  is no name or Seyang.  It just says law offices.  I think that

1    is what he reported and later gone in, what was he supposed to

2    ask?  Is Seyang here?  The answer may have said no.

3         Was he supposed to ask, is someone here authorized to

4    accept process of service for Seyang Korea?  We don't know what

5    the answer is.  Even if he had done all that, and the person

6    said yes, and also, if you look at Exhibit A to the complaint,

7    Mr. Bach, all he had to do was say I, in New York, am the agent

8    for service of -- I, in Manhattan, am the agent for service of

9    process.  He didn't do that.  He designated the Secretary of

10   State in Albany, and service on Mr. Bach in any normal suit

11   would not be good service, I believe.  You probably deal with

12   that issue every day.

13        But service is on the Secretary of State.  The

14   Secretary of State then forwards the documents to Mr. Bach.

15   Mr. Bach presumably thought about it and decided I am not going

16   to be the agent for service of process of Seyang New York, but

17   even if I had done all of that, all that I would have effected

18   was service on Seyang New York.  I still haven't, and he's made

19   no allegation or contention or affidavit that Seyang Korea is

20   doing business in this District.  He's not contending that

21   Seyang New York is the general agent that derives any revenues,

22   that it's doing the business of Seyang Korea.

23        THE COURT:  Bear with me just one second.

24        Your distinction about Seyang New York and Seyang

25   Korea do not appear to be present in the defendant that you

478fponc                          Conference

1    have named in the caption, which is merely Seyang Shipping

2    Company Limited.

3              MR. LAMBERT:  It's alleged to be a Korean corporation.

4    I don't think there is any dispute.  The party that is a party

5    to the arbitration in London is Seyang London -- Seyang Korea.

6    It's two different companies.

7              The other thing Mr., I assume after hearing all this,

8    Mr. Bach is an attorney.  But after I got the report that there

9    is no name on that floor, I went to the -- and set out in my

10   affidavit of search, which was presented to the Court at the

11   time the order was signed, and said well, Mr. Bach's address is

12   in Flushing.  For all I knew, he moved and that's in the

13   Eastern District.

14             But anyway, I believe I met my obligation of due

15   diligence.

16             There is also a case which we cite in our brief for a

17   different point that talks about even having -- the McAllister

18   case, I mention that in the record, where it talks about the

19   obligation of due diligence.  It's from the Eastern District of

20   Pennsylvania.  It turned out an officer lived in Philadelphia

21   and we were supposed to find him.  The court rejected, held

22   that the plaintiff had met its obligation of due diligence.

23             Again, these are all interesting issues, but at the

24   end of the day, in the absence of any allegation by Seyang

25   Korea that it is, in fact, doing business in this District, it

478fponc                        Conference

1    wouldn't have mattered what service I could have performed or

2    affected on Seyang New York.

3            Mr. Bach had -- let me just --

4            THE COURT:  No, no.  Because I'm -- you left me behind

5    at the train station.

6            MR. LAMBERT:  Okay.

7            THE COURT:  I am confused.  Because you are saying

8    that Seyang Korea is different from Seyang New York even though

9    they are both called Seyang Shipping Company, Ltd.?

10           MR. LAMBERT:  I am saying that Seyang Korea is a

11   corporation organized, I think, publicly traded in Korea, and

12   they come to New York and apparently instruct Mr. Bach, who is

13   apparently an attorney, to create a presence by forming a

14   corporation, a New York corporation.

15           He had another option under the business corporation

16   law.  He could have qualified Seyang Shipping Company, Ltd. of

17   Korea as a corporation in New York; that's not our case either.

18           So, he neither, he neither established a

19   jurisdictional presence for Seyang Korea, nor did he establish

20   a person, an actual person within the bounds of this District

21   upon whom to effect service, because he chose the Secretary of

22   State for New York, and he's in Flushing.

23           And, so, anyway, to me, I think that we satisfied our

24   obligation of due diligence.  In fact, I think we went more,

25   because we, ourselves, raised the issues by putting all these

478fponc                    Conference

1    funny facts in our affidavit.

2              It was puzzling to me why somebody would form another

3    company.  It appears, it appears that earlier in February or

4    January of this year, an affiliate of Seyang had been subject

5    to an attachment order in an unrelated case.  It's not my place

6    to speculate as to why they did it this way.

7              THE COURT:  All right.

8              MR. LAMBERT:  But they didn't make themselves found in

9    this district.  And Seyang Korea is not found to this day in

10   this district.  They are not doing business in this district.

11             THE COURT:  All right.  Then let me ask you,

12   Mr. Lambert.  Do you say that the fact that they have answered,

13   filed a general answer in this case is not sufficient for them

14   to be found for personal jurisdiction?

15             MR. LAMBERT:  Yes, I say that, and agree with

16   Mr. Pare, that that is the interesting issue.

17             I do, just to follow up on his opening remark, I am

18   not aware of any property found or -- I will use a different

19   word -- any property attached as a result of our attempts to

20   attach property.

21             THE COURT:  How many banks have you gone to at this

22   point?

23             MR. LAMBERT:  We went to 17 in the space of three or

24   four days.  Several of the banks we went to on several

25   occasions.  I have received, I just tallied it up, I have

13

478fponc                        Conference

1     received a response in some fashion from nine of the 17, and

2     the responses range from a correct response to a handwritten

3     nothing on a piece of paper.  And but I think it's fair to say

4     that if, in fact, we had -- I think it's fair to say Seyang

5     Korea at this point doesn't have an account at any of these

6     banks, but --

7                THE COURT:  I'm sorry.  An account?

8                MR. LAMBERT:  An account at any of these banks,

9     otherwise I think we would have heard.

10               I do want to reserve on that, and whatever comes out

11    of this hearing, I would like a carve out to allow me time to

12    follow up with the various garnishees to make sure that I have

13    been told an accurate and complete story.

14               But --

15               THE COURT:  So that, in essence, the garnish -- the

16    attachment has been mooted by lack of funds to support it.

17               MR. LAMBERT:  It could very well be, your Honor.

18               THE COURT:  All right.

19               MR. LAMBERT:  And I don't want to take up any of the

20    Court's time or the party's time unnecessarily.  I believe the

21    issue has been squarely presented, but I also agree that the

22    interesting issue for these parties, as well the maritime bar

23    in general, which is the point about whether a general

24    appearance today precludes --

25               THE COURT:  Well, not just today; they answered.

478fponc                              Conference

1          MR. LAMBERT:  A subsequent general appearance preclude

2    any further attachments.

3          THE COURT:  All right.  Mr. Pare.

4          MR. PARE:  Your Honor, I would just like to make two

5    points.

6          The first point I would like to make is it's an almost

7    philosophical and certainly a hypertechnical distinction as to

8    whether Seyang Shipping Company, Ltd., Incorporated is a

9    different company from Seyang Shipping Ltd. New York.

10         People can have, you know, different passports and

11   there is no reason, unless you get really hypertechnical about

12   it, why a company cannot do the same thing.  There is no intent

13   to hide here.  They wanted to do business, so they incorporated

14   in New York.

15         The argument to the contrary is they should have done

16   it a different way.  They should have registered to do

17   business.  I think that is a supertechnical decision.

18         THE COURT:  Your position is they are identical?

19         MR. PARE:  They are.

20         THE COURT:  Seyang Shipping Company Korea is the same

21   company that has been incorporated as Seyang Shipping Company

22   New York?

23         MR. PARE:  And, your Honor, I guess I have two levels

24   of response.  Yes, they are.  And, two, if they are not,

25   they're so close, for purposes of due diligence they are close

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

478fponc                          Conference

1    enough.

2          THE COURT:  Well, see, I guess the problem is is that

3    the plaintiff, not being sure of that, has a right to question

4    whether or not New York is sufficient.

5          MR. PARE:  That's fine.  Questioning inquiry, you are

6    on notice, as my opponent indicated, if Seyang Shipping Company

7    Ltd., the New York company, was a managing agent of the Korean

8    company, he concedes that that would have been enough for the

9    Korean company to be present in the district.

10          And here we are with a company with the identical

11    name, formulated for the very purpose of the Korean company

12    doing business in New York.  That's at least as good as a

13    managing agent in New York.

