UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
GLORY WEALTH SHIPPING SERVICE LTD.,

                                Plaintiff,

        - against -

FIVE OCEAN CORPORATION LTD.,

                                Defendant.
----------------------------------------------------------------------X

**ECF CASE**

08 Civ. 1102 (VM)

## DECLARATION OF ZHANG LEI IN OPPOSITION TO MOTION TO VACATE ATTACHMENT

       ZHANG LEI, affirms and states the following under the penalties of perjury under 28 USC § 1746:

       1.     I am the Senior Chartering Manager of Glory Wealth Shipping Service Ltd. ("Glory Wealth") and make this Declaration in opposition to Five Ocean Corporation Ltd.'s ("Five Ocean) motion seeking countersecurity, vacation or reduction of the attachment.

       2.     Glory Wealth is a leading worldwide dry bulk carrier and ship owner with its main office located in Singapore, and at all relevant times was the disponent owner of the M/V TE HO (the "Vessel").

       3.     Glory Wealth had chartered the Vessel from head owners Ta-Ho Maritime Corporation ("Head Owners").

       4.     On January 8, 2008, Five Ocean time chartered the Vessel from Glory Wealth for a period of time to run from January 11, 2008, until a minimum date of May 7, 2008, and a maximum date of June 6, 2008 (the "Time Charter"). (Copies of the fixture recap and the charter party upon which the Time Charter was based are annexed as Exhibits C & D to the declaration of Eric Choi.)

5. Clause 31 of the Time Charter prohibited the Vessel from trading with Iraq or from sailing into the Arabian Gulf if general hostile action exists or is seriously threatened as defined by Lloyds of London.

6. Specifically, Clause 31 was titled "Trading Limit" and provided in pertinent part: "Trading always afloat, always via safe berth(s), safe port(s), safe anchorage(s) always within Institute Warranties Limits excluding … Iraq (excluded U. N proved cargo) … The vessel is not to be ordered to Arabian Gulf if general hostile actions exist or are seriously threatened as defined by Lloyds of London."

7. Unbeknownst to Glory Wealth, Five Ocean subsequently sub-chartered the Vessel to Brave Bulk Transport Ltd. ("Brave Bulk") for a single voyage charter to Iraq.

8. Glory Wealth first received notice of the possible voyage to Iraq on January 10, 2008, when Brave Bulk asked the Master of the Vessel to prepare a pre-stow plan based on a discharge port of Iraq.

9. Realizing the possibility that the voyage would not be permitted by Head Owners, Glory Wealth immediately questioned Five Ocean regarding the Iraq voyage, such as whether the cargo was U.N. approved.

10. Nevertheless, on January 11, 2008, at 1033 GMT, Glory Wealth delivered the Vessel to Five Ocean pursuant to the terms of the Time Charter.

11. The Time Charter required Five Ocean, upon taking delivery of the Vessel, to make an advance payment for 15 days of hire as well as for the bunkers aboard the Vessel on delivery, and to further make additional hire payments every 15 days. Thus, Five Ocean was required to prepay hire for the period of January 11, 2008 to January 26, 2008, and to make another 15 day hire payment on January 26, 2008.

12. Five Ocean made an advance payment of $1,840,900.94 to Glory Wealth. Glory Wealth received this advance payment from Five Ocean on January 17, 2008. (See the declaration of Eric Choi at ¶3).

13. On January 15, 2008, Brave Bulk issued its formal voyage instructions to the Master of the Vessel, calling for the Vessel to load at Houston, Texas and to proceed to a discharge port of Umm Qasr, Iraq. The Master, in turn, forwarded these voyage instructions to Glory Wealth on January 16, 2008.

14. That same day, immediately after receiving Brave Bulk's formal voyage instructions from the Master of the Vessel, Glory Wealth notified Five Ocean that the Iraq voyage was not being permitted by Head Owners under Clause 31 of the Time Charter, and asked Five Ocean to arrange for an alternative voyage.

15. Over the next twelve (12) days, Head Owners, Glory Wealth and Five Ocean had further communications regarding the applicability of Clause 31 and the basis for the rejection of the Iraq voyage. Throughout this period, the Vessel continued sailing towards Houston.

