UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
GLORY WEALTH SHIPPING SERVICE LTD.,

         Plaintiff,

    - against -


FIVE OCEAN CORPORATION LTD.,

         Defendant.
----------------------------------------------------------------------X

**ECF CASE**


08 Civ. 1102 (VM)


**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT FIVE OCEAN CORPORATION LTD.'S
MOTION SEEKING COUNTERSECURITY, VACATION
OR REDUCTION OF THE ATTACHMENT**


Of Counsel:

Edward P. Flood
Jon Werner

**Lyons & Flood, LLP**
Attorneys for Plaintiff
GLORY WEALTH SHIPPING
SERVICE LTD.
65 W. 36th Street, 7th Floor
New York, NY 10018
(212) 594-2400

### *TABLE OF CONTENTS*

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    POINT I       FIVE OCEAN'S COUNTERCLAIM SHOULD BE
                    REDUCED .......................................................................................... 2

                a.      Five Ocean's Counterclaim For the Return of the
                    Advance Hire Payment Is Unfounded ............................................ 2

                b.      Five Ocean's Claim For Indemnity Relating to
                    Brave Bulk Is Contingent and Unripe ............................................ 5

                c.      The Amount of Interest and Costs Claimed By Five
                    Ocean Should Be Reduced ............................................................. 7

                d.      At Most Five Ocean Is Only Entitled to
                    Countersecurity Up to the Amount Attached By
                    Glory Wealth ................................................................................. 8

    POINT II      PLAINTIFF HAS MET ITS RULE E(4)(f) BURDEN
                    UNDER AQUA STOLI ...................................................................... 9

                a.      Glory Wealth Was Entitled to Retain the Advance
                     Hire Payment and a Portion of the Bunkers ................................ 10

                b.      Glory Wealth's Actual Damages ................................................... 11

                  c.      Five Ocean's Discovery Request Is Moot .................................... 12

    POINT III     CONTRARY TO FIVE OCEAN'S ASSERTIONS, A
                    DEFENDANT'S GENERAL APPEARANCE WILL NOT
                    PREVENT FUTURE ATTACHMENTS ...................................................13

CONCLUSION ........................................................................................................................ 17

## TABLE OF AUTHORITIES

**Cases**

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006)............ 9, 10, 12

*Bottiglieri Di Na Vigazione SPA v. Tradeline LLC*, 472 F. Supp. 2d 588
    (S.D.N.Y. 2007) ........................................................................................................ 7

*Clipper Shipping Lines, Ltd. v. Global Transporte Oceanico S.A.*, 2007 U.S. Dist.
    LEXIS 18827 (S.D.N.Y. 2007) .................................................................................. 9

*Constr. Exporting Enters. v. Nikki Mar. Ltd.*, 558 F.Supp. 1372 (S.D.N.Y. 1983),
    *appeal dismissed*, 742 F.2d 1432 (2d Cir. 1983) .................................................... 16

*Continental Shipping, Ltd. v. Telfair Int'l Corp.*, 1990 U.S. Dist. LEXIS 11549
    (S.D.N.Y. 1990) ........................................................................................................ 9

*Finecom Shipping Ltd v. Multi Trade Enterprises AG*, 2005 U.S. Dist. LEXIS
    25761 (S.D.N.Y. 2005) .............................................................................................. 9

*Greenwich Marine, Inc. v. S.S. Alexandra*, 339 F.2d 901 (2d Cir. 1965) ....................... 7

*Heidmar, Inc. v. Anomina Ravennate di Armamento Sp.A*, 132 F.3d 264 (5th Cir.
    1998) ................................................................................................................... 15, 16

*J.K. Int'l Pty. Ltd. v. Agriko S.A.S.*, 2007 U.S. Dist. LEXIS 10074 (S.D.N.Y.
    2007) ......................................................................................................................... 7

*Mediterranea Di Navigazione Spa v. Int'l Petrochemical Group S.A.*, 2007 U.S.
    Dist. LEXIS 35869 (S.D.N.Y. 2007) ........................................................................ 7

*Navieros Inter-Americanos, S.A. v. M/V Vasilia Express*, 120 F.3d 304 (1st Cir.
    1997) ....................................................................................................................... 16

*Parkroad Corp. v. China Worldwide Shipping Co. Ltd.*, 2005 U.S. Dist. LEXIS
    11122 (S.D.N.Y. 2005) ............................................................................................ 16

*Rapture Shipping Ltd. v. Allround Fuel Trading B.V. Chemoil*, 2006 U.S. Dist.
    LEXIS 60771 (S.D.N.Y. 2006) ........................................................................... 13, 16

*Result Shipping Co. v. Ferruzzi Trading USA*, 56 F.3d 394 (2d Cir. 1995) ......... 3, 4, 9

*Sanko Steamship Co., Ltd. v. China National Chartering Corp.*, 07 Civ. 2401
    (VM) (S.D.N.Y. February 22, 2008) .................................................................. 7, 12

