USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8 -4 -08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
GLORY WEALTH SHIPPING SERVICE LTD., :
                                      :
                      Plaintiff,      :
                                      :
      - against -                     :
                                      :
FIVE OCEAN CORPORATION LTD.,          :
                                      :
                      Defendant.      :
--------------------------------------X

08 Civ. 1102 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

On February 5, 2008, plaintiff Glory Wealth Shipping Service Ltd. ("Glory Wealth") applied ex parte for an order for process of a maritime attachment (the "Attachment") against defendant Five Ocean Corporation Ltd. ("Five Ocean") pursuant to Rule B ("Rule B") of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims ("Admiralty Rules"). See Rule B(1). The Court granted the order.

Five Ocean filed a general appearance, answer and counterclaim on February 28, 2008 (the "Answer"). Five Ocean now moves pursuant to Rule E ("Rule E") of the Admiralty Rules to: (1) bar Glory Wealth from serving any further attachments under the terms of the Attachment; (2) vacate, or in the alternative, reduce the Attachment, and/or have discovery with respect to Glory Wealth's refixing of the M/V TE HO (the "Vessel") on an abbreviated scale; and/or (3) require Glory Wealth to post countersecurity. See Rule E(4)(f), E(6), E(7). For the reasons stated below, Five Ocean's motion is DENIED in

1

part and GRANTED in part.

## I. **BACKGROUND**[1]

By a time charter dated January 8, 2008 (the "Time Charter"), Five Ocean chartered the Vessel from Glory Wealth, the Vessel's disponent owner,[2] for a period of time to run from January 11, 2008, until a minimum date of May 7, 2008, and a maximum date of June 6, 2008. Pursuant to the Time Charter, Five Ocean agreed to pay Glory Wealth $82,000 per day (the "Charter Party Rate"). Five Ocean paid Glory Wealth an initial hire payment of $1,840,900.94 (the "Initial Payment"), which included $1,230,000 for 15 days hire from January 11, 2008 to January 26, 2008 (the "Initial Period"), and $664,097 for the value of bunkers aboard the Vessel on delivery.

Five Ocean subcharted (the "Subcharter") the Vessel to a third party, Brave Bulk Transport Ltd. ("Brave Bulk"), for $85,000 per day for a single voyage to Iraq. Both the Time Charter and the Subcharter are subject to arbitration in London and governed by English law.

On January 11, 2008, Five Ocean notified the Vessel's

---

[1] The factual recitation set forth below is drawn from the Verified Complaint, dated Feb. 1, 2008 (the "Complaint"); the Declaration of Eric Choi, dated Feb. 28, 2008; the Affidavit of Armand M. Pare, Jr. in Support of Five Ocean's Motion for Countersecurity, Vacation and/or Reduction in Security, and Barring Further Attachments of Five Ocean's Property, dated Feb. 28, 2008 ("Pare Aff."); and the Declaration of Zhang Lei, dated Mar. 5, 2008 ("Lei Decl."). Except as quoted or otherwise cited, no other specific reference to these documents will be made.

[2] Glory Wealth chartered the Vessel (the "Head Charter") from Ta-Ho Maritime Corporation (the "Head Owner").

2

master (the "Master") that the voyage would be via the United States Gulf to Iraq.   Four days later, Brave Bulk issued voyage instructions (the "Voyage Instructions") to the Master, calling for the Vessel to be loaded at Houston, Texas and to proceed to a discharge port in Umm Qasr, Iraq (the "Iraq Voyage").   That same day, Glory Wealth notified Five Ocean that it would not permit the Iraq Voyage, and asked Five Ocean to arrange for an alternate voyage, claiming that the Iraq Voyage would be in violation of clause 31 of the Time Charter ("Clause 31"),[3] which prohibits trading to Iraq unless the cargo is "U.N. proved cargo," and prohibits the Vessel from being "ordered to [the] Arabian Gulf if general hostile actions exist or are seriously threatened as defined by the Lloyds of London."   (Lei Decl., at ¶ 6.)

Glory Wealth asserts that over the next twelve days it discussed the applicability of Clause 31 with the Head Owners and Five Ocean.   During that time, the Vessel continued to sail toward Houston and, on January 28, 2008, the Vessel arrived at Houston.