14          The second --

15          THE COURT:  Well, it certainly might be if we are

16    talking about New York, but the specific issue here is within

17    the district.

18          MR. PARE:  Oh, they certainly are within the district,

19    because remember they are incorporated in New York and,

20    therefore, under the Second Circuit Shaneline case, they are

21    present in every district in the case for purposes of

22    jurisdiction.

23          THE COURT:  All right.  But in terms of purposes of

24    service?

25          MR. PARE:  Well, service, that is a different story.

478fponc                          Conference

1    That's two things.  That gets me to my second point.

2              One, is ring the bell, and the second point is as my

3    noble, my learned colleague, a good friend of mine says, he

4    called up the 212 number for Seyang Shipping Company, Ltd.  He

5    got a recording that says this is Seyang Shipping Company.

6    Please a message.  No message was left.  No inquiry was made.

7    Where are you located?  Is there somebody here I can serve?

8    That's not sufficient under the due diligence standard under

9    Dragonfly, under Seawind and the under Gogetter.

10             THE COURT:  And you are saying because it's a 212 area

11   code, which is the Southern District, because it did answer in

12   the name of the company in question and it did say leave a

13   message, and no message was left, that you are saying that that

14   should have put the plaintiff on notice that they were present,

15   that Seyang Shipping Company was present within the district.

16             MR. PARE:  Yes.  And at the very least it put them on

17   further inquiry notice.

18             THE COURT:  To leave a message or something?

19             MR. PARE:  To leave a message and ask, ask a simple

20   question.

21             THE COURT:  Okay, all right.

22             MR. LAMBERT:  Your Honor, may I just --

23          .  THE COURT:  Sure.

24             MR. LAMBERT:  But again, it's nice to hear that, in

25   effect, Seyang Korea has pierced its own corporate veil with

1    Seyang New York.

2            Again, just basic corporate law.  Seyang New York is

3    not Seyang Korea and, as a matter of fact, despite the

4    contentions Mr. Pare just made, none of the -- they presented

5    no facts, they have not even denied that the 212 number was

6    ringing in Flushing, New York, not in the Southern District.

7    There is no office of Seyang New York in this district.  The

8    212 is simply a tie line.  And there is no person in this

9    district.

10           All that Seyang New York had to do to get at a person

11   in this district is to appoint, fill in the form of the

12   Certificate of Incorporation and name someone.  They didn't do

13   that.

14           And besides Seyang New York is not Seyang Korea.

15           THE COURT:  All right.  Well, Mr. Pare?

16           MR. PARE:  Once again, your Honor, they don't have to

17   have a person in New York.  They have incorporated in New York.

18   They are in New York, everywhere in New York.  They don't have

19   to have a person.  They don't have to have an office.  They

20   don't even have to do any business.  They are here under

21   Chilean line, the decision of the Second Circuit.

22           THE COURT:  So that's for purposes of jurisdiction?

23           MR. PARE:  Yes.

24           MR. LAMBERT:  But they don't have a physical person in

25   this District to whom to hand something to.

18

478fponc                    Conference

1              THE COURT:  Are you talking about service?

2              MR. LAMBERT:  I am talking about service.

3              THE COURT:  You agree with Mr. Pare that in terms of

4     jurisdiction, they are present here.

5              MR. LAMBERT:  Not necessarily, your Honor.  Because

6     that is another point that I would just like to make for the

7     record.

8              The Chilean line case was based on a draft, some

9     comments for a draft ruling at the time, and now -- then

10    district Judge Lavalle wrote in 1979, in the Integrated

11    Container Service Case, 476 F.Supp. 119, and the Fifth Circuit

12    picked up on it in 1981, that Chilean Line is questionable on

13    that point.

14             And, in fact, Judge Lavalle in '79, as a then district

15    judge, said that service on the Secretary of State in Albany

16    would not be sufficient for a New York corporation where that

17    was the only agent for service of process because that's the

18    Northern District not the Southern District.  But ultimately

19    the key point is there is no physical person in this district.

20             THE COURT:  But I guess that this is sort of a

21    wrinkle, because the Secretary of State is directed to send

22    whatever process received to an address, a name and address in

23    the Southern District of New York.

24             MR. LAMBERT:  But again, just by definition, your

25    Honor, if I had tried to serve Mr. Bach, I'm not sure that that

478fponc                          Conference

1     in other circumstances -- now it's to their advantage to say

2     it's good.  Obviously, they weren't convinced at the time, or

3     else he would have named like CT Corporation, like all the

4     registered agents for service of process in New York do.

5          For whatever reason, they were trying to have it both

6     ways.  They were trying to have it many ways.  The whole idea

7     of incorporating a separate corporation, the shell game with

8     Mr. Bach, and the tie lines to Flushing.  I think the orders

9     that were presented were correctly signed and the attachments

10    issued thereunder were valid.

11          THE COURT:  All right.  So, it seems to me that there

12    are enough open factual questions here so that it certainly

13    appears that at the time that the order was served, and signed

14    by Judge Hellerstein, that the plaintiff had, indeed, met,

15    excuse me, its requirements for due diligence, because all of

16    these issues are being raised again today.

17          In terms of whether Seyang Korea and Seyang New York

18    are the same in terms of whether having a person available in

19    Queens with a tie line into Southern District of New York is

20    sufficient for being present in the district, there is also a

21    question that based on what was in the Certificate of

22    Incorporation.  The Secretary of State would mail, as agent

23    would mail to this address and to this person's name, but that

24    person's name did not appear anywhere on the building, and only

25    by going into the office, inquiring of somebody of either where

1    is Mr. Bach, or is someone here handling legal affairs for

2    Seyang Shipping Company, which the plaintiff's position is is

3    asking a bit too much under the circumstances.

4            I can see that a reasonable person would think that

5    they had gone far enough.  And I also understand that Mr. Pare,

6    you must agree that the additional steps required in order to

7    ascertain that they were not in the district could have been

8    obviated by a simple agency by Mr. Bach directly in some place

9    in New York where he could be found -- I'm sorry, the Southern

10   District of New York, where he could be found, rather than

11   putting the individuals to these extra steps.

12           And, I mean, I think it's significant that he's in

13   Queens.  The tie line goes to Queens, I assume, the 212 line?

14           MR. PARE:  I'm not sure.

15           THE COURT:  Okay.  But do you disagree with

16   Mr. Lambert that it's a tie line?

17           MR. PARE:  I don't think I disagree with it.  I'm not

18   sure of all the mechanics of how telephones work.

19           THE COURT:  My question is:  You do not, are you

20   disagreeing that should, someone, when someone calls 212 number

21   they are actually making contact with someone out of the

22   Southern District?

23           MR. PARE:  Again, I am not sure of that.  I suspect

24   that's the case.

25           THE COURT:  All right.  So you can see that with all

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

478fponc                      Conference

1   of these sort of ambiguous situations, that it is not obvious

2   that the defendant is present for purposes of process in the

3   Southern District of New York.  And, therefore, I agree that

4   with all of these open questions, that certainly the plaintiff

5   had fulfilled its obligation in terms of getting the order

6   signed by Judge Hellerstein.

7           Now, at this point, it is the Court's understanding

8   that certainly for purposes of this lawsuit -- bear with me

9   just one second.

10          Mr. Lambert, I am looking at the general appearance

11  and the answer to complaint filed by Seyang, and looking at

12  paragraph three on page two.  It seems to me that Seyang

13  Shipping Company Ltd. hereafter, hereinafter referred to as

14  Seyang says that Seyang admits that it is a corporation

15  organized and existing under the laws of Korea.

16          Are you saying that is not sufficient for them, Korea

17  to be having, that being the company that has answered and

18  appeared in this case?

19          MR. LAMBERT:  Yes, your Honor, if I have understood

20  the question correctly.  They have made it clear that Nourse

21  and Bowles is acting on behalf of Seyang Korea, not Seyang New

22  York.

23          THE COURT:  But, again, my difficulty is you are the

24  one making the Seyang New York, Seyang Korea distinction.