16. On January 28, 2008, at 1830 LT, the Vessel arrived at Houston and later anchored and awaited further orders.

17. Finally, on February 1, 2008, at 0853 GMT, Five Ocean gave notice to Glory Wealth that it was refusing to submit a different, acceptable voyage to Glory Wealth, and was instead terminating the Time Charter. (A copy of Five Ocean's termination notice is annexed hereto as Exhibit A).

18. Although the Time Charter called for Five Ocean to prepay an additional 15 days hire at 1033 GMT on January 26, 2008, Five Ocean never made any such payment to Glory

Wealth. Thus, Glory Wealth is owed hire from 1033 GMT on January 26, 2008 to the time of Five Ocean's termination of the Time Charter on February 1, 2008, at 0853 GMT.

19.     The value of the hire owed for the period 1033 GMT January 26, 2008 to 0853 GMT February 1, 2008 is $468,316.15, calculated as the Time Charter hire rate of $82,000.00 per day for 5.930555 days ($486,305.51) less a 3.75% address commission ($18,236.46), plus the pro rata communication / victualling / entertainment expenses for the period ($247.10).

20.     Moreover, the advance payment of $1,840,900.94 made by Five Ocean included $664,097.00 for the bunkers aboard the Vessel on delivery. The Time Charter provided that there were approximately 1200 metric tons of IFO 380 bunkers ("bunkers") aboard the Vessel on delivery. However, from the date of delivery on January 11, 2008 to Five Ocean's termination of the Time Charter on February 1, 2008, the Vessel used approximately 600 metric tons of bunkers traveling to the load port of Houston and remaining at anchorage in Houston at Five Ocean/Brave Bulk's direction. The value of the bunkers thus used was approximately $315,000.00, and Glory Wealth is entitled to retain $315,000.00 of the $664,097.00 advance payment, as compensation for the bunkers utilized by Five Ocean/Brave Bulk.

21.     I have been told by counsel for Glory Wealth that Five Ocean is claiming that approximately 300 metric tons of fuel oil ("additional bunkers") were provided to the Vessel by Brave Bulk prior to Five Ocean's termination of the Time Charter, and that Glory Wealth's claim for security should be reduced for the value of this fuel oil. In response I note that since Five Ocean is claiming that Brave Bulk provided these additional bunkers, there does not seem to be any basis for Five Ocean's claim that these additional bunkers are somehow security for Glory

Wealth's claim against Five Ocean. Moreover, on or about March 1, 2008, Brave Bulk has itself filed and obtained an order for the arrest of these additional bunkers in the Netherlands.

22. Turning to future lost hire damages, I further understand that Five Ocean has objected to the amount of lost hire claimed, accusing Glory Wealth of "double dipping." There has in fact been no "double dipping" and Glory Wealth's lost hire damage calculations are straightforward.

23. Since the Time Charter called for Five Ocean to redeliver the Vessel between May 7, 2008, and June 6, 2008, Glory Wealth, for the purpose of obtaining security for its claim, assumed that the Vessel would be redelivered on May 24, 2008, an intermediate date between the minimum and maximum possible redelivery dates. However, even assuming that the Vessel would be redelivered at the earliest possible time on May 7, 2008, Glory Wealth would still be entitled to recover damages for lost hire from 0853 GMT on February 1, 2008, to 0001 GMT on May 7, 2008, a period of approximately 97 days.

24. Further, the amount of future lost hire damages properly recoverable by Glory Wealth is the difference between the Time Charter hire rate of $82,000.00 per day and the market rate for hire of the Vessel post-breach.

25. Following Five Ocean's termination of the Time Charter, there was no immediate cargo available for the Vessel, so she remained idle for about 6 days. Moreover, Five Ocean's termination occurred on a Friday, and was also in conjunction with the Chinese and Lunar New Years' celebrations, all of which impacted the prevailing market rate. The Vessel was finally fixed on 0601 GMT February 7, 2008, at a rate of $55,350.00 per day with an $800,000.00 gross ballast bonus. (See Exhibit B annexed hereto).

26.   I understand that Five Ocean has submitted a declaration from D. J. Kim, a charter party broker with Seoul Maritime Corporation, observing that the M/V DIMITRIOS S (which is smaller and older than the Vessel) was chartered at a rate of approximately $65,000.00 per day (including a ballast bonus and rounded upward) in February of 2008.