*Sonito Shipping Company Ltd. v. Sun United Maritime Ltd.*, 2007 U.S. Dist.
    LEXIS 19531 (S.D.N.Y. 2007) ............................................................................ 6, 7

*Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A.*, 339 U.S. 684, 70 S. Ct. 861, 94 L. Ed. 1206 (1950) ........................................................................ 15

*Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629 (1924) ............................................................................................ 9

*Western Bulk Carriers, Pty. v. P.S. Int'l*, 762 F. Supp. 1302 (S.D. Ohio 1991) .......................... 14

**Other Authorities**

Notes of the Advisory Committee on the 2005 Amendments to Rule B of the Federal Rules of Civil Procedure ............................................................................ 14

**Rules**

Federal Rule of Civil Procedure B(1)(a) ........................................................................ 14

Federal Rule of Civil Procedure B(1)(b) ........................................................................ 15

Federal Rule of Civil Procedure E(7) ............................................................................ 2

This Memorandum of Law is respectfully submitted by plaintiff Glory Wealth Shipping Service Ltd. ("Glory Wealth") in opposition to defendant Five Ocean Corporation Ltd.'s ("Five Ocean") motion seeking countersecurity, or to vacate and/or reduce the maritime attachment and dismiss plaintiff's Verified Complaint. The facts in opposition to the motion are set forth in the Declaration of Zheng Lei dated March 5, 2008 ("Lei Decl."), to which the Court is respectfully referred.

## PRELIMINARY STATEMENT

This dispute involves Five Ocean's January 8, 2008, time charter (the "Time Charter") of the M/V TE HO (the "Vessel") from its disponent owner, Glory Wealth. The Time Charter was "back-to-back" with (i.e. had essentially the same terms as) Glory Wealth's charter of the Vessel from Ta-Ho Maritime Corporation ("Head Owners"). Both the Head Charter and the Time Charter contained clauses prohibiting the Vessel from trading with Iraq or from sailing into the Arabian Gulf if a general hostile action exists or is seriously threatened. (See Lei Decl. at ¶¶ 5-6).

Five Ocean subsequently sub-chartered the Vessel to Brave Bulk Transport Ltd. ("Brave Bulk") for a single voyage charter to Iraq. The voyage to Iraq was in violation of the Head Charter and the Time Charter and accordingly, Glory Wealth refused to permit the voyage. Subsequently, on February 1, 2008, Five Ocean repudiated the Time Charter causing Glory Wealth to suffer damages in the form of lost hire as a result.

On February 1, 2008, Glory Wealth commenced the instant Rule B action, and on February 5, 2008, Glory Wealth obtained a signed Ex Parte Order For Process of Maritime Attachment and Garnishment ("Attachment Order") granting leave to seek security in the amount of $6,097,148.10 from Five Ocean. On February 19, 2008, Glory Wealth attached two electronic funds transfers in the aggregate amount of $1,130,926.17 being routed through Citibank for the benefit of Five Ocean.

In response, Five Ocean has asserted a counterclaim alleging that Glory Wealth breached the Time Charter by not permitting the voyage to Iraq, and seeks countersecurity for its counterclaim. Five Ocean also challenges the amount of the attachment and challenges Glory Wealth's right to continue to attach additional funds transfers in the future.

### ARGUMENT

### <u>POINT I</u>

### FIVE OCEAN'S COUNTERCLAIM<br><u>SHOULD BE REDUCED</u>

As noted above, the principal thrust of Five Ocean's motion is to obtain countersecurity for its counterclaim in the amount of $7,486,156.70, which is broken down into a claim of $1,840,900.94 for the return of advance hire and bunkers paid to Glory Wealth, a claim of $3,439,283.75 for indemnity for claims brought against Five Ocean by Brave Bulk under their sub-charter, a claim of $270,000.00 for Five Ocean's lost profits under its sub-charter with Brave Bulk (calculated at $3,000.00 per day for 90 days), $550,000.00 for arbitration costs, and $1,385,972.01 for interest on its principal claim. (See Five Ocean's Memo at pp. 3-4).

**a.**     **Five Ocean's Counterclaim For the Return of the**<br>     <u>**Advance Hire Payment Is Unfounded**</u>

Rule E(7) of the Supplemental Rules For Certain Admiralty and Maritime Claims provides in relevant part:

> Whenever there is asserted a counterclaim arising out of the same transaction or occurrence with respect to which the action was originally filed, and the defendant or claimant in the original action has given security to respond in damages, any plaintiff for whose benefit such security has been given shall give security in the usual amount and form to respond in damages to the claims set forth in such counterclaim, **unless the court, for cause shown, shall otherwise direct**…." (emphasis added).

Thus, the Court has broad discretion in deciding whether to order countersecurity. As the

Second Circuit explained:

> In exercising this discretion, the court should be guided primarily by two principles, which sometimes conflict with one another. On the one hand, the purpose of Rule E(7) is 'to place the parties on an equality as regards security,' which usually favors granting countersecurity when a defendant whose property has been attached asserts non-frivolous counterclaims growing out of the same transaction, especially when the counterclaimant could have proceeded in rem or quasi in rem in an independent suit. On the other hand, the Rule is not intended to impose burdensome costs on a plaintiff that might prevent it from bringing suit. In balancing these policies, the trial court is to be guided by the essential and equitable purposes of the rule. In doing so, the court must weigh the importance of the security interest giving rise to the initial seizure, and the burden of posting countersecurity, against the potential injustice of requiring the defendant-counterclaimant to post security without affording reciprocal protection.