By fax dated February 1, 2008 (the "February Fax"), Five Ocean informed Glory Wealth that it "wrongly repudiated the [Time Charter]," it "had ample opportunity to reconsider [its] conduct but chose to maintain [its] wrongful repudiation," and

---

[3] Glory Wealth also claims that the Iraq Voyage is in violation of the Head Charter.

that Five Ocean would treat the "unlawful repudiation as terminating the [Time Charter] with immediate effect." (Fax dated February 1, 2008, attached as Ex. A to Lei Decl.) Five Ocean contends that the cargo was "U.N. proved" and that "Lloyds of London has not ... defined trading to [the Arabian Gulf]" as stated in Clause 31. (Reply Memorandum, dated March 6, 2008 ("Reply Mem."), at 2.) Glory Wealth, however, asserts that the Iraq Voyage violated Clause 31, thus, Five Ocean repudiated the Time Charter when it sent the February Fax.

## II. **DISCUSSION**

A. VACATUR

1. Legal Standard

In Aqua Stoli Shipping. v. Gardner Smith Pty, the Second Circuit articulated the "limited circumstances" under which a district court may exercise its equitable discretion to vacate a Rule B attachment. 460 F.3d 434, 445 (2d Cir. 2006). A district court may vacate a Rule B attachment if a defendant shows that: (1) "the defendant is subject to suit in a convenient adjacent jurisdiction;" (2) "the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located;" or (3) "the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." Id.

The Second Circuit also explained that a plaintiff has the burden to show that:

4

1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment.

Id. And, the burden is "on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E." Id. at 445 n.5.

The Second Circuit, however, did not define what constitutes a "valid prima facie admiralty claim." Id. And courts in this District have not always been consistent in their analysis in determining whether a plaintiff has stated a "valid prima facie admiralty claim." Id. Some courts have articulated a "reasonable grounds standard," which "involves review not only of the adequacy of the allegations in the complaint, but also of any evidence submitted by the parties" to determine whether reasonable grounds for a Rule B attachment exist. Wajilam Exps. (Singapore) v. ATL Shipping, 475 F. Supp. 2d 275, 279 (S.D.N.Y. 2006); see also Maersk, Inc. v. Neewra, Inc., 443 F. Supp. 2d 519, 527 (S.D.N.Y. 2006); Ullises Shipping Corp. v. FAL Shipping Co., 415 F. Supp. 2d 318, 322-23 (S.D.N.Y. 2006). These cases explain that to determine whether reasonable grounds for the Attachment exist, "Supplemental Rule E does not restrict review to the adequacy of the allegations in the complaint," and thus the court may also "consider any allegations or evidence offered in the parties' papers or at the

post-attachment hearing." Wajilam Exps., 475 F. Supp. 2d at 279 (citations and quotation marks omitted).

However, "[t]he majority of courts in this [D]istrict have understood Aqua Stoli to require the application of the prima facie standard when considering the adequacy of a claim in a maritime vacatur motion." Ronda Ship Mgmt. Inc. v. Doha Asian Games Organising Comm., 511 F. Supp. 2d 399, 403 (S.D.N.Y. 2007); see also OGI Oceangate Transp. Co. v. RP Logistics PVT., No. 06 Civ. 9441, 2007 WL 1834711, at *4 (S.D.N.Y. June 26, 2007) (noting that of "the courts in this district that have considered the issue, the majority have interpreted Aqua Stoli to require the application of the prima facie standard when considering the adequacy of the claim asserted in the context of a maritime attachment"). Under this view, "[t]he prima facie standard ... is a pleading requirement, not an evidentiary standard." Ronda, 511 F. Supp. at 403; see also Transportes Navieros y Terrestes v. Fairmount Heavy Transp., No. 07 Civ. 3076, 2007 WL 1989309, at *4 (S.D.N.Y. July 6, 2007) (stating that "maritime plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing"); Tideline, Inc. v. Eastrade Commodities, Inc., No. 06 Civ. 1979, 2006 U.S. Dist. LEXIS 95870, at *17 (S.D.N.Y. Aug. 15, 2006) (finding that "to show that it has a valid prima facie claim, a plaintiff seeking a maritime attachment need not provide any supporting evidence; its

6

complaint should suffice").