25          MR. LAMBERT:  Seyang Korea has come in and said we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

478fponc                        Conference

1    generally appear.  Seyang Korea is still Seyang Korea, not

2    doing business in this district or for that matter anywhere in

3    New York.  It wasn't doing business in July.  It wasn't doing

4    business today, unless something changes.  It's not going to be

5    doing business in the future and that brings us directly to the

6    interesting point.

7            Because there are, there are a line of cases which are

8    cited by Mr. Pare, most of them older, holding that a general

9    appearance precludes future attachment.

10           There are cases that we cite on page 12 of our brief

11   that we contend create a difference of opinion in the cases on

12   this point.  Because to be found, to be found in the district

13   means both, having a physical person, and to be doing business

14   here.  Seyang Korea is simply not doing business here in our

15   view.

16           The Supreme Court in Swift and Co., Second Circuit,

17   and numerous District Court cases agree that Rule B has two

18   purposes:  To secure an appearance, and to assure satisfaction

19   of the claim.

20           THE COURT:  Do you agree at least that the appearance

21   has been secured by this answer?

22           MR. LAMBERT:  That's the next part of my argument that

23   I would like to make.

24           THE COURT:  Okay.

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

478fponc                        Conference

1              MR. LAMBERT:  The difficulty in this case arises from

2      the interplay between the purposes of Rule B and the statutes

3      and cases promoting arbitration.  Imagine no arbitration

4      clause, then -- I don't need Rule B to prosecute a plenary in

5      persona claim on the merits against Seyang Shipping.  I'm doing

6      that in London.

7              And the courts, going back to 1944, the Supreme Court

8      said that you can get an attachment in connection with a claim

9      that is otherwise subject to arbitration, so I mean and all the

10     cases -- and I don't think anybody is going to dispute that

11     that's the law, and nobody is asking anybody to revisit that

12     development in the law over the years.

13             THE COURT:  Just refresh my recollection on that.  In

14     those cases, at what stage has the attachment been sought

15     vis-a-vis the arbitration?

16             MR. LAMBERT:  They have been allowed at any stage.

17             THE COURT:  Including --

18             MR. LAMBERT:  Including after the arbitration has been

19     commenced.

20             THE COURT:  But prior to a judgement?

21             MR. LAMBERT:  Well, you could also get one subsequent

22     to an award as well.

23             THE COURT:  No.  But my question is in those cases,

24     where attachment has been sought in relation to an arbitration,

25     has the attachment been sought and granted at the beginning

478fponc                          Conference

1    stages of the arbitration before any ruling had been made or

2    are there cases or are the cases only where there is obviously

3    an award upon which the attachment is based?

4              MR. LAMBERT:   I dare say, your Honor, at all three

5    stages; at the very beginning, in any range in the middle, and

6    afterwards, because it depends what triggers it.

7              Of course, it is the plaintiff's belief, hope,

8    knowledge, that he's found an asset somewhere where the

9    defendant otherwise is not.  And that knowledge comes to him,

10   it has nothing to do with the merits as it were.

11             And the courts, the courts did struggle at the

12   beginning, because some courts said it had to -- you had to

13   commence the action at the time you commenced the arbitration,

14   and under state law and sales contracts, I believe the cases

15   still are that you can't get an attachment at all subject to

16   arbitration, but the maritime line of cases is quite clear.

17   You can get it because of such respect for these remedies, the

18   attachment and the arrest under the supplemental rules, and the

19   maritime practitioners and parties are used to dealing with,

20   so -- and I think Mr. Pare would agree more or less with what I

21   have just said, that it can happen at any time.

22             So, if I already have, if I have already secured a

23   general appearance, if that, if that alone precludes me from

24   getting a Rule B attachment, then it seems to me necessarily

25   that entire line of cases has to be revisited.

1        So it just can't be that simply as Seyang argues.

2   And, indeed, the cases that we refer to make the test, we

3   contend, that what is important is the time, at the time of the

4   filing of the complaint.

5        And we cite from -- I meant to ask one of my

6   colleagues, I have never had to say it out loud in such a

7   public place.  Is it Judge Brieant, we cited on page three.  He

8   says the right to attachment is not defeated by the filing of a

9   general appearance, but for the security of an attachment

10  because there is no real presence here --

11       THE COURT:  Bear with me.  Let me correct myself, its

12  Charlie Brieant.

13       MR. LAMBERT:  It won't come across on the transcript.

14       -- will be of no assistance to plaintiff in enforcing

15  its rights, and is not equivalent to being found within the

16  district.

17       We literally could appoint anyone.  We could also

18  appoint an attorney.

19       In fact, my firm filed a declaratory action in

20  Connecticut within the past year and said we are here, and I am

21  the agent for service of process.  And not, I didn't do it, we

22  are here, in Connecticut, and Judge Droney in the District

23  Court of Connecticut said that, well, that's all very

24  interesting, but are you still not here, you are not doing

25  business here, and refused to vacate the attachment.  That is

478fponc                              Conference

1    the Oilmar case which we have cited on page four of our brief.

2            Now, I think, I don't think it's as simple as it first

3    blush sounds.  And there is another reason I think, a good

4    policy reason for that not being the rule.

5            Because if, if that is that rule, say, that Pioneer is

6    the only maritime creditor in the world that doesn't have a

7    Rule B remedy, because the next creditor that comes along is

8    going to search and, assuming they don't make, name an agent to

9    search and qualified to do business, they're not going to find

10   Seyang Korea.

11           I think the test should be an objective one.  As a

12   practical matter, there are those two purposes of the rule.

13   Just because you have achieved one, doesn't necessarily mean

14   that the second one goes away; that's my position.

15           THE COURT:  I can understand that position.

16           Mr. Pare, do you wish to be heard on that?

17           Before you are, I do want to not lose sight of the

18   fact that we are talking about the legal arguments at this

19   point, but I don't want to forget about the practical factual

20   aspects of this particular case, where, if I understand what

21   you have told me this morning, is that based on the 17 banks

22   sought, there are no assets at this point that have been found?

23           MR. LAMBERT:  No bank has reported to me finding any.

24           THE COURT:  Is that different from what I have said?

25           MR. LAMBERT:  None have been found to date.

478fponc                          Conference

1           And Mr. Pare, his client would be the one to know if

2      it was missing any money or had been prevented from receiving

3      any.

4           MR. PARE:  There is a very important practical

5      difference, your Honor.  My opponent wants to have the ability,

6      as he's pleaded in his complaint, in his pleading, to

7      continuously serve writs of process of maritime attachments and

8      garnishments on banks in the hope of finding something in the

9      future.

10          The reason why he wants to do it in the future has to

11     go with the decision in the Second Circuit call Rebore.  In the

12     Rebore case, the Second Circuit case made it clear, a writ of

13     attachment, which is nothing more than a piece of paper, only

14     attaches a bank account or the funds in a bank account at the

15     very moment the attachment is levied.  If money comes in a

16     second letter, it doesn't get it.  If it comes in a day later,

17     it doesn't get it.

18          For that reason, plaintiffs like to seek to serve

19     multiple writs of attachments today, tomorrow, next month, next

20     year.  That is what we are seeking to prevent and the reason,

21     of course, is that we filed a general appearance.

22          Now, to understand the significance of a general

23     appearance, you have to go back to Rule B, the test, found

24     within the district, and Rule E.  Rule E, it's a little bit of

25     a minuet.

478fponc                    Conference

1          Rule B says the plaintiff can get the defendant or

2     levy its assets to the extent of its assets if the defendant is

3     not found within the district.  Once it attempts that, then the

4     defendant has a choice to make.

5          Under Rule E(8), the defendant can come in, and it can

6     make a restrictive appearance.

7          THE COURT:  I thought that whole distinction was wiped

8     out by the 1985 amendments?

9          MR. PARE:  No, your Honor.  A very important

10    distinction.  Under Rule E(8), the defendant can come in and

11    make a restricted appearance, and only defend to the extent of

12    the assets that are attached.

13         The quasi in rem jurisdiction, and hence if $10,000 is

14    attached, I and Seyang would have a right to come in here, not

15    make a general appearance and say, your Honor, those

16    attachments are wrong and should be vacated.  And if you decide

17    that's the case, the case is over, we walk away, and there is

18    nothing left to be done.