27.   I do not believe that Mr. Kim's declaration is applicable to this dispute. First, the DIMITRIOS S fixture could have been negotiated long before it became effective in February of 2008, and thus, the rate might not accurately reflect the prevalent market rates during that period. Second, any market quotes from other vessels will not take into account the fact that the Vessel here had to be fixed on short notice, and thus, had to either suffer a longer idle period to wait for cargoes offering a high hire rate, or take a cargo available sooner at a discounted hire rate. Third, even if the DIMITRIOS S fixture is used as a basis for the relevant market hire rate, the ballast bonus of $6,666.66 per day should not be applied and only the DIMITRIOS S' actual hire rate of $58,000 per day should apply, since the ballast bonus is really only meant to provide compensation for the time a vessel is waiting for its next fixture and is not an actual measure of a vessel's hire.

28.   In any event, as noted above, the Vessel was actually fixed at a rate of $55,350.00 per day with $800,000.00 gross ballast bonus. The actual rate at which the Vessel was fixed should take precedence over competing hypothetical hire rates.

29.   As noted above, the purpose of the ballast bonus is to provide compensation for the time a vessel is waiting for its next fixture. Thus, Glory Wealth did not suffer a loss for the period from 0853 GMT February 1, 2008, to 0601 GMT February 7, 2008, since the net ballast bonus of $770,000.00 can be attributed to that period.

–6–

–7–

30.     However, the value of the lost hire for the period from 0601 GMT February 7, 2008, to 0001 GMT May 7, 2008, is approximately $2,308,556.25, calculated as the difference between the Time Charter hire rate of $82,000.00 per day and the market hire rate of $55,350.00 per day for 90 days ($2,398,500.00) less a 3.75% address commission ($89,943.75).

31.     Thus, the total lost hire damages recoverable by Glory Wealth are $2,776,872.40, comprised of $468,316.15 in lost hire from January 26, 2008 to February 1, 2008, and $2,308,556.25 in lost hire from February 7, 2008 to May 7, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:   March 5, 2008

_____
Zhang Lei

## CERTIFICATE OF SERVICE

  Edward P. Flood, an attorney duly admitted to practice before this Honorable Court, affirms on this 5th day of March 2008, I served true copies of the foregoing, by e-mail and ECF notice to:

>NOURSE & BOWLES, LLP
>Attorneys for Defendant
>FIVE OCEAN CORPORATION LTD.
>One Exchange Plaza
>New York, NY 10006
>
>Attn.:  Armand M. Pare, Jr., Esq.
>   jpare@nb-ny.com

_____
      Edward P. Flood

U:\kmhldocs\2618009\Motions\Aff-ZL-OppVacate.doc

# EXHIBIT A

## Glory Wealth / Ji Xu

| | |
|---|---|
| 发件人: | "Lorri/Bromar Maritime" &lt;lorri@bromar.com.cn&gt; |
| 收件人: | "Glory Wealth / Ji Xu" &lt;operation@glorywealth.com&gt; |
| 抄送: | "wing" &lt;ops@bromar.com.cn&gt; |
| 发送时间: | 2008年02月01日,星期五 14:35 |
| 主题: | Re:MV TE HO/FOC-IRAQ |

BROMAR MARITIME CO., LTD
ADDRESS: ROOM 611 NO.97 JU YE ROAD SHANGHAI CHINA, 200135

TEL: +86 21 5169 3590     FAX: +86 21 5821 5769
MSN: lorri07@hotmail.com

Dear Hanlu/Lorri,

good day
foll from charterer,pls kindly know and confirm safely receipt by return

QTE
RE: M/V TE HO

DEAR SIRS,

Charterers refer to the latest message from Owners and to the refusal of
Owners to perform the voyage to Iraq for which the ship has been fixed
on sub charter which has been terminated.

Owners have wrongly repudiated the charter and have caused huge losses
to Charterers.

Owners had ample opportunity to reconsider their conduct but chose to
maintain their unlawful repudiation.

Charterers treat the unlawful repudiation as terminating the charter
with immediate effect.

Sub Charterers maintain that they are suffering losses of US$11 million.
Charterers will provide Owners with particulars of their losses in
connection with the requirement for security of US$13 million shortly,
as soon as they receive further information from Sub Charterers.