*Result Shipping Co. v. Ferruzzi Trading USA*, 56 F.3d 394, 400 (2d Cir. 1995) (internal quotations and citations omitted).

One of the principal sums making up Five Ocean's counterclaim is the advance payment of $1,840,900.94 it made to Glory Wealth shortly after delivery of the Vessel. As Mr. Lei explains in his declaration, the $1,840,900.94 payment was comprised of an initial hire payment of $1,230,000 for 15 days hire (January 11, 2008 to January 26, 2008) and $664,097 for the value of the bunkers aboard the Vessel on delivery. (See Lei Decl. at ¶¶ 11 and 20). Five Ocean was required to make this advance payment upon delivery of the Vessel under the Time Charter, and was required to continue to make additional advance payments of hire every 15 days. (See Lei Decl. at ¶ 11).

The central premise underpinning its counterclaim for the return of the advance payment is Five Ocean's theory that it was Glory Wealth, rather than Five Ocean, who repudiated the Time Charter, by refusing to permit the voyage to Iraq. Five Ocean claims that the same day it made the advance payment, it "advised Plaintiff's Captain that the voyage would be via the U.S. Gulf to Iraq" and "asserts that its orders for the Vessel to load a grain cargo for Iraq were legitimate and Plaintiff's

refusal to proceed to Iraq amounted to a repudiation of the Charter Party giving rise to Defendant's damages as outlined herein." (See Five Ocean's Memo at pp. 2-3).

It is notable that Five Ocean provides no support for its assertion that the Iraq voyage was permitted under the Time Charter, save a conclusory statement that "[t]here is no prohibition in the Charter Party from the Vessel carrying the grain cargo in question to Iraq." (See Five Ocean's Memo at p. 2). It is well-settled that a claim for countersecurity must arise out of the same transaction or occurrence as the plaintiff's original claim, and must be non-frivolous. *See*, *e.g.*, *Result Shipping*, *supra*, 56 F.3d at 399-400 (holding that granting countersecurity is favored "when a defendant whose property has been attached asserts non-frivolous counterclaims growing out of the same transaction"). While Glory Wealth concedes that Five Ocean's counterclaim arises out of the same transaction or occurrence that is the subject of Glory Wealth's claim, we question whether Five Ocean has sufficiently supported its counterclaim to take it out of the realm of frivolousness.

In any event, Five Ocean's counterclaim with regard to the advance hire payment is unfounded, since the facts demonstrate that the Time Charter was in effect and being performed until February 1, 2008. Five Ocean's claim that the breach occurred on January 11, 2008, fails to take into account all of the facts. While Glory Wealth did receive notice on January 11, 2008, as to Five Ocean's Iraq voyage, formal notice was not given until January 15, 2008, by Brave Bulk. (See Lei Decl. at ¶ 13). That same day, Glory Wealth notified Five Ocean that the Head Owners were not permitting the Iraq voyage pursuant to Clause 31 of the Head Charter, and that therefore, Glory Wealth was also denying the Iraq voyage pursuant to Clause 31 of the Time Charter. (See Lei Decl. at ¶ 14). However, upon being advised of this, Five Ocean did not immediately terminate the Time Charter or claim that Glory Wealth was in breach. Rather, Head Owners, Glory Wealth and Five Ocean continued to negotiate and discuss the issues regarding the applicability of Clause 31 and the

basis for the rejection of the Iraq voyage. In the meantime, Five Ocean and its sub-charterer Brave Bulk still enjoyed full use of the Vessel, and the Vessel continued to steam towards the load port of Houston, Texas. (See Lei Decl. at ¶¶ 15-16). It was only on February 1, 2008, several days after the Vessel had already been at anchor in Houston, that Five Ocean issued its notice to Glory Wealth that it was terminating the Time Charter. (See Lei Decl. at ¶ 17).

Since Glory Wealth continued to perform its obligations under the Time Charter up until February 1, 2008, and Five Ocean and Brave Bulk enjoyed full use of the Vessel until that date, Glory Wealth is entitled to the full hire called for under the Time Charter up until February 1, 2008 – including the advance hire payment for 15 days (January 11, 2008 to January 26, 2008), in the amount of $1,230,000.00, as well as additional hire for the period from January 26, 2008 to February 1, 2008.

Additionally, as noted above, the advance payment made by Five Ocean consisted of $664,097.00 for the value of the bunkers aboard the Vessel on delivery, in addition to the hire payment of $1,230,000.00. Glory Wealth concedes that Five Ocean is entitled to assert a counterclaim for the return of a portion of the $664,097.00 bunker payment. However, Five Ocean is only entitled to recover the amount it paid for bunkers which were not subsequently consumed during the performance of the Time Charter. As the Lei declaration explains, approximately $315,000.00 worth of bunkers were used prior to Five Ocean's repudiation of the Time Charter on February 1, 2008. (See Lei Decl. at ¶ 20).