The prima facie standard appears to be more consistent with the Second Circuit's conception of the Rule B attachment process as a limited inquiry designed to "be obtained with a minimum of litigation." Aqua Stoli, 460 F.3d at 443.  In Aqua Stoli, the Second Circuit explained that

> a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district ... If the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment.

Id. at 438 (citing Rules B(2), E(3)).  In addition, the Second Circuit stated that "a fact-intensive inquiry" is "improper because Rule B specifies the sum total of what must be shown for a valid maritime attachment."  Aqua Stoli, 460 F.3d at 447; see also Ronda, 511 F. Supp. 2d at 404 (stating that "Aqua Stoli implies that a plaintiff need not provide evidence showing that it has a claim against the defendant to satisfy its burden under Rule E(4)(f)") (citing Tide Line, 2006 U.S. Dist LEXIS 95870, at *16).

    2.    Application

    a.    Prima Facie Admiralty Claim

Five Ocean argues that the Attachment should be vacated because Glory Wealth has not met its burden of proving that reasonable grounds exist for the Attachment.  The Court disagrees.

7

Regardless of whether the Court analyzes Glory Wealth's claim under the reasonable grounds standard, as asserted by Five Ocean, or the prima facie standard, as the majority of courts in this District follow, Glory Wealth has met its burden of stating a prima facie admiralty claim.  Under the reasonable grounds standard, Glory Wealth's burden "is not to prove by a preponderance of the evidence that it is entitled to relief, but merely to show reasonable grounds for an attachment," therefore, "the appropriate course is to allow discovery to go forward and give the parties an opportunity to prove their versions of the facts."  Wajilam Exps., 475 F. Supp. 2d at 281.  Glory Wealth asserts that it entered into the Time Charter with Five Ocean and that the Iraq Voyage was prohibited by Clause 31.  Glory Wealth further asserts, that upon learning of the Iraq Voyage, it informed Five Ocean that the Iraq Voyage was denied pursuant to Clause 31.  It is unclear from the record how Five Ocean responded to Glory Wealth with respect to the applicability of Clause 31, except that Five Ocean's February Fax stated that Glory Wealth repudiated the Time Charter and that Five Ocean was treating Glory Wealth's repudiation as a termination of the Time Charter.

Five Ocean offers no evidence to support its assertion, other than conclusory statements in its papers, that its cargo on the Iraq Voyage was "U.N. proved" and that the Iraq Voyage

was not otherwise in violation of Clause 31.  Therefore, after reviewing the Complaint and all the parties' submissions, it is reasonable for Glory Wealth to believe that the Iraq Voyage may have been prohibited by Clause 31, and that Five Ocean may have repudiated the Time Charter.  "[I]t would defeat the purpose of attachment ... to require at this stage that [Glory Wealth] prove that the facts in the complaint are true."  Id. at 279.  Thus, the Court is persuaded that reasonable grounds exist for the Attachment.  Accordingly, the Court finds that Glory Wealth has stated a prima facie admiralty claim under the reasonable grounds standard.

Glory Wealth has also satisfied its burden under the prima facie standard.  Glory Wealth filed the Complaint against Five Ocean asserting a claim under maritime law as the Complaint alleges that Five Ocean repudiated the Time Charter, a maritime contract.  In addition, the Complaint prays for an attachment and states that Five Ocean cannot be found in this District.  See Aqua Stoli, 460 F.3d at 438.

Because the Time Charter is subject to arbitration in London and governed by English law, whether Clause 31 prohibited the Iraq Voyage and whether Five Ocean repudiated the Time Charter are questions of contract law that are for the London arbitrators to decide, not for this Court.  See Rice Co. v. Express Sea Transport Corp., No. 07 Civ. 7077, 2007 WL 4142774, at *2 (S.D.N.Y. Nov. 15, 2007) (stating that

"[c]ourts in a maritime attachment action are not permitted to make substantive determinations on the plaintiff's underlying claim, since 'Rule B specifies the sum total of what must be shown for a valid maritime attachment.'") (quoting Aqua Stoli, 460 F.3d at 447); see also T & O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A., 415 F. Supp. 2d 310, 316 (S.D.N.Y. 2006) (finding that the "substantive legal question ... will be decided under English law in the arbitration and is not a question that this Court should or will resolve").  For the purposes of the Attachment, it is sufficient that Glory Wealth has met its burden of stating a prima facie admiralty claim against Five Ocean.   See Transportes Navieros, 2007 WL 1989309, at *4.  Accordingly, Five Ocean's motion with respect to vacating the Attachment on this basis is denied.