19         We didn't do that in this case.  We filed not a

20    restricted appearance under E(8), but a general appearance, a

21    general appearance.  And that is why the cases are clear,

22    crystal clear that if you file a general appearance, that bars

23    future maritime attachments.

24         Now, my opponent was on vacation at the time that the

25    brief was written, and I said that to his credit, because the

478fponc                    Conference

1    cases that are cited in his brief do not stand for the

2    proposition that if you file a general appearance that bars

3    future attachments with one exception, that exception is a case

4    in Maryland.

5          I would like to address each those cases if you have

6    time.

7          THE COURT:  You have as much time as you need.

8          MR. PARE:  Thank you.

9          THE COURT:  As do you, Mr. Lambert.

10         MR. LAMBERT:  Thank you.

11         MR. PARE:  By the way, I cited eight cases, five of

12   which were decided by this court every one of the single minded

13   view that if you file a general appearance, that bars future

14   attachments, including a decision, a recent decision of the

15   11th Circuit.

16         Now, let's go to my opponent's cases.

17         He starts with the Heidmar case, and if you look at

18   the Heidmar case, and you focus on it at page -- at 132 F.3d,

19   page 268, you see that this is not a case involving general

20   appearance.  This is a case involving a last minute attempt to

21   appoint an agent to accept service of process on behalf of the

22   defendant.  And in such a case, they said we not going to

23   listen to that.  We are allowing the attachment.  There it was

24   not a case in which there was a general appearance filed.

25         And there is one other interesting point in this case,

1   and it helps to understand Judge Brieant's case.  This was a

2   conversion case, what I will call a conversion case.

3           The plaintiff originally sought to do an attachment

4   under Rule C, which is in rem arrest.  It later discovered

5   there what was no right to arrest, so the Court allowed that

6   pleading, that Rule C pleading to be converted to Rule B, and

7   say that converted Rule B spoke as of the moment of the

8   original complaint, the filing of the original process.  That

9   is a very interesting point for reasons which will explain

10  Judge Brieant's case and I will get to that in a moment.  This

11  is not a case in which the Court ruled a general appearance is

12  irrelevant to future attachments.

13          THE COURT:  Okay.

14          MR. PARE:  The second case they cite is to the same

15  effect, and that is the Navieros case, that was a case in

16  which, again, an 11th hour, a twelfth hour attempt to appoint a

17  lawyer in Puerto Rico to accept service of process was held

18  insufficient.

19          I could read the language, but if your Honor would

20  look at 120 F.3d at page 315, you will see what I have in mind.

21  And now there is an interesting point here, and my opponent

22  read from a case, I believe, once again, this is not correct.

23  This is what the judge said in the Navieros case.  Vasilia,

24  simply by virtue of its subsequent appearance in this action,

25  is entitled to dissolution of the attachment.  What they are

```
 1   saying was later, after the attachment filing a general

 2   appearance, that will not vitiate the attachment that was done

 3   earlier, and that's not our argument in this case, but you see

 4   that language cited quite a bit, including the language that my

 5   opponent had just read, I believe stands for that and only that

 6   proposition.

 7            THE COURT:  I can't undo what was already done prior

 8   to the general appearance.  All right.

 9            MR. PARE:  That is tested as of the moment the

10   pleading were filed.  Once you file a general appearance, all

11   bets were off.

12            THE COURT:  Going forward.

13            MR. PARE:  Correct.  The third case my opponent cites,

14   the Madredeus case.  Once again, it's the same case, the same

15   situation.  It was an 11th hour attempt to appoint an agent,

16   and here you will find that discussion at 2000 AMC, at page

17   962.

18            In a sense, however, claimant's own attempt to satisfy

19   the second prong with an eleventh hour designation of the agent

20   in the district is not persuasive.  That's all the case stands

21   for, no general appearance.

22            20th Century Fox, her's what it says.  Defendant may

23   not post-attachment appoint agents for service of process in

24   the district and defeat a writ of attachment, citing Navieros.

25   Again, not a general appearance case, only an eleventh hour
```

32

478fponc                              Conference

1    appointment of an agent.

2              Oh, and in fact, in that very case, cited by my

3    opponent, the Court says later on, that it will address later

4    the issue of a general appearance.  It didn't do it in this

5    case, and there is no subsequent opinion.

6              And that you will find discussed at -- the first

7    discussion is found at 992 F.Supp. 1426, and then the

8    subsequent dismissal at page 1428.

9              Then we come to TransAmerica cited by my opponent,

10   and.  Once again, this is not what my opponent cites it for.

11   The language which is found at 256 says this:  In making its

12   determination on this issue, the Court's inquiry must focus on

13   the facts known at the time of the attachment.  And then in

14   parentheses, defendant's filing a notice of general appearance

15   after defendant's filing notice of general appearance after

16   attachment does not defeat court's quasi in rem jurisdiction

17   and is not grounds to vacate the attachment.  Once again,

18   that's the past attachment.  There is to dispute about that in

19   this case, but it doesn't stand for the proposition for which

20   the plaintiff cites it.

21             Now, we come to the one case that does stand for the

22   proposition that the plaintiff cites it for.  That is Nikko

23   versus the Seawind, a case not of this court, a case of

24   District Court of Maryland, which strangely enough ignores its

25   own decision in Fernandez which we cited in our brief.  This is

478fponc                        Conference

1    found now at 1997 AMC, and specifically page 401 and 402.

2            The Court comes -- this is a very unusual case.  What

3    happened in this case was there is a ship discharging cargo in

4    the harbor, and the plaintiff filed its suit, right then and

5    there, and the defendant was almost waiting at the courthouse

6    to file a general appearance before the Rule B process was

7    actually issued.  And the Court in that case said that's a

8    little bit two sketchy for us.  We're not going to allow it.

9    And it cites three cases, saying that the filing of a general

10   appearance is insufficient.  Those three cases it cites do not

11   stand for that proposition.

12           And these are found, once again, at page 401.

13           The first case it cites is Construction versus Nikki,

14   and I'm going to talk about that in a moment.  The second case

15   that it cites is the Navieros case, which I have already talked

16   about, and the third case it cites is ER Ron express lines,

17   which the Court completely misanalyzes.

18           And if you go to -- and it's not cited by my opponent.

19   If you go to Iran Express Lines case you find, and that is

20   found at 563 F.2d. starting at page 648, and if you go to page

21   650, you see that the attachments were issued on April 30 and

22   May 9th, and the general appearance was filed on May 12th, and

23   so there was no attachment after May 12th, and the district

24   court in that case said, had an opinion with respect to the

25   general appearance, I think, I'm not sure, but the main part of

478fponc                    Conference

1    the case was the Court said that there was no right to an

2    attachment because the claim at that point at the time of the

3    attachment was not mature.  Because of some technical point

4    that was not relevant.

5              THE COURT:  What jurisdiction is that case?

6              MR. PARE:  This was the Fourth Circuit.

7              And the Court then goes on to say we disagree with the

8    decision below.  We think the claim was mature on April 30 and

9    May 9 and, therefore, the attachment was valid.

10             It does in say that the filing of a general appearance

11   is irrelevant to a subsequent attachment; in fact, there was no

12   subsequent attachment in this case, and yet the only case that

13   stands for that proposition, the Nikko case, relies on it

14   incorrectly.

15             Now, that brings us to Judge Brieant's case, and that

16   is found at 558 F.Supp. 1372.  This was another conversion

17   case.  This was a very interesting case for us.  But this was a

18   case in which the plaintiff initially attempted to obtain an

19   attachment under Article 62 of the CPLR.  And it was a maritime

20   case, and there has been discussion in the cases not relevant

21   to -- well, perhaps relevant, but the discussion in the cases

22   was can you obtain an attachment in aid of an arbitration that

23   is subject to the convention on the recognition and enforcement

24   of arbitration award or does that attachment violate?

25             And the cases in New York State say it violates, you

1    cannot get an attachment.  So, when the case went to the Second

2    Circuit, the Second Circuit said you can't get an attachment

3    under the CPLR here because of the convention and the cases

4    under it, but you know what, the plaintiff could have tried to

5    get a maritime attachment because that stands on a stronger

6    footing under the cases.