UNQTE


Thanks & Best Regards
Lorri,He xiaoyue
Mob: +86-13816794407
Email: ops@bromar.com.cn

# EXHIBIT B

jixu
_____

| | |
|---|---|
| From: | Glory Wealth / Ji Xu [operation@glorywealth.com] |
| Sent: | 2008年02月07日星期四 0:06 |
| To: | Undisclosed-Recipient:; |
| Subject: | Fw: MV TE HO/EUROBULK |
| Categories: | Orange Category |

----- Original Message -----
From: "DryCargo Panamax Shanghai" <panamax.shanghai@clarksons.com>
To: "GLORY WEALTH SHIPPING LTD - LEI ZHANG" <ZHANGLEI@GLORYWEALTH.COM>
Cc: <HANLU@GLORYWEALTH.COM>; "OP - GLORY WEALTH SHIPPING LTD"
<operation@glorywealth.com>
Sent: Wednesday, February 06, 2008 10:19 PM
Subject: MV TE HO/EUROBULK


ZHANGLEI/DANIEL
CC.HANLU

RE: MV TE HO/COSCO EUROBULK -- REVISED

PLSD TO CFM TT WE HV AGREED THE FULLY FIXTURE ON 6TH FEB 2008 ASF:

M/V TE HO
---------
PAN FLAG BLT 2004
77,834 MT DWT ON 1 4. 122 M SSW
GRT/NRT 41,372 / 26,094
LOA/BM  225.0 /32.26 M
HATCH COVER : 2 PANNEL, SIDE ROLLING TYPE
7 HO/7HA, 92,151CBM GR CAPA
H/SIZE : NO.1   17.10 X 13.36M
         NO.2-7 17.00 X 15.03M
GRAIN CAPA :
NO.1  12,827 M3
NO.2  13,531 M3
NO.3  13,306 M3
NO.4  13,328 M3
NO.5  13,364 M3
NO.6  13,332 M3
NO.7  12,460 M3
TOTAL GRAIN CAPACITY : 92,151 M3
Speed/Cons :
about 14.0 Kts Laden/about 15.0 Kts Ballast (under good weather
conditions not exceeding Beaufort wind force 4 / Douglas sea state 3
and free of any adverse currents.)
Consumption :
At sea - FO (IFO 380 CST) abt 36.5 mt + DO abt 0.3 mt per day
In port - idle IFO abt 2.5mt + DO abt 0.3mt per day
         working IFO 3.5mt + MDO 0.3mt per day
at intermediate climate condition (plus additional DO 0.5MT/day at
cold climate condition)
Vessel has liberty of using MDO when manoeuvering in/out of ports,
navigating in shallow or restricted or busy waters, canals, rivers,
estuaries and/or in foggy weather and also during hold

1

```
  cleaning/ballasting
  operations.

FULL TC DESC AS PER BTB HEAD CP

- ACCT COSCO EUROPE BULK SHIPPING GMBH
- DELIVERY AFSPS OR PASSING S.W. PASS, US GULF ATDNSHINC
- LAYCAN 0001L 7TH - 2400L 10TH  FEB 2008
- FOR TC PERIOD OF MIN 6TH MAY 2008 / MAX 6TH JUN 2008
- REDEL AS PER BTB HEAD CP
- HIRE USD  55,350.-  DIOT PLUS GBB USD 800,000.-
- BUNKER CLS :
   BOD ABT 750-850 MT IFO AND ABT 70-80 MT MDO
   BOR ABT SAME QTTY AS BOD
   BUNKER PRICE SAME AT BENDS USD 480 PMT FOR IFO AND USD 750PMT FOR MDO
- 1ST HIRE OF 15 DAYS PLUS GBB AND VALUE OF BOD TO BE PAID W/I 3BANKING
DAYS AFTER VSL'S
   DELIVERY
- ADCOM 3.75PCT + 1.25 PCT FOR CLAKRSONS
- O'WISE AS PER MV TE HO/GLORY WEALTH CP DATED 16TH MARCH 2007 WITH
LOGICAL AMENDED ONLY IN LINE WITH MAIN TERMS AGREED
END

TRUST ABV ALL IN ORDER, PLS ADV IF ANY DISCREPANCY

TKS

DANIEL WANG
CLARKSON SHANGHAI
PANAMAX SECTION
DIR TEL: +86-21-61030212
TEL: +86-21-61030100
MOB: +86-13818966407
```