Thus, Glory Wealth respectfully submits that Five Ocean's counterclaim should be reduced in the amount of $1,545,000.00 which represents $1,230,000.00 in hire rightfully earned and $315,000.00 in bunkers consumed by the Vessel prior to the breach.

**b.      Five Ocean's Claim For Indemnity Relating to Brave Bulk
         Is Contingent and Unripe**

Five Ocean is also counterclaiming for $3,439,283.75 in indemnity for damages claimed by Brave Bulk under the sub-charter party. (See Five Ocean's Memo at p. 3). At the outset we note that Five Ocean has provides absolutely no details regarding the alleged claims brought against Five Ocean by Brave Bulk. There is no indication as to whether the dispute is merely anticipated or whether it has actually commenced. Nor does Five Ocean provide any breakdown or analysis of Brave Bulk's damages or an explanation as to Brave Bulk's theory of liability. Accordingly, Glory Wealth respectfully submits that Five Ocean has insufficiently plead this aspect of its counterclaim, and thus, Five Ocean's counterclaim should be reduced by an additional $3,439,283.75.

Further, putting aside the sufficiency of Five Ocean's submissions relating to the indemnity claim, it is clear that the claim is unripe and unaccrued, since accrual of any claim for indemnity from Glory Wealth is necessarily contingent on a finding of fault on the part of Five Ocean.

Clause 62 of the Time Charter provides that "[a]ll disputes arising out of this contract shall be arbitrated at London...." and Clause 73 provides that the Time Charter is "to be governed by and construed in accordance with English law." Thus, English law governs the charter party between Five Ocean and Glory Wealth, and under English law there is some authority that a claim for indemnity does not accrue until there has been an actual payment made on the third party claim.

There is authority in this Circuit that absent compelling circumstances, a contingent claim is not a proper basis for security in a Rule B context. In general, the party seeking security in a Rule B context must wait until the underlying claim has been resolved before it may seek security for any type of indemnity claim under Rule B. *See*, *e.g.*, *Sonito Shipping Company Ltd. v. Sun United Maritime Ltd.*, 2007 U.S. Dist. LEXIS 19531, at *19 (S.D.N.Y. 2007) (stating that this Circuit has not been receptive to contingent indemnity claims as bases for maritime attachments); *Greenwich*

*Marine, Inc. v. S.S. Alexandra*, 339 F.2d 901 (2d Cir. 1965) (vacating attachment based on indemnity claim as premature as no judgment had been entered in the third-party claim).

Recent case law confirms the principle that where the underlying claim has not been resolved, indemnity claims remain premature and generally cannot serve as the basis for security in a Rule B context. *See*, *e.g.*, *Sonito Shipping*, *supra*, 2007 U.S. Dist. LEXIS 19531, at *21 (stating that "a number of district judges of this Court have vacated maritime attachments based upon comparable claims for contingent indemnity"); *Mediterranea Di Navigazione Spa v. Int'l Petrochemical Group S.A.*, 2007 U.S. Dist. LEXIS 35869 (S.D.N.Y. 2007); *J.K. Int'l Pty. Ltd. v. Agriko S.A.S.*, 2007 U.S. Dist. LEXIS 10074 (S.D.N.Y. 2007); *Bottiglieri Di Na Vigazione SPA v. Tradeline LLC*, 472 F. Supp. 2d 588 (S.D.N.Y. 2007) (finding that until the underlying action is resolved, an indemnity action based thereon is premature); *see also Sanko Steamship Co., Ltd. v. China National Chartering Corp.*, 07 Civ. 2401 (VM) (S.D.N.Y. February 22, 2008).

Thus, until Five Ocean actually pays, or is ordered to pay, Brave Bulk's claims, its indemnity claims against Glory Wealth remain unripe and contingent. Here, Five Ocean can show neither that the claims underlying its indemnity actions have been resolved nor that there are any compelling circumstances which would justify maintaining the attachment. Five Ocean will not even be able to show that the underlying claims will be resolved in the near future. To the contrary, it is indisputable that Five Ocean's claims are highly speculative and contingent. Thus, for the foregoing reasons, Glory Wealth respectfully submits that even under U.S. law, Five Ocean's indemnity claim remains unripe and Glory Wealth should not be required to post any countersecurity with respect to that claim.

c.     **The Amount of Interest and Costs Claimed By Five Ocean Should Be Reduced**

Five Ocean has also counterclaimed for $550,000.00 in arbitration costs, and $1,385,972.01 for interest on its principal claim. (See Five Ocean's Memo at pp. 3-4). As Five Ocean observed, these figures are the same amounts claimed by Glory Wealth in its Verified Complaint. This might have been appropriate if the principal amount of Five Ocean's counterclaim was close to the principal amount of Glory Wealth's claim. However, as noted above, Five Ocean's counterclaims are inflated and should be reduced greatly. Accordingly, the amounts of costs and interest claimed by Five Ocean should be reduced so that they are in proportion to Five Ocean's principal counterclaim amount.