    b.   Sufficient Security

Five Ocean contends that, since Glory Wealth has already obtained sufficient security for any potential judgment, the Attachment should be vacated. Specifically, Five Ocean claims that Glory Wealth has greatly exaggerated its damage calculation at $6,097,148.10 (the "Damage Calculation"). According to Five Ocean's calculation of any potential damages Glory Wealth may incur, the Attachment should be reduced to $148,099.07.  Five Ocean also claims that, since Brave Bulk refueled the Vessel with approximately $150,000 worth of bunkers (the "Bunkers"), Glory Wealth has sufficient security

in the amount of the value of the Bunkers to cover any potential damage amount that it may assert against Five Ocean.

The Court is not persuaded. First, it is unclear on what basis Five Ocean claims that the Bunkers are sufficient security for potential claims Glory Wealth may have against Five Ocean since Brave Bulk, not Five Ocean, provided the Bunkers and Brave Bulk obtained an order for the arrest of the Bunkers in the Netherlands. (See Lei Decl., at ¶ 21.) Second, the Court disagrees with Five Ocean's assertion that the Attachment should be reduced to $148,099.07, as discussed further in Section II.B.2. Accordingly, Five Ocean's motion with respect to vacating the Attachment on the basis of sufficient security is denied.

B.    REDUCTION

   1.    Legal Standard

Rule E states, "[w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given." While a "plaintiff need not prove its damages with exactitude," the court must find that the plaintiff's damages estimate is "not frivolous." Dongbu Express Co. v. Navois Corp., 944 F. Supp. 235, 237 (S.D.N.Y. 1996). Courts have released funds where the plaintiff has failed to provide sufficient evidence to support its claim. See Daeshin Shipping Co. v. Meridian Bulk Carriers, Ltd., No. 05 Civ. 7173, 2005 WL 2446236, at *2 (S.D.N.Y. Oct. 3, 2005).

2.  Application

In the Complaint, Glory Wealth requested an order for process of maritime attachment against Five Ocean in the amount of the Damage Calculation ($6,097,148.10), which is derived from the following: (1) $468,316.15 as security for past due hire payments (the "Past Due Hire Payments") due and owing to Glory Wealth under the Time Charter; (2) $4,060,000 as security for the loss of the $37,000 per day in hire payments ("Hire Payments")[4] that Glory Wealth would have received had Five Ocean fulfilled its obligations under the Time Charter; (3) $1,018,832 as security to cover interest; and (4) $550,000 as security to cover any legal costs in connection with the London arbitration.

Five Ocean claims that the Attachment should be reduced because Glory Wealth greatly exaggerated its Damage Calculation.  Specifically, Five Ocean asserts that Glory Wealth: (1) failed to account for Five Ocean's Initial Payment in the amount of $1,840,900.94, and the value of the Bunkers in the amount of $150,000; (2) "double-dipped for the month of January 2008;" and (3) relied on an artificially low market value and an excessive daily damages rate in its Damage Calculation.  (Mem. of Law in Supp. of Order Seeking

---

[1] The Hire Payment is calculated by taking the daily Charter Party Rate ($82,000) and subtracting the daily current market rate of hire payment ($45,000) (the "Current Market Rate of Hire").

Countersecurity, Vacation or Reduction in Security Sought by Glory Wealth and/or Discover Respecting Same, and Order Barring Further Attachments by Glory Wealth dated Feb. 28, 2008, at 6.)

a.    Initial Payment and the Bunkers

Five Ocean claims that Glory Wealth's Damage Calculation should be reduced by amount of the Initial Payment and the value of the Bunkers.  Glory Wealth argues that the Initial Payment was for the Initial Period, which was not included in its Damage Calculation, and that Brave Bulk, not Five Ocean, provided the Bunkers.  The Court agrees with Glory Wealth.