7          And so the Court allowed a conversion of the

8    attachment and said the 6201 attachment can now be converted to

9    a maritime Rule B attachment.  And that attachment spoke as of

10   the time of the initial pleadings and that's what Judge Brieant

11   said, at 558 Fed. Supp. 1375.

12         He said presence in the District at times prior to May

13   18, 1982, that's after the defendants closed its office, will

14   not defeat the right to an attachment to be determined here as

15   of November 22, when the case was filed, when the original

16   complaint was filed, to which date the amended complaint

17   relates back.

18         And it's clear from this case, because it was one of

19   those unusual conversion cases that the Court is testing the

20   situation by what the facts were at the time of the original

21   filing of the complaint and the original issuance of the State

22   court process.  The language that my opponent read in here, I

23   believe, must be taken in light with all the other cases,

24   including the cases of this court, which clearly say the filing

25   of a general appearance will not vitiate a past attachment, but

478fponc                          Conference

1    it doesn't address the question as to whether or not it will

2    vitiate a subsequent attachment.  And, indeed, when you read

3    this case, you realize there was no subsequent attachment in

4    this case either because it all related back and, therefore,

5    your Honor, eight cases cited in our brief, five of this court,

6    all stand for the clear proposition which is, in fact,

7    mirroring the Rule B, Rule 8 distinction between a restricted

8    appearance and a general appearance.

9          One further point, my opponent in his wherefore

10   clause, clause three pleads for a stay, and he invokes Section

11   8 of the Arbitration Act.  It's not clear that Section A

12   applies to a London arbitration.  Let's assume it does.

13   Section 8 says, Section 8 says that after you get your

14   attachment, the case is stayed.  There is no provision for

15   opening the stay, having another attachment, closing the stay,

16   opening it for another attachment and closing it.

17         THE COURT:  Right.

18         MR. PARE:  There are no cases.  That would be a

19   startling proposition for those of us in the maritime bar if

20   the plaintiff were allowed to do what he's seeking to do here,

21   to have multiple attachments in the future ad infinitum in aid

22   of an arbitration in London.  It would create a cottage

23   industry for us.  It would probably be fabulous for maritime

24   lawyers in New York.  It would be making new law, flatly

25   inconsistent with the very notion of Rule B and Rule E and all

478fponc                          Conference

1   of the cases.

2               THE COURT:  So, it's your position, Mr. Pare, that

3   there is no case that states once a general appearance has been

4   filed, that it is okay to continue to have attachments?

5               MR. PARE:  There is one case, your Honor.  Its' the

6   case in Maryland.

7               THE COURT:  No, no, no.  I, with all due deference to

8   the Court in Maryland, I don't care what they say.  I am more

9   interested in what the Second Circuit has said, and I certainly

10  will listen to what Judge Brieant has said, but I am not bound

11  by it.

12              So, for our purposes, you are saying there is no case

13  that says once a general appearance has been filed, that it is

14  okay to either continue with attachments or to have new ones?

15              MR. LAMBERT:  I have -- I am not aware of any case in

16  this District, in this circuit.  My opponent argues that Judge

17  Brieant's case says that.  I respectfully strongly disagree.

18              THE COURT:  You will distinguish it?

19              MR. PARE:  No, I don't distinguish it.

20              THE COURT:  You are saying Judge Brieant does not deal

21  with the state of affairs after the general appearance?

22              MR. PARE:  Right.

23              THE COURT:  Because of the conversion, he is limited

24  to what happened at the time of the filing of the complaint and

25  the request for the attachment?

478fponc                          Conference

1            MR. PARE:  Yes.  And, furthermore, when he says that

2      an appearance, a general appearance will not vitiate an

3      attachment, what it means is it won't vitiate an earlier in

4      time attachment.

5            THE COURT:  Which I can understand.  I see your basis

6      for arguing that.

7            Let's take a five-minute break and then obviously --

8            MR. LAMBERT:  I do want to respond.

9            THE COURT:  In five minutes.

10           (Recess taken)

11           THE COURT:  Mr. Lambert, before I permit you to

12     respond to what Mr. Pare has said, I just have a few additional

13     questions for Mr. Pare.

14           Mr. Pare, the cases that you have cited that

15     essentially you say once first a general appearance has been

16     had that there is no basis for continued attachment, is that

17     your position?

18           MR. PARE:  Yes, your Honor.

19           THE COURT:  Do those cases deal with the security

20     aspect of Rule B at all, the dual purpose?  Do they talk about

21     that?

22           MR. PARE:  In the sense they may say -- I don't

23     remember exactly.  If they do, they would say if there had been

24     an initial attachment, then that initial attachment remains a

25     valid one.  I don't remember specifically if they did say --

478fponc                    Conference

1          THE COURT:  Because the thing I find amazing, I'm

2     impressed with the speed sometimes with which Congress passes

3     rules, but I am looking at Rule B(1)(e), which seems to

4     address, I guess the security aspect, regardless of whether or

5     not jurisdiction has been found, so I wondered if you could

6     help me out a little bit here and talk to me about your

7     interpretation of the role of Rule B(1)(e).

8          MR. PARE:  Plaintiff make invoke state law remedies

9     under Rule 64 for seizure of personal property for the purpose

10    of securing satisfaction of a judgment.

11          Well, I believe that that is nothing more than

12    clarification to the maritime bar that in addition to Rule B

13    and Rule C, you can also seek attachment under the local State

14    court procedures, as was done in that one case I cited where

15    the plaintiff first sought to get a CPLR attachment; that's all

16    this is designed to do, to remind the bar or to tell the bar

17    for clarity, you can use State court attachment procedures.

18          In this case, the interesting thing is that the case I

19    indicated, you cannot use the State court procedures because

20    that would violate or deem to violate the convention and the

21    recognition and enforcement of an arbitration award, which

22    would apply to the London arbitration, I believe.

23          THE COURT:  Okay.  Mr. Lambert?

24          MR. LAMBERT:  Thank you, your Honor.

25          I guess the principal point or the principal

1    distinction that Mr. Pare says the cases draw, and that I am

2    not convinced that they do, is the difference between a general

3    appearance by an attorney and appointing an agent and giving

4    notice to the world of a person, an actual person in the

5    district that is there to accept service.

6            Because the effect is, functional effect of it is the

7    same if the company, if the defendant is otherwise present in

8    the district.

9            Now, you have satisfied the prong of having a natural

10   person to go to in the district and serve papers, serve

11   process.  And, in fact, many of the cases that are under

12   discussion here involve attempts by a defendant.  They

13   announce, I appoint my attorney so and so as my agent.

14           I did show, during the break, a case that I would like

15   to read, to cite in the record.  It is from Virginia.  It is

16   Bonito Offshore versus Talmare, and it's -- the only cite is in

17   the maritime cases, 1983 AMC 538.  It is not cited in our

18   briefs, but I believe that case stands for the proposition that

19   a general appearance prior to an attachment doesn't preclude a

20   subsequent attachment if, in fact, the defendant is not doing

21   business.  In that case they went on to find the defendant was

22   doing business, but certainly the proposition that it's cited

23   for is that you can't, if you can't be found in a district,

24   filing a general appearance doesn't solve it.  You either can

25   or can't be found.

478fponc                       Conference

1          THE COURT:  Where is this case, again?

2          MR. LAMBERT:  It's in Virginia.

3          THE COURT:  Um-hum.

4          MR. LAMBERT:  Apparently, it was before my time at the

5    maritime bar.  Attorneys used to get wind of this, and they

6    would actually send somebody to stand at the clerk's window and

7    try to intercept this to say that I am here, you can find me.

8          I don't, I don't believe -- I think the Oilmar case,

9    which I have already discussed, is an example from the district

10   of Connecticut, but within the circuit, where we, my firm filed

11   a declaratory action, submitted to the jurisdiction of the

12   District of Connecticut, and Judge Droney did not hold

13   that that precluded a subsequent attachment because he found

14   that our client, my firms's client, was simply not, in fact,

15   doing business.  The only thing they had was a person to serve,

16   which is what I think a general appearance is.  You are either

17   doing business or you are not.  And having a lawyer doesn't

18   mean that you are doing business.  There aren't any ships

19   calling here.  They aren't generating business here.  They

20   aren't generating revenues here.