Glory Wealth respectfully submits that Five Ocean's principal counterclaim should be reduced to $565,900.94 and that therefore, Five Ocean should only be entitled to claim for costs of $60,000.00 and interest of $141,314.73 (7.5% for 3 years at 3 month rests). The total amount of Five Ocean's counterclaim should thus, be limited to $767,215.67.

**d.    At Most Five Ocean Is Only Entitled to Countersecurity
        Up to the Amount Attached By Glory Wealth**

Alternatively, Glory Wealth respectfully requests that the Court only require Glory Wealth to post countersecurity up to the amount of security actually held by Glory Wealth, and further permit such countersecurity to be posted in the form of a letter of undertaking issued by its P & I Club, or in the form of a surety bond, rather than cash security which Five Ocean has requested.

This position is consistent with the approach taken by Judge Lynch in a similar situation, where the value of the counterclaim that the defendant sought to secure exceeded the amount that the plaintiff had managed to attach as security for its original claim. Judge Lynch ordered the plaintiff to provide security in the same amount that it had succeeded in attaching and that it provide additional security matching any additional property it should subsequently succeed in attaching. *See Finecom Shipping Ltd v. Multi Trade Enterprises AG*, 2005 U.S. Dist. LEXIS 25761, at *6 (S.D.N.Y. 2005);

*see also Clipper Shipping Lines, Ltd. v. Global Transporte Oceanico S.A.*, 2007 U.S. Dist. LEXIS 18827, at *5-6 (S.D.N.Y. 2007) (holding that it would be inequitable to require posting of full amount of countersecurity where plaintiff was only secured for roughly nine percent of its claim).

In *Result Shipping*, the Second Circuit has provided some guidance on this issue; "the court must weigh the importance of the security interest giving rise to the initial seizure, and the burden of posting countersecurity, against the potential injustice of requiring the defendant-counterclaimant to post security without affording reciprocal protection." *Result Shipping*, *supra*, 56 F.3d at 400. The Second Circuit emphasized that the purpose of Rule E(7) countersecurity is "to place the parties on an equality as regards security." *Id.*; *see also Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629, 638-39 (1924) (holding that the established purpose of Supplemental Rule E(7) is to place the parties on an equal footing.); *Continental Shipping, Ltd. v. Telfair Int'l Corp.*, 1990 U.S. Dist. LEXIS 11549 (S.D.N.Y. 1990) (a non-maritime Rule B case which involved the attachment of fraudulent transfers to third parties).

## POINT II

### PLAINTIFF HAS MET ITS RULE E(4)(f)
### BURDEN UNDER AQUA STOLI

Five Ocean next argues that Glory Wealth's claims are "greatly exaggerated" and requests that Glory Wealth's attachment be vacated. (See Five Ocean's Memo at p. 9).

To the extent Five Ocean is seeking vacatur of the Attachment Order, such relief should be denied. In *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006), the Second Circuit greatly reduced the grounds upon which a Rule B attachment can be vacated. Under *Aqua Stoli*, in a Rule E(4)(f) inquiry challenging a Rule B attachment, plaintiff has the limited burden to show that: (a) it has a valid *prima facie* admiralty claim; (b) the named defendant cannot be found within district; (c) the defendant's property attached was within the district; and (d) there is

no statutory or maritime law bar to the attachment. *Aqua Stoli*, *supra*, 460 F.3d at 445. No further

showing is required under *Aqua Stoli* in order to establish plaintiff's right to the attachment.

Five Ocean has not contested any of the traditional factors set forth in *Aqua Stoli*. Rather,

Five Ocean has merely challenged the amount of security claimed by Glory Wealth. In failing to

contest the *Aqua Stoli* factors, Five Ocean has conceded Glory Wealth's right to the attachment.

Accordingly, to the extent Five Ocean seeks vacatur of the attachment, Glory Wealth respectfully

submits that that branch of Five Ocean's motion should be denied.

Five Ocean has also asked the Court to exercise its equitable power and reduce the amount of

security claimed by Glory Wealth, arguing the Glory Wealth's claims are exaggerated. As set forth

below, these arguments have no merit.

**a.    Glory Wealth Was Entitled to Retain the Advance Hire**
**      Payment and a Portion of the Bunkers**

Five Ocean argues that Glory Wealth's claim should be reduced because it has failed to

account for the $1,840,900.94 advance payment for hire and bunkers. (See Five Ocean's Memo at p.

6). In making this argument Five Ocean appears to have misunderstood how Glory Wealth

calculated its damages in its Verified Complaint.

Glory Wealth never claimed any lost hire damages for the period from January 11, 2008 to

January 26, 2008, since it had already been paid hire in advance for those 15 days by Five Ocean.