The Complaint claims Past Due Hire Payments in the amount of $468,316.15, for the period from January 26, 2008 through February 1, 2008 (the "Claimed Period").  Both parties agree that the Initial Payment was for the Initial Period of January 11, 2008 through January 26, 2008.  Since the Initial Period is not part of Glory Wealth's Claimed Period, the Court sees no reason to reduce the Damage Calculation in the amount of the Initial Payment.  The Court also sees no reason to reduce the Damage Calculation in the amount of the value of the Bunkers.  The Bunkers were provided by Brave Bulk, not Five Ocean, and an order for the arrest of the Bunkers was obtained in the Netherlands.  Accordingly, Five Ocean's motion with respect to reducing the Attachment on this basis is denied.

b.    "Double-Dipping" for January 2008

Five Ocean claims that Glory Wealth's Damage Calculation included approximately six extra days in the calculation of its Past Due Hire Payments and several extra days in the calculation of its Hire Payments.  Five Ocean asserts that Glory Wealth "puts days of the 'voyage' in different categories to puff up its claim as high as possible." (Reply Mem., at 2.)  Specifically, Five Ocean states that Glory Wealth was first notified on January 11, 2008, not January 15, 2008, of the Iraq Voyage.  In addition, Five Ocean asserts that Glory Wealth "pretend[ed] it was proceeding ... to the U.S. Gulf for [Five Ocean] under its instructions throughout January" in order to claim that it was "performing the voyage for Five Ocean" so it could count those days in January 2008 at the Charter Party Rate rather than at a fraction of the Charter Party Rate based on the difference between the Charter Party Rate and the Current Market Rate of Hire.  (Id. at 2-3.) Further, Five Ocean claims that Glory Wealth sailed the Vessel to Houston in order to position the Vessel in a location where a grain vessel, such as the Vessel, has the highest possible charter market value.  (Id. at 3.)

With the information currently available to the Court, it cannot rule with certainty what the proper damage calculation is for the month of January 2008.  It is unclear what impact, if any, notification to Glory Wealth of the Iraq Voyage on January 11, 2008, as opposed to January 15, 2008, would have

14

on the Damage Calculation.  In addition, although Five Ocean
contends that Glory Wealth was "pretending" to proceed to the
United States Gulf, and was "positioning" the Vessel in a
location for the purpose of obtaining the highest possible
charter market value, the record indicates that Brave Bulk's
Voyage Instructions called for the Vessel to sail to Houston
and that is where the Vessel sailed.  It was not until the
February Fax that Five Ocean notified Glory Wealth that it
considered the Time Charter terminated. Thus, it is plausible
that, when the Vessel sailed to Houston, Glory Wealth was
performing its obligation under the Time Charter because that
is what it had contracted with Five Ocean to do, and not
because it was trying to increase any possible damages it may
have against Five Ocean.  For the purposes of the Attachment,
it is sufficient that Glory Wealth's Damage Calculation is not
frivolous.  Accordingly, Five Ocean's motion with respect to
reducing the Attachment on this basis is denied.

     c.   Low Market Value and Excessive Daily Damages

     Five Ocean claims that Glory Wealth's calculation of its
Hire Payments was excessive because it was based on a low
Current Rate of Hire.  In the Complaint, Glory Wealth
calculated its Hire Payments at $37,000 per day by taking the
Charter Party Rate ($82,000) per day and subtracting the
Current Market Rate of Hire ($45,000) per day.  Glory Wealth
asserts that the Current Market Rate of Hire was based on the

best offer Glory Wealth had received per day to fix the Vessel
at the time the Complaint was filed on February 1, 2008, the
same day Glory Wealth claims that Five Ocean repudiated the
Time Charter.  Subsequent to the filing of the Complaint, on
February 7, 2008, Glory Wealth fixed the Vessel at a hire rate
of $53,350 per day, with an $800,000 gross ballast bonus
("Actual Fix Rate").   The Court agrees that Glory Wealth's
actual damages may be less than the Damage Calculation in the
Complaint because the original calculation of the Hire
Payments was based on the Current Market Rate of Hire rather
than the Actual Fix Rate.  "Because pre-judgment attachments
are usually based upon reasonable estimates and not precise
facts, parties often attach amounts which are later deemed
excessive in light of changes in circumstance."  Dongbu, 944
F. Supp. at 237.   Therefore, "a reduction in security is
freely granted upon a showing that the attachment is
excessive."  Id. (citation and quotation marks omitted).
Thus, the Court is persuaded that the demand in the Attachment
in the amount of the Hire Payments ($4,060,000) should be
reduced.  The Hire Payments should be calculated by taking the
Charter Party Rate and subtracting the Actual Fix Rate for the
days that the Vessel was fixed at the Actual Fix Rate, and, if
there are any days that the Vessel was not fixed at the Actual
Fix Rate, the Hire Payments should be calculated by taking the