21          Finally, on the Judge Brieant case, it's not clear to

22   me as I read it that we are not, that we are not talking about

23   a general appearance.  I have read it again during the break.

24   Judge Brieant uses -- and it is a complicated procedural

25   history, but I think we do agree it's a term of art, and if

1    he's a careful judge, which I believe him to be, the right of

2    attachment is not defeated by the filing of a general

3    appearance, because at this point, when he made that statement,

4    the funds had not been attached, if I have understood it

5    correctly, had not been attached pursuant to Rule B.  They were

6    there to be attached.  In effect it was not an ex parte

7    proceeding.  They were arguing the point before him because the

8    funds had been set aside, it turns out improperly, but then

9    kept there while it went up on appeal, and then finally he got

10   into a position where I have to decide is this plaintiff

11   entitled to attach, under Rule B, these funds.  I think that

12   is -- in that context he made that statement.

13          THE COURT:  All right.  What are your views on Rule 8,

14   I'm sorry, B(1)(e)?

15          MR. LAMBERT:  Rule B(1)(e), I generally agree with

16   what Mr. Pare said.

17          In my experience, you would often make a prayer for

18   relief for both in your complaint, if you wanted to reserve the

19   right to proceed under State court attachment proceedings.

20   State court would not, generally does not allow an attachment

21   if it's subject to arbitration or subject to the international

22   convention, I agree with that.  And the State court involves

23   posting a bond, and security for costs, and I think most

24   maritime practitioners don't, don't make use of it.  But I

25   believe that it's a carve out to let you know that.

478fponc                          Conference

1              THE COURT:  What you are saying, you have no rights

2      under state law since we are talking about arbitration?

3              MR. LAMBERT:  Right.  Under state law I think you have

4      to show the person is absconding.  It's a more difficult burden

5      to meet.

6              THE COURT:  All right.  So that the only thing that

7      would protect your security interest would be a continuing, a

8      continuation of the attachment?

9              MR. LAMBERT:  If I had previously attached, if I have

10     previously attached anything?

11             THE COURT:  Yes.

12             MR. LAMBERT:  Then I don't think that there is any

13     dispute that that is set aside, to be paid into -- to the

14     Court.  We can reach an agreement with the bank to hold it in a

15     interest bearing account pending the arbitration outcome in

16     London.

17             THE COURT:  Assuming you got something, would you say

18     you are entitled to a continuing attachment?

19             MR. LAMBERT:  To continue the right?

20             THE COURT:  For future, beyond.

21             MR. LAMBERT:  That is my position, yes, your Honor.

22             THE COURT:  All right.  And, Mr. Pare, you do not

23     agree with that.

24             MR. PARE:  No, your Honor.  Clearly not.

25             THE COURT:  When you say clearly not --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

478fponc                    Conference

1              MR. PARE:  Two reasons.  First of all, the Rebore

2    decision, and I should probably give you the citation for that.

3    The Rebore decision can be found, it's a division of the Second

4    Circuit, and it can be found at 579 F.2d. 262, and that stands

5    for the proposition that the only thing that is effectively

6    attached is funds in the hands of the bank at the moment that

7    the writ hits the bank.  So, nothing that comes later can be

8    attached.  That is the first reason.

9              And then the second reason is once you file a general

10   appearance, you cannot issue another writ.  So, the first writ

11   will not do anything other than freeze money that was frozen at

12   the moment the levy hit the bank.

13             THE COURT:  All right.  Do you disagree with that,

14   Mr. Lambert?

15             MR. LAMBERT:  That is the -- that is the ruling.  I

16   don't disagree with it.  At least that's my understanding.

17             There is a Second Circuit case, Winterstorm, and it's

18   evolving, but that's the basic.  Roughly, you have to hit

19   property at the time of attachment.

20             THE COURT:  Okay.

21             MR. LAMBERT:  And so I, at this point, as to what's

22   happened before, I either have or I haven't, and I will try to

23   vet the situation with the banks to see if there is any basis

24   for saying that I have, that I actually attached something.

25             THE COURT:  All right.

478fponc                        Conference

1          MR. LAMBERT:  But what we are then arguing about is

2     whether I have the right to continue to serve additional

3     attachments as and when I believe there may be assets of Seyang

4     Korea in New York.

5          THE COURT:  On banks other than the 17 that were

6     included in the order?

7          MR. LAMBERT:  No.  If Rebore is correct, that I only

8     get what I serve at the time, then I have to re-serve.  I would

9     have to serve the banks again.

10         THE COURT:  But I guess, if I understand Mr. Pare, and

11    obviously he will correct me if I am wrong, to say that once

12    he's entered a general appearance, you can't re-serve --

13         MR. LAMBERT:  That's what we are arguing about,

14    whether I can or can't, once he's done.

15         THE COURT:  I find it difficult to believe that this

16    has not come up before.

17         MR. LAMBERT:  It is a source of concern to the bar,

18    because as Mr. Pare here has his views, I have my views here.

19    I don't believe there is, certainly not a recent squarely

20    presented decision in this district on the point.

21         THE COURT:  Mr. Pare?

22         MR. PARE:  I strongly disagree.  This has come up

23    before.  It's come up in 1942, 1956, 1962, 1984, 1990, 1991,

24    and 1969, all with the identical answer, except for the one

25    case in Maryland, and I would like to address the Bonito case

1    in a moment.

2             It's come up frequently, and again, the answer matches

3    Rule B and Rule E(8).  If you make a restricted appearance,

4    perhaps everything is still fair game because you haven't filed

5    a general appearance, and that's fair because the plaintiff

6    only has this small amount that is attached.  This has come up

7    before.  It's come up eight times and it's been decided eight

8    times.  It's come up five times before this court.

9             THE COURT:  I'm not sure I understand what are you

10   saying has come up five times.

11            MR. PARE:  The proposition, once you file a general

12   appearance, no further maritime attachments are permitted.

13            THE COURT:  You are saying these cases explicitly say

14   that?

15            MR. PARE:  Explicitly say that.  I would be happy to

16   refer your Honor to exactly where they say that.

17            THE COURT:  Great.

18            MR. PARE:  Let's start with the Southern District of

19   Ohio, which puts it in the clearest --

20            THE COURT:  No, no.  Let's start with cases in the

21   Second Circuit or the -- any courts in New York.

22            MR. PARE:  The Southern District of Ohio talks about a

23   prior attachment and a subsequent attachment, and it makes it

24   clear, very clear; that's in my brief.

25            I'll talk to you about what Judge Lavelle decided

478fponc                        Conference

1    after Judge Brieant's case.  Judge Lavalle, this was a case

2    involving an attachment of a letter of credit.  Presentation of

3    the documents hadn't been made on the letter of credit at the

4    time of the first levy, so the Court said, well, then the

5    letter of credit wasn't ripe at that point, so that attachment

6    falls.  Then the general appearance had been filed and then

7    there was a second levy, and this is what the judge, since El

8    Hadad had appeared in the action prior to the time it drew on

9    the letter at Morgan, I need not consider whether upon that

10   later occurrence the attachment could become effective against

11   the sums which became payable by Morgan to El Hadad.  He says

12   he doesn't have to decide after El Hadad had appeared.

13          THE COURT:  But he said he didn't decide it.

14          MR. PARE:  He doesn't have to decide, since El Hadad

15   had appeared in the action prior to the time that it drew on

16   the letter, I need not consider whether upon that later

17   occurrence the attachment could become effective; that's what

18   he said.  It wasn't effective.  It was ineffective because

19   there had been an appearance.

20          THE COURT:  Read the second sentence.

21          MR. PARE:  El Hadad's motion to vacate the attachment

22   is hereby granted.  Judge Lavalle, after the Judge Brieant

23   case.

24          Again, I would like to address something in the Judge

25   Brieant case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

478fponc                         Conference

1              Southern District of New York, Judge Lowe, and Shumet

2    Shipping.  You will find that at 1978 AMC, begins at page 2579,

3    and this language is at page 2580.  The maritime attachment

4    should be vacated for another reason.  Med Africa has made a

5    preattachment appearance, thus voluntarily subjecting itself to

6    this court's jurisdiction.