Instead, Glory Wealth only claimed lost hire for the period it was not paid, (January 26, 2008 to

February 1, 2008) and the difference between the Time Charter hire rate and the market rate for the

period from February 1, 2008 to May 24, 2008. (See Exhibit 4 to the Affidavit of Armand M. Paré,

Jr., at ¶¶ 13-14). Thus, it is difficult to understand why Five Ocean argues that Glory Wealth "failed

to account for" the $1,840,900.94 advance payment.

Moreover, Five Ocean has already counterclaimed for the $1,840,900.94 advance payment. (See POINT I(a), supra). For Five Ocean to argue that Glory Wealth's claim should also be reduced by this amount would be tantamount to "double dipping."

It is similarly improper for Five Ocean to argue that Glory Wealth's claim should be reduced due to additional bunkers allegedly provided by Brave Bulk. (See Five Ocean's Memo at p. 6). Since Five Ocean contends that these additional bunkers were provided by Brave Bulk, there cannot be any basis for Five Ocean's claim that these additional bunkers somehow provided security for Glory Wealth's claim against Five Ocean. Moreover, on or about March 1, 2008, Brave Bulk has itself filed and obtained an order for the arrest of these additional bunkers in the Netherlands. (See Lei Decl. at ¶ 21). Thus, Five Ocean cannot properly lay any claim to these additional bunkers and they are entirely irrelevant to Glory Wealth's claim against Five Ocean.

**b.** **Glory Wealth's Actual Damages**

Five Ocean makes a number of criticisms towards Glory Wealth's damages calculations, accusing Glory Wealth of "double dipping" (see Five Ocean's Memo at p. 6), calling into question the number of days of lost hire claimed, and challenging the market hire rate Glory Wealth utilized, characterizing it as being "artificially low." (See Five Ocean's Memo at p. 7).

Whatever faults may be found with Glory Wealth's damages calculations may be attributed to the fact that its Verified Complaint was filed on February 1, 2008, the same day that Five Ocean gave notice that it was repudiating the Time Charter. Thus, the future lost hire damages claimed by Glory Wealth were necessarily partly estimated, since it was uncertain at what precise rate the Vessel would be able to find a fixture to cover its losses. To that end, Glory Wealth used the figure of $45,000.00 per day as its estimate of the likely market hire rate for the Vessel, since as of February 1, 2008, that was the best offer it had received.

However, subsequently on February 7, 2008, the Vessel actually became fixed at a hire rate of $53,350.00 per day, with an $800,000.00 gross ballast bonus. (See Lei Decl. at ¶ 25). Thus, whatever objections Five Ocean might have to Glory Wealth's original damage calculations are irrelevant since Glory Wealth has now submitted the details of its actual post-breach fixture.

In any event, since, as noted above in POINT I(b), English law governs the Time Charter, and all disputes are to be determined by London arbitration, and Five Ocean has conceded that Glory Wealth has met its limited burden under *Aqua Stoli* of showing that it has a valid *prima facie* admiralty claim, Glory Wealth respectfully submits that the issue of the amount of its claim should be left for resolution by the London arbitrators. A similar approach was adopted by this Court in its recent decision of *Sanko Steamship Co., Ltd. v. China National Chartering Corp.*, 07 Civ. 2401 (VM), Decision and Order dated February 22, 2008, at p. 13 (S.D.N.Y. 2008) ("The issues of the interpretation of Clause 78(c) and the determination of any attendant damages are for the London arbitrators to decide, not this Court … For the purposes of the attachment, it is sufficient that [plaintiff] have a prima facie maritime claim against [defendant], and as previously noted, the exact damages for that claim are not questions to be decided by this Court. The Court need only be satisfied that [plaintiff's] claims are not frivolous.")

c.    **Five Ocean's Discovery Request Is Moot**

Further, in connection with its claim that Glory Wealth has utilized an unrealistic market rate in computing its damages, Five Ocean has issued discovery demands to Glory Wealth requesting information on the actual attempts made by Glory Wealth post-breach to fix the vessel, and the rate at which the vessel was actually fixed at post-breach.

Since Glory Wealth has volunteered this information already and a copy of the relevant fixture recap is annexed to its opposition papers (see Exhibit B to the Lei Decl.), Glory Wealth

respectfully submits that the portion of Five Ocean's motion seeking to compel discovery, should be denied as moot.

## POINT III

### CONTRARY TO FIVE OCEAN'S ASSERTIONS, A DEFENDANT'S GENERAL APPEARANCE WILL NOT PREVENT FUTURE ATTACHMENTS

Five Ocean's final argument is that its filing of a general appearance in this action (as opposed to a limited appearance strictly to challenge the attachment) bars Glory Wealth from attaching additional funds in the future. (See Five Ocean's Memo at p. 9). Specifically, Five Ocean argues that the filing of a general appearance subjects itself to the Court's personal jurisdiction and thus, the two purposes of a Rule B attachment (obtaining jurisdiction over a party and obtaining security) are satisfied such that no further attachments can be obtained.