Charter Party Rate and subtracting the Current Market Rate.[5]
Accordingly, Five Ocean's motion with respect to reducing the
Attachment in the manner set forth in this section is granted.

### C.   LIMITED DISCOVERY

Five Ocean argues that, if the Court does not vacate or
reduce the Attachment, it should be allowed discovery for the
limited purpose of determining the amount for which Glory
Wealth fixed the Vessel post-repudiation of the Time Charter.
Because the Court has granted Five Ocean's request to reduce
the Attachment to the extent set forth in the proceeding
section, and because Glory Wealth has submitted documentation
on this issue as discussed above, Five Ocean's motion is
denied as moot in so far as it seeks to compel discovery on
this limited issue.   Accordingly, Five Ocean's motion with
respect to limited discovery is denied.   D. COUNTERSECURITY

### 1.   Legal Standard

Rule E(7)(a) states, in relevant part,

> When a person who has given security for damages in the
> original action asserts a counterclaim that arises from
> the transaction or occurrence that is the subject of the
> original action, a plaintiff for whose benefit the
> security has been given must give security for damages
> demanded in the counterclaim unless the court for cause
> shown, directs otherwise ....

"Although this Rule initially appears to make the posting

---

[5] Although the parties disagree as to how many days Hire Payments may be
due to Glory Wealth, that is not an issue to be decided by this Court.
Therefore, the parties are instructed to calculate the Hire Payments
based on the number of days Glory Wealth used to calculate the Hire
Payments in its original Damage Calculation in the Complaint.

of countersecurity mandatory whenever its conditions are satisfied, the final clause of the quoted language makes clear that the trial court possesses broad discretion in deciding whether to order countersecurity under such conditions." Result Shipping Co. v. Ferruzzi Trading, 56 F.3d 394, 399 (2d Cir. 1995) (citations omitted).    "In exercising its discretion," a court should be guided by two principles: (1) countersecurity is intended "to place the parties on an equality as regards security," and (2) countersecurity is not intended "to impose burdensome costs on a plaintiff that might prevent it from bringing suit."  Id. at 399-400 (citations and quotation marks omitted).

"'Inherent in the district court's discretion in deciding whether to order countersecurity is discretion to determine the amount of the countersecurity' ... A district court's exercise of discretion 'will be governed by its sense of fairness and equality.'"    Fednav Intern. v. Sunwoo Merchant Marine Co., No. 07 Civ. 3886, 2007 WL 3051669, at *1 (S.D.N.Y. Oct. 18, 2007) (quoting Clipper Shipping Lines v. Global Transporte Oceanico, No. 06 Civ. 15299, 2007 WL 646329, at *1 (S.D.N.Y. Feb. 26, 2007).

"[C]ountersecurity will not be awarded for counterclaims that are blatantly without merit; this rule is a corollary of the proposition that courts should exercise their discretion so as to avoid imposing unnecessary and burdensome obstacles

18

to plaintiffs' seeking security for maritime claims." <u>Voyager</u>
<u>Shipholding Corp. v. Hanjin Shipping Co.</u>, 539 F. Supp. 2d 688,
691 (S.D.N.Y. 2008) (citations omitted). However, "courts
should be reluctant to prejudge the merits of claims based
essentially on the pleadings and a sparse record consisting of
a few documents, in advance of any discovery. This is
particularly so when the ultimate merits will be decided not
by this Court, but by an arbitration panel in another
country." <u>Finecom Shipping v. Multi Trade Enters.</u>, No. 05
Civ. 6695, 2005 WL 2838611, at *1 (S.D.N.Y. Oct. 25, 2005).