7              Southern District of New York, in Maryland

8    Shipbuilding, which is found at 201 F.Supp., page 858.  And the

9    language I am going to quote is found at page 860.

10             The funds could not have been attached in the prior

11   action, because rule two of the admiralty rules of the Supreme

12   Court permits a foreign attachment, that is what a -- a foreign

13   attachment only, quote, if such respondents shall not be found

14   within the District.  Since the respondent's attorneys had

15   filed a general appearance in the first action, the respondent

16   was present in the district up to the time when the prior

17   action was discontinued and no further attachment could be

18   made.

19             Next case in the Southern District, Cocotos Steamship

20   of Panama, which is found on the 1957 AMC, page 397, and the

21   language you will find at page 398 at the bottom.  Inasmuch as

22   Stratos appeared in suit on July 23rd, 1956, the process was

23   use of foreign attachment dated July 23, and executed on July

24   24, insofar as it attaches property of Stratos is quashed after

25   the appearance.

49

478fponc                            Conference

1          The Takaoka Marau, found at 44 F.Supp. 939, you will

2     find the language at page 940.  On balance, the motion for a

3     writ of foreign attachment is denied.  After personal

4     appearance in the interposition of an answer respondent is

5     subject to the jurisdiction of this court.

6          Those are the, those are the five cases in this

7     district.

8          THE COURT:  Fine.

9          MR. PARE:  And then there are the other three

10     including, Judge Brieant.  My opponent wants to read his

11     language to say that a general appearance will vitiate a

12     subsequent maritime attachment.

13          Since he would have been the first judge saying that,

14     you would have thought that if that's what he said he would

15     have cited a case.  But when you read the language that my

16     opponent reads, there is no case cited.

17          Bonito -- my opponent cites a case that is not in his

18     brief.  He showed it to me.  If you read the first paragraph of

19     Bonito, you will see that the defendant's lawyer did exactly

20     what my opponent had described.  He was waiting at the

21     courthouse.

22          First of all, they sent letters to all of the maritime

23     bar, saying we have authority to accept service of process on

24     behalf of our client, the defendant, an eleventh hour attempt

25     to defeat maritime attachment.

478fponc                      Conference

 1          Then the second thing they did was they posted

 2     somebody at the clerk's office, and as soon as an answer was

 3     filed -- excuse me, a complaint was filed, but before the

 4     process could be walked over to the marshal, the defendant

 5     filed a general appearance.  The court thought again, that's,

 6     we don't, we don't like that; that's an attempt to avoid the

 7     natural course of the law.  We didn't do that in this case.

 8     They filed an attachment.  We never got notice of it.  Three

 9     weeks later we filed a general appearance.

10          So, Judge Brieant clearly would not have said I'm

11     announcing a new rule that no other court has ever said, and

12     that's that general appearance is irrelevant, without citing a

13     case or at least explaining what he meant.

14          THE COURT:  If it's a new rule, he couldn't have cited

15     another case.

16          MR. PARE:  He would have at least said I'm grappling

17     with this.

18          THE COURT:  So cavalierly you are saying?

19          MR. PARE:  Yes, your Honor.

20          THE COURT:  In other words, he would say I know of all

21     these other cases and I am going against them?

22          MR. PARE:  Yes, your Honor, I believe so.  But, the

23     case which I just read from, by Judge Lavalle, was decided a

24     year after Judge Brieant, clearly stating the filing of a

25     general appearance bars further maritime attachments.

1          The only other thing I would like to mention, I found

2     it now, is the Section 8 of the U.S. Code, and it says clearly

3     and it's not a very long provision.

4          And it says if the basis of jurisdiction is admiralty,

5     you can get an attachment, but then it goes on to say, the

6     court shall then have jurisdiction to direct the parties to

7     proceed with the arbitration.  That's what is always done in a

8     Section 8 attachment.

9          Once these writs issue, the defendant comes in, as we

10    have done in this case and, in fact, we go one step further and

11    we said, your Honor, please stay this action pending

12    arbitration, and that's the only relief that is ever granted.

13    And it would be, as I said before, quite a novelty to have the

14    case remain open to issue attachments in a shuttling effect.

15         But to answer the first point, there are no clear

16    cases, and the cases in this court are clear that the filing of

17    a general appearance is, bars future maritime attachments.

18         THE COURT:  All right.  Thank you, Mr. Pare.

19    Mr. Lambert?

20         MR. LAMBERT:  Just on that El Hadad case, my reading

21    of it is that he vacated a -- the attachment that he vacated

22    was because he didn't believe that that attachment could reach

23    property of the defendant.

24         As your Honor correctly pointed out, he then went on

25    to say, I don't need to decide about a subsequent attachment,

478fponc                        Conference

1    but in the meantime there was a general appearance; that is all

2    he said.

3            What he actually did was to vacate the previous

4    attachment.  I don't believe it's as clear as Mr. Pare makes it

5    out to be.  We address these issues in our briefs, refer to the

6    Oilmar case, and also the MidAfrica case, Judge Lowe's case.

7    Again, that was a secondary holding as it were.  She already

8    reached her main holding on why the attachment should be

9    vacated.

10            But if you look at the purposes of Rule B, in light of

11    the present day prevalence of maritime disputes being reduced,

12    maritime disputes being resolved by arbitration, then I think

13    the issue needs to be addressed and clarified because you have

14    your general appearance in the arbitration, that's where the

15    merits are being decided.

16            THE COURT:  But I also have a general appearance in a

17    case before me, and it was in this court that the writ of

18    attachment was issued, and that -- that is my concern here.

19            Let me -- bear with me just one second.  Where is the

20    order that was signed by Judge Hellerstein?

21            All right.  I am looking at the the order Judge

22    Hellerstein signed.  Is it, I take it, Mr. Pare, the bottom of

23    page three, the order that says ordered, that supplemental

24    process enforcing the court's order may be issued by the clerk

25    upon application without further order of the Court.  Is that

478fponc                    Conference

1    what you are challenging?

2              MR. PARE:  Yes, your Honor.

3              THE COURT:  And that's it, what you are challenging?

4              MR. PARE:  Well, the whole concept.  Not just the

5    phraseology of the order, but the whole concept, my opponent

6    saying I now have the right to go ahead and do that.

7              THE COURT:  All right.

8              MR. LAMBERT:  Your Honor, may I just point out

9    that that language tracks Rule 1(b).

10             MR. PARE:  But it doesn't come in a vacuum; it comes

11   with all the maritime law associated with it.

12             MR. LAMBERT:  The clerk may issue supplemental process

13   enforcing the court's order on application without further

14   court order.

15             THE COURT:  Yes.  Well you know what, I think isn't

16   that under certain circumstances like of an emergency nature?

17             MR. LAMBERT:  No, your Honor.  Because once I have

18   made my showing that he could be found, I can try to find

19   property wherever I can without bothering the court again.

20             Just let me volunteer something, your Honor.  If, if

21   your Honor wishes to take the decision under advisement, I will

22   certainly undertake not to seek such writs without coming to

23   you first.

24             THE COURT:  Well, let me do better than that.  It

25   seems to me that Mr. Pare has a weighty argument in terms of

478fponc                        Conference

1    the impact of a general appearance on these orders of

2    attachment, and it would be difficult for me to say that it

3    makes sense to continue beyond the appearance the force and

4    effect of the order of attachment based on the case law and the

5    understanding of the function of it.

6            Yes, it does have a dual purpose under Rule B of

7    security as well as appearance, but I cannot see in the

8    materials submitted and the cases discussed a statement that

9    the security interest continues once the appearance has been

10   made and, therefore, a continuing order of attachment is

11   appropriate.

12           So, under those circumstances, I am ruling in favor of

13   the defendant, and my ruling would be to nunc pro tunc that

14   part of the order signed on July 21st, to eliminate that phrase

15   that talks about supplemental process enforcing the Court's

16   order may be issued without further order of the Court.  That

17   part is stricken and, therefore, the order of attachment is

18   valid up to the point of the time of a general appearance,

19   since the general appearance was made.