In support of this argument, Five Ocean cites a smattering of older District Court cases, which it purports stand for the proposition that the filing of a general appearance will bar future attachments. All of these cases but one – *Rapture Shipping Ltd. v. Allround Fuel Trading B.V. Chemoil*, 2006 U.S. Dist. LEXIS 60771 (S.D.N.Y. 2006)[1] – were decided prior to a recent amendment to Rule B(1)(a) and no longer represent the present state of the law. In particular, Five Ocean singles out the decision reported at *Western Bulk Carriers, Pty. v. P.S. Int'l*, 762 F. Supp. 1302, 1308 (S.D. Ohio 1991), as providing a clear statement on the effect of a general appearance in the context of maritime attachments. (See Five Ocean's Memo at p. 10).

However, the *Western Bulk Carriers* decision simply does not represent the current law of the Second Circuit. The court's use in *Western Bulk Carriers* of the time of the attachment as the relevant point from which to determine whether a defendant is found within the district is

---

[1] This case is clearly distinguishable as discussed on pp. 16-17 below.

particularly outmoded. This issue of timing is at the heart of Five Ocean's claim that the general appearance will bar future attachments. When the *Western Bulk Carriers* case was decided, a number of courts had indeed held that the relevant time to determine whether a defendant was found within the district was at the time of the attachment.

However, in 2005, Rule B(1)(a) of the Supplemental Rules For Certain Admiralty and Maritime Claims was amended, to provide in pertinent part, that "[i]f a defendant is not found within the district **when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed**, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property--up to the amount sued for--in the hands of garnishees named in the process." (emphasis added to reflect the new language).

The purpose of these changes was explained in the Notes of the Advisory Committee on the 2005 Amendments:

> Rule B(1) is amended to incorporate the decisions in *Heidmar, Inc. v. Anomina Ravennate Di Armamento Sp.A. of Ravenna*, 132 F.3d 264, 267-268 (5th Cir. 1998), and *Navieros InterAmericanos, S.A. v. M/V Vasilia Express*, 120 F.3d 304, 314-315 (1st Cir 1997). **The time for determining whether a defendant is "found" in the district is set at the time of filing the verified complaint that prays for attachment and the affidavit required by Rule B(1)(b).** (emphasis added).

Thus, post-2005, the relevant time period for determining when a defendant is "found" within the district was the time the Verified Complaint and the affidavit required by Rule B(1)(b) were filed.

The rationale behind this change was explained in *Heidmar, Inc. v. Anomina Ravennate di Armamento Sp.A*, 132 F.3d 264 (5th Cir. 1998), where the Fifth Circuit was faced with an argument similar to that made by Five Ocean. In *Heidmar*, the defendant had appointed an agent for the service of process fifteen minutes after the plaintiff had filed its Rule B complaint. Nevertheless, the court determined that the attachment should stand since defendant could not be found within the

district at the time the complaint was filed. The Fifth Circuit based its finding that the relevant time

was the filing of the complaint on an examination of the language of Rule B:

> First, the text of Rule B itself indicates that, at the very least, courts
> do not look for presence at the time of attachment. Rule B provides
> that a party seeking attachment must submit along with its complaint
> an affidavit signed by the party or its attorney that, to the best of the
> affiant's knowledge or belief, the defendant cannot be found within
> the district. Fed.R.Civ.P.Supp.R. B(1). Rule B further provides that if
> the court upon review of the complaint and the affidavit finds that the
> conditions set forth in the rule appear to exist, the court shall
> authorize attachment. Id. **Thus, it is apparent that the
> determination of whether the defendant can be found within the
> district must be made before attachment is ordered.**

*Heidmar*, *supra*, 132 F.3d at 267-68 (5th Cir. 1998) (emphasis added). The Fifth Circuit then cited

*Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A.*, 339 U.S. 684, 693, 70 S. Ct. 861,

867, 94 L. Ed. 1206, 1213 (1950), for the proposition that maritime attachments have two purposes,

to secure a respondent's appearance and to assure satisfaction in case the suit is successful, and that

therefore "an attachment is not dissolved by the subsequent appearance of respondent."

     The *Heidmar* case was controversial in the maritime bar, and spawned discussion regarding

the need to amend Rule B to clarify the operation of the rule and avoid similar disputes from arising

in the future. At its meeting in January of 2003, the Committee on Rules of Practice and Procedure,

through its Advisory Committee on Civil Rules, voted to publish an amendment to Rule B(1)(a) to

fix the time for determining whether a defendant is "found" in the district as the time when the

verified complaint praying for attachment and the accompanying affidavit are filed with the court.

The Advisory Committee further noted that the proposed amendment enjoyed the support of the

Maritime Law Association. Subsequently the proposed amendments were adopted in 2005.

Thus, Five Ocean's argument runs contrary to the currently generally accepted position that the only relevant time for determining the validity of the issuance of an attachment order is the time the plaintiff filed its complaint.