    2.  Application

    In the Answer, Five Ocean asserts counterclaims in the
amount of $7,486,156.70 (the "Counterclaim Damage
Calculation"), which is derived from the following: (1) the
Initial Payment; (2) $270,000 in lost profits ("Lost Profits")
based on Five Ocean's losing $3,000 per day under the
Subcharter for a period of approximately 90 days; (3)
3,349,283.75 in damages claimed by Brave Bulk under the
Subcharter (the "Indemnity Claim"); and (4) $1,385,972.01 as
security to cover interest (interest calculated based on the
same interest rate that Glory Wealth used in the Complaint)
(the "Interest Claim"); and (5) $550,000 as security to cover
any legal costs in connection with the London arbitration
(same as Glory Wealth claimed in the Complaint) (the "Legal
Costs Claim").

Glory Wealth argues that Five Ocean's Counterclaim Damage Calculation should be reduced because: (1) Five Ocean repudiated the Time Charter, so that it is not entitled to the Initial Payment and the Lost Profits; (2) Five Ocean is not entitle to security for the Indemnity Claim because that claim is not ripe; and (3) the Interest Claim and the Legal Costs Claim should be reduced because the principal amount of Five Ocean's Counterclaim Damage Calculation is inflated. In the alternative, Glory Wealth requests that it be required to post security in the same amount that it has succeeded in attaching Five Wealth's assets, and that the security amount be posted in the form of a letter of undertaking or a security bond, rather than cash security.

As to Glory Wealth's assertion that the Counterclaim Damage Calculation should be reduced by the Initial Payment, the Lost Profits, the Interest Claim, and the Legal Cost Claim, the Court disagrees. The determinations of whether the Iraq Voyage violated Clause 31, or which party repudiated the Time Charter, are not issues for this Court to decide. For the purpose of granting countersecurity, it is sufficient that the Court finds that Five Ocean's claims are not "blatantly without merit." Voyager, 539 F. Supp. 2d at 691; see also Finecom, 2005 WL 2838611, at *2. Therefore, the Court finds that Glory Wealth's request to reduce the amount of the Counterclaim Damage Calculation with respect to the Initial

Payment, the Lost Profits, the Interest Claim, and the Legal Cost Claim is denied.

As to Glory Wealth's assertion that the Counterclaim Damage Calculation should be reduced by the Contingency Claim, the Court agrees.  Five Ocean argues that, since Brave Bulk filed a complaint on February 1, 2008, and a Rule B attachment on behalf of Brave Bulk issued on February 4, 2008 against Five Ocean in this District concerning the same transaction at issue in this action, (see Brave Bulk Transp.. v. Five Ocean Corp., 08 Civ. 1077, Docket Nos. 1 and 3), Five Ocean is unfairly being "'attached' from both ends" because of [Glory Wealth's] breach."  (Reply, at 6.)  However, the Court notes, that subsequent to Five Ocean's filing of the Reply, Brave Bulk filed a Notice of Voluntary Dismissal on February 11, 2008, dismissing that action against Five Ocean with prejudice, and releasing any funds of Five Ocean that may have been attached in this District.   (See Brave Bulk, 08 Civ. 1077, Docket No. 13.)

"In general, courts in this circuit have not been receptive to contingent indemnity claims as bases for maritime arrests for attachments," Sonito Shipping Co. v. Sun United Maritime, 478 F. Supp. 2d 532, 540 (S.D.N.Y. 2007).  Five Ocean has offered no compelling reason why this Court should do so in this case.  Therefore, the Court finds that Glory Wealth's request to reduce the amount of the Counterclaim

Damage Calculation with respect to the Indemnity Claim is granted. Accordingly, Five Ocean's request for countersecurity should be reduced by the amount of the Indemnity Claim, and any portion of the Interest Claim that was calculated based on the amount of the Indemnity Claim.

The Court finds that granting Five Ocean's request for countersecurity is in keeping with the principles of Rule E(7)(a). Placing the parties in a position of equality, and avoiding the imposition of burdensome costs on Glory Wealth seems best served by ordering Glory Wealth to provide (1) security in the same form as stated in the Attachment,[6] and in the same amount, $1,130,926.17, as Glory Wealth has succeeded in attaching Five Ocean's assets to date; and (2) additional security matching any additional property Glory Wealth is able to restrain in the future, up to a maximum of the Counterclaim Damage Calculation less the Indemnity Claim and any interest calculated on the Indemnity Claim. Accordingly, Five Ocean's motion with respect to countersecurity is granted.