20           When did you file your appearance, Mr. Pare?

21           MR. PARE:  I think it was August 6th, if I am not

22   mistaken, your Honor.

23           THE COURT:  So anything between July 21st and August

24   6th is fair game, and that has turned up nothing as I

25   understand it.  And I am terminating the impact of that order

478fponc                        Conference

1    of July 21st as of this point because of the appearance, the

2    general appearance of the defendant in this case.

3            I am staying this proceeding, I imagine pending

4    results of the arbitration going on in London.

5            Are there any other matters that we need to deal with

6    in this case at this time?

7            MR. LAMBERT:  Your Honor, could I just ask for a

8    clarification on the stay?  Because again, as I said, I think

9    there are eight or nine garnishees that I have not formally

10   heard from.

11           I think, I will let Mr. Pare address it, if I could

12   just keep the action alive for the purpose of vetting the -- in

13   other words, we served them with a garnishment, as well as

14   interrogatories, and we asked them questions.  Do you have

15   money?  Have you had money?  And I don't have proper answers.

16   And this just happened the end of July.  I have 20 days to do

17   that.

18           Is it clear that I still have the right to finish that

19   up, all relating -- I'm not going to serve any more

20   attachments.

21           THE COURT:  You have the right to finish it up in

22   terms of monies in the account prior to August 6th.

23           MR. PARE:  Yes, your Honor, I believe so.

24           THE COURT:  August 6th.  So anything that they had in

25   that account between July 21st and August 6th would be subject

478fponc                    Conference

1    to the order of attachment signed on the 21st.

2            Mr. Pare?

3            MR. PARE:  Yes.  The only point at which I would, this

4    is the point I would make.  Under Rebore it only attaches money

5    that is actually in any account or in any bank at the moment of

6    the levy.  If the money comes in, the next day under Rebore, it

7    doesn't attach it.

8            Now, if my opponent had made a second attachment on

9    August 2nd or August 3rd or August the 4th and gotten money,

10   then, yes, that would be attached.  But the fact that he made

11   an attachment on July the 21st --

12           THE COURT:  Did you make the attachment on July 21st?

13           MR. LAMBERT:  I made an attachment, I would say, on

14   maybe 12 or 13 of the banks.  I only did it once.  Whether it

15   was July 21 or July 22 or July 23, I don't remember.

16           On three or four of the banks, I did go up once in the

17   morning, once in the afternoon and the next day.

18           Reflecting what Mr. Pare just said, I'm trying to

19   serve it at a time when the bank actually has one of these

20   transfers coming through and that's what I would like to vet.

21   It does seem to me that the record on that issue is closed.  I

22   either got something or I didn't.  But I am entitled to an

23   efficient response from the banks about whether I did or

24   didn't, and did they do what they were supposed to do in

25   response to my writ.

478fponc                       Conference

 1          THE COURT:  All right.  So, then let me modify what I
 2     just said.
 3          That under Rebore it would seem that on the day that
 4     the attachment was, excuse me, served on the bank, that is
 5     what's at issue, not forward.  So that if you served on July
 6     23rd, any funds in the bank up to July 23rd would be subject to
 7     the attachment.
 8          MR. PARE:  Not exactly.  Under Rebore, the moment, not
 9     the day, if the money the attachment is leveled at 12 o'clock
10     noon on August the 1st, and there is money there, at that time,
11     Rebore says the attachment validly reaches the money.  If the
12     money comes in at one o'clock, it does not.
13          THE COURT:  And how are we keeping track of what time
14     the attachment was actually entered?
15          MR. PARE:  That is the subject of Rebore and cases
16     that have followed it and it gets to be pretty picayune.  We
17     don't have that case before you.  A lot of times you bring in
18     the bank officer, you bring in the statements and there is
19     testimony.
20          MR. LAMBERT:  Our process server notes the time and
21     you get into issues about, does the bank, how much time does
22     the bank have to respond, and -- but these are the types of
23     issues I would like -- I don't want the action stayed so as to
24     preclude me, and I don't think Mr. Pare is objecting to vetting
25     those issues about what the bank did or did not do, whether

478fponc                    Conference

1    there were, there were or were not funds at the time I served

2    the process.

3                THE COURT:  All right.  So then --

4                MR. LAMBERT:  I don't think we need to get so far into

5    Rebore.  I don't think you need to make a prospective ruling

6    under Rebore until we find out whether there is any issue at

7    all.

8                THE COURT:  Whether?

9                MR. LAMBERT:  Whether we ever got anything.

10               THE COURT:  Let me say in terms of the merits of the

11   case, obviously that is what I am saying.

12               Until further action in the arbitration, should you

13   wish to bring this back to me then either confirming or

14   whatever, then we will deal with that at that time.

15               In terms of the actual writ, however, if there are

16   issues about when the levy was made, and when there were funds,

17   I would keep that open, and you can bring that in, and we will

18   deal with that in terms of whatever proof you have, whatever

19   disagreements you have on that.  But I am not of the school

20   that once an appearance has been made further levies are

21   appropriate, and I am also -- well, I guess that's as far as I

22   need to go.

23               Are there any other issues that we need to deal with

24   in this case at this time?  Mr. Lambert?

25               MR. LAMBERT:  Your Honor, speaking for my client, as

478fponc                          Conference

1    well as the bar in general, it would be of service to the bar

2    if your ruling today could be made in a fashion that we could

3    publish it to the bar, whether it has to be a formal opinion

4    or --

5                THE COURT:  Well, I will tell you what I will do.  I'm

6    going to order this transcript on a daily basis and I am going

7    to split the cost between the parties.  And since I have made

8    my ruling on the record and giving you my reasons therefore,

9    and it is also including your wonderful arguments, I think that

10   should make it pretty clear.

11               All right?

12               MR. LAMBERT:  Thank you, your Honor.

13               MR. PARE:  Thank you, your Honor.

14               THE COURT:  All right.  This matter is adjourned.

15   Please see Bonnie.

16                                oOo

17

18

19

20

21

22

23

24

25

# Exhibit 7

*Exhibit 7*

NOURSE & BOWLES, LLP
Attorneys for Defendant
FIVE OCEAN CORPORATION LTD.
One Exchange Plaza
At 55 Broadway
New York, NY  10006-3030
(212) 952-6200


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GLORY WEALTH SHIPPING SERVICES LTD.,       :
                                                                              :
                              Plaintiff,                           :
                                                                              :     08 Civ. 1102(VM)
                         - against -                             :
                                                                              :     **REQUEST FOR PRODUCTION**
FIVE OCEAN CORPORATION LTD.,                   :        **OF DOCUMENTS**
                                                                              :
                              Defendant.                        :
-------------------------------------------------------------------X

       Defendant hereby requests that Plaintiff produce the following documents at the offices

of the undersigned for inspection and copy within the time provided under the Federal Rules of

Civil Procedure or any shorter time as may be ordered by the Court.

       1.      Copies of all communications sent by Plaintiff or any agents or brokers showing

Plaintiff's attempts to fix the M/V TE HO following Plaintiff's refusal to allow the vessel to

proceed to Iraq pursuant to the fixture with Defendant.

       2.      All fixture negotiations exchanged by Plaintiff or any agents or brokers acting on

its behalf respecting the rechartering of the M/T TE HO following Plaintiff's refusal to allow the

vessel to proceed to Iraq pursuant to the fixture with Defendant.

3.      Copy of charter party and any incorporated terms under which Plaintiff fixed the

M/V TE HO following Plaintiff's refusal to allow the vessel to proceed to Iraq pursuant to the

fixture with Defendant.


Dated: New York, New York
       February 28, 2008

                              Yours, etc.

                              NOURSE & BOWLES, LLP
                              Attorneys for Defendant
                              FIVE OCEAN CORPORATION LTD.

                              By:_____
                                   Armand M. Pare, Jr.(AP-8575)
                                   One Exchange Plaza
                                   At 55 Broadway
                                   New York, NY  10006-3030
                                   (212) 952-6200


TO:    LYONS & FLOOD, LLP
       Attorneys for Plaintiff
       65 West 36th Street, 7th Floor
       New York, New York 10018
       (212) 594-2400