Moreover, numerous courts have held that the subsequent presence within a district by a defendant, or its after the fact consent to jurisdiction is meaningless and ineffective in vacating the attachment order already obtained. It is well-settled that the post-attachment consent of a party to the court's jurisdiction is a nullity and that the subsequent general appearance of a defendant will not defeat an attachment. *See*, *e.g.*, *Heidmar*, *supra*; *Navieros Inter-Americanos, S.A. v. M/V Vasilia Express*, 120 F.3d 304, 314 (1st Cir. 1997) (observing that to hold otherwise would allow a defendant who was otherwise safely outside the service power of the district court to effectively avoid Rule B attachment by waiting until after the plaintiff filed a Rule B action to designate an agent for service); *Parkroad Corp. v. China Worldwide Shipping Co. Ltd.*, 2005 U.S. Dist. LEXIS 11122 (S.D.N.Y. 2005) (general appearance by defendant after filing of complaint does not bar attachment); *Constr. Exporting Enters. v. Nikki Mar. Ltd.*, 558 F.Supp. 1372 (S.D.N.Y. 1983), *appeal dismissed*, 742 F.2d 1432 (2d Cir. 1983).

It is worth noting that the only post-2005 cited by Five Ocean in support of its argument is *Rapture Shipping Ltd. v. Allround Fuel Trading B.V. Chemoil*, 2006 U.S. Dist. LEXIS 60771 (S.D.N.Y. 2006). However, Rapture Shipping is clearly distinguishable. In *Rapture Shipping*, Judge Keenan not only vacated an attachment order but dismissed the entire action because at the time the action was filed (and the attachment order was signed) there already existed a duplicative action. Before the plaintiff could obtain an attachment order in the earlier action, defendant answered entering a general appearance. Thereafter the case was administratively closed,[2] and the plaintiff

---

[2] Although the earlier action had been "administratively" closed, the court indicated that it was not a substantive

subsequently filed a new action in an attempt to obtain a attachment order. Hence, Judge Keenan, in vacating the attachment order in the second action, held that "plaintiff may not file duplicative complaints in order to expand their legal right." (citation omitted). Conversely, in the instant case, Five Ocean was not present within the District at the time Glory Wealth filed the Verified Complaint along with the Rule B(1)(b) affidavit.

Accordingly, Glory Wealth respectfully submits that Five Ocean's post-attachment consent to the Court's jurisdiction by virtue of its filing of a general appearance does not affect the Court's analysis of the propriety of the attachment, nor bar Glory Wealth from obtaining additional Attachment Orders in the future.

## <u>CONCLUSION</u>

Glory Wealth respectfully submits that Five Ocean's counterclaim should be reduced from $7,486,156.70 to a total of $767,215.67. Further, Glory Wealth respectfully submits that its total restated damages are $4,020,302.91, broken down as follows:

(a)     Lost hire from 1033 GMT January 26, 2008 to 0853 GMT February 1, 2008: **$468,316.15**[3]

(b)     Lost hire from 0601 GMT February 7, 2008 to 0001 GMT May 7, 2008: **$2,308,556.25**[4]

(c)     Interest under English law (7.5% for 3 years at 3 month rests): **$693,430.51**

(d)     Legal costs in connection with the London arbitration: **$550,000.00**

Glory Wealth further respectfully requests that this Court deny Five Ocean's motion to the extent it seeks to reduce Glory Wealth's claim, or vacate Glory Wealth's attachment.

---

dismissal on the merits, and could and should have been re-opened.

[3] Calculated as the Time Charter hire rate of $82,000.00 per day for 5.930555 days ($486,305.51) less a 3.75% address commission ($18,236.46), plus the pro rata communication / victualling / entertainment expenses for the period ($247.10). (See Lei Decl. at ¶ 19).

[4] Calculated as the difference between the Time Charter hire rate of $82,000.00 per day and the market hire rate of $55,350.00 per day for 90 days ($2,398,500.00) less a 3.75% address commission ($89,943.75). (See Lei Decl. at ¶ 30).

Dated: March 5, 2008

                                                         LYONS & FLOOD, LLP
                                                         Attorneys for Plaintiff
                                                         GLORY WEALTH SHIPPING SERVICE LTD.

By:                                

                                                         Edward P. Flood (EPF-5797)
                                                         Jon Werner (JW-5000)
                                                         65 West 36th Street, 7th Floor
                                                         New York, New York 10018
                                                         (212) 594-2400

TO:     NOURSE & BOWLES, LLP
            Attorneys for Defendant
            FIVE OCEAN CORPORATION LTD.
            One Exchange Plaza
            New York, NY 10006

            Attn:    Armand M. Paré, Jr., Esq.
                      jpare@nb-ny.com

U:\kmhldocs\2618009\Motions\MOL-OppVacate.doc

## <u>CERTIFICATE OF SERVICE</u>

Edward P. Flood, an attorney duly admitted to practice before this Honorable Court,

affirms on this 5th day of March 2008, I served true copies of the foregoing, by e-mail and ECF

notice to:

> NOURSE & BOWLES, LLP
> Attorneys for Defendant
> FIVE OCEAN CORPORATION LTD.
> One Exchange Plaza
> New York, NY 10006
>
> Attn.:  Armand M. Paré, Jr., Esq.
>      jpare@nb-ny.com

Edward P. Flood

U:\kmhldocs\2618009\Motions\MOL-OppVacate.doc