E. FUTURE ATTACHMENTS

Five Ocean argues that, since it filed a general appearance and answer, Glory Wealth should be barred from obtaining future attachment of Five Ocean's property. The Court disagrees.

---

[6] The Attachment states that it "shall issue against all tangible and intangible property of [Five Ocean]." (Attachment, at 1.)

"[A] district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E." Aqua Stoli, 460 at 445; see also Fed. R. Civ. P. Supp. R. E(4)(f). Under Rule B, a plaintiff has the burden of proving that "a defendant is not found within the district." Fed. R. Civ. P. Supp. R. B(1)(a). Although Rule B does not define "found within the district," the Second Circuit has interpreted it to require "a two-pronged inquiry: first, whether [the Defendant] can be found within the district in terms of jurisdiction, and second, if so, whether it can be found for service of process." Seawind Compania, S.A. v. Crescent Line, Inc. 320 F. 2d 580, 582 (2d Cir. 1963) (citations and quotation marks omitted). Whether a defendant is found within the district is to be determined as of the date the complaint is filed. See Rule B advisory committee's notes ("The time for determining whether a defendant is 'found' in the district is set at the time of filing the verified complaint that prays for attachment and the affidavit required by Rule B(1)(b)."); see also Parkroad Corp. v. China Worldwide Shipping Co. Ltd., No. 05 Civ. 5085, 2005 WL 1354034, at *1 (S.D.N.Y. June 6, 2005) (citations omitted).

Here, Glory Wealth met its burden of showing that, at the time the Complaint was filed, it satisfied the requirements of Rules B and E, therefore, a subsequent filing of a general

appearance by Five Ocean should not defeat the effect of the Attachment.    See HBC Hamburg Bulk Carriers GmbH & Co. v. Proteinas y Oleicos, No. 04 Civ. 6884, 2005 WL 1036127, at *5 (S.D.N.Y. May 4, 2005); Parkroad Corp. v. China Worldwide Shipping Co. Ltd., 2005 WL 1354034, at *2; (but see Pioneer Trading (Asia Pacific) v. Seyang Shipping, 04 Civ. 5655, Transcript of Oral Argument dated Aug. 9, 2004, attached as Ex. 6 to Pare Aff., at 53:24-54:19) (finding that a general appearance barred future attachments)).    Accordingly, Five Ocean's motion with respect to barring future attachments is denied.

### III. ORDER

**ORDERED** that the motion (Docket No. 8) of defendant Five Ocean Corporation Ltd. ("Five Ocean") to bar plaintiff Glory Wealth Shipping Service Ltd. ("Glory Wealth") from serving any further attachments under the terms of the Order of Attachment, dated February 5, 2008 (the "Attachment"); vacate, or in the alternative, reduce the Attachment, and/or have discovery with respect to Glory Wealth's refixing of the M/V TE HO on an abbreviated scale; and/or require Glory Wealth to post countersecurity herein is DENIED in part and GRANTED in part; and it is further

24

**ORDERED** that Five Ocean's request for countersecurity is GRANTED to the extent that Glory Wealth is ordered to post security within ten (10) days of the date of this Decision and Order (the "Order") in the amount of $1,130,926.17, to be supplemented if and when Glory Wealth restrains additional funds belonging to Five Ocean, up to an amount to be determined by this Court; and it is further

**ORDERED** that Five Ocean's alternative request that the Attachment be reduced is GRANTED to the extent set forth in the decision above.

Glory Wealth is directed to submit its calculation in accordance with the Order regarding the reduction of the Attachment and a proposed Amended Order for Process Of Maritime Attachment and Garnishment within seven (7) days of the filing of the Order. Five Ocean may respond within five (5) days of the filing of Glory Wealth's response to the Order should it disagree with Glory Wealth's calculation.

Five Ocean is directed to submit its calculation in accordance with the Order regarding its request for countersecurity within seven (7) days of the filing of the Order. Glory Wealth may respond within five (5) days of the filing of Five Ocean's response to the Order should it disagree with Five Ocean's calculation.

**SO ORDERED.**

Dated:      New York, New York
            1 August 2008

VICTOR MARRERO
U.S.D